UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| ETEROS TECHNOLOGIES USA, INC.; and AARON MCKELLAR, a citizen of Canada,<br><br>      Plaintiffs,<br><br>      *v.*<br><br>UNITED STATES OF AMERICA;<br><br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY, a department of the U.S. Government;<br><br>UNITED STATES CUSTOMS AND BORDER PROTECTION, an agency of the U.S. Department of Homeland Security;<br><br>HARMIT S. GILL, in his Official Capacity as the Area Port Director of United States Customs and Border Protection for Blaine, Washington.<br><br>      Defendants. | CASE No. 25-181<br><br>**DECLARATION OF PLAINTIFF AARON MCKELLAR** |

DECLARATION OF PLAINTIFF
AARON MCKELLAR
[CASE NO. 2:25-cv-00181-KKE] - 1

NEVILLE PETERSON LLP
701 FIFTH AVE., STE. 4200-2159
SEATTLE, WA 98104-4089
(206) 905-3648

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

<u>**DECLARATION OF PLAINTIFF AARON MCKELLAR**</u>

I, Aaron McKellar, hereby declare under penalty of perjury under the laws of the United States of America, and pursuant to 28 U.S.C. § 1746, that the following statements are true and correct to the best of my knowledge and belief:

1.    My name is Aaron McKellar. I am a Canadian citizen residing in British Columbia, Canada. I am the founder and Chief Executive Officer of Eteros Technologies Inc. ("Eteros Canada"), headquartered in Surrey, British Columbia, and I hold the same title with Eteros Technologies USA, Inc. ("Eteros USA"), which is Eteros Canada's U.S. affiliate. Eteros USA is headquartered in Las Vegas, Nevada. I am a plaintiff in this action. I make this declaration in support of Plaintiffs' opposition to Defendants' motion to dismiss in this case.

2.    <u>Eteros' Business and Lawful Operations</u>: Eteros designs and manufactures specialized agricultural and post-harvest processing equipment. Eteros's machines are general-purpose industrial agricultural machines used for harvesting and processing a variety of crops. This includes use in federally legal and state-authorized legal cannabis operations, as well as other crops. Importantly, neither Eteros Canada nor Eteros USA engages in any "plant-touching" activities with respect to federally illegal marijuana. In other words, we are not growers, manufacturers, processors, sellers, or handlers of marijuana, and we do not cultivate, produce, harvest, or distribute any controlled substances. Our company's role is strictly limited to the design, manufacturing, importation, and sale of equipment that farmers and processors (our customers) use in their own operations.

3.    <u>No Trafficking of Controlled Substances</u>: In my capacity as CEO, I have personal knowledge that Eteros personnel, including myself and Ms. Amanda James, Eteros's Director of

DECLARATION OF PLAINTIFF
AARON MCKELLAR
[CASE NO. 2:25-cv-00181-KKE] - 2

NEVILLE PETERSON LLP
701 FIFTH AVE., STE. 4200-2159
SEATTLE, WA 98104-4089
(206) 905-3648

Strategy and Business Development, are not involved in the trafficking of controlled substances, or aiding and abetting same, in any way.

4.   <u>No Knowledge of THC Content or Specific End Use</u>: Eteros's equipment can be used with various crops, including cannabis, and we have no knowledge of the specific THC content or end use of any crop that our customers process using our machines. Just as a tractor manufacturer would not know the details of a farmer's crop potency, Eteros does not test or inquire into whether a customer's harvested plant material is classified as "hemp" (which by law contains less than 0.3% THC) or "marijuana" (above 0.3% THC). We do not conduct or commission laboratory testing of our customers' crops, and it would be impossible for us to know or control the cannabinoid content of plants that our equipment might process. In sum, Eteros is not a cannabis company in the sense of producing or dealing in cannabis itself; rather, it is an agricultural equipment design and manufacturing company. We stand in the same position as other agricultural equipment providers (e.g., makers of tractors, irrigation systems, or general farm machinery) – our business is to supply tools, not to manage what specific plants are cultivated or processed by those tools.

5.   <u>Legality of Eteros's Operations (21 U.S.C. § 863(f)(1))</u>: All of Eteros's operations and business activities are entirely lawful under United States federal law and applicable state laws. I am aware that federal law, through the Mail Order Drug Paraphernalia Control Act (21 U.S.C. § 863), generally prohibits the importation and distribution of drug paraphernalia. However, there is a critical statutory exception in 21 U.S.C. § 863(f)(1) which provides that the prohibition "shall not apply to … any person authorized by local, State, or Federal law to manufacture, possess, or distribute such items." Eteros falls squarely within this exception. Our

DECLARATION OF PLAINTIFF
AARON MCKELLAR
[CASE NO. 2:25-cv-00181-KKE] - 3

NEVILLE PETERSON LLP
701 FIFTH AVE., STE. 4200-2159
SEATTLE, WA 98104-4089
(206) 905-3648

equipment is authorized by state law in states where cannabis has been legalized to be manufactured, imported, and used for lawful purposes. In fact, Eteros's importation and sale of cannabis-related processing equipment has been examined by a federal court of national jurisdiction, and it was judicially determined that our activities are lawful and exempt under § 863(f)(1). Specifically, in *Eteros Technologies USA Inc. v. United States*, 592 F. Supp. 3d 1313 (Ct. Int'l Trade 2022), the United States Court of International Trade ("CIT") held that Eteros is a "**person authorized** by State law" to import cannabis-related equipment, and therefore the federal paraphernalia prohibition does not apply to our products. A true and correct copy of the CIT's decision in *Eteros Technologies USA Inc. v. United States* is attached hereto as Exhibit A. The CIT unequivocally confirmed that Eteros's business and import operations are entirely legitimate and lawful under federal law, and that nothing about Eteros's activities is "illicit" in any way. The government did not appeal that decision. Following this decision, U.S. Customs and Border Protection ("CBP")—a defendant in this action—itself acknowledged the legality of importing such cannabis-related equipment. In March 2024, CBP's Headquarters issued Ruling HQ H327540, which provided guidance that cannabis-related merchandise imported into U.S. states where cannabis is legal falls under the § 863(f)(1) exemption, and thus such imports are not prohibited contraband, but rather, exempt from federal prohibition. In short, both a federal court and CBP itself has recognized that Eteros's products are lawful and permitted to enter U.S. commerce for further distribution to *inter alia* cannabis growers and processors.

6.    <u>Cannabis Legalization in U.S. States and Industry Practices</u>: I would like to emphasize the broader context of Eteros's business. As of this date, a substantial number of U.S. states (a majority of states) have laws that legalize cannabis for medical or adult recreational use

DECLARATION OF PLAINTIFF
AARON MCKELLAR
[CASE NO. 2:25-cv-00181-KKE] - 4

NEVILLE PETERSON LLP
701 FIFTH AVE., STE. 4200-2159
SEATTLE, WA 98104-4089
(206) 905-3648

under state-regulated programs. In these jurisdictions, state-licensed operators grow, harvest, and process cannabis legally under state law. Based on my industry experience, all such legal operators depend on a robust supply chain for specialized agricultural equipment, and this supply chain is international in nature. Many advanced harvesting and processing machines (like those Eteros produces) are designed and built by companies in Canada or other countries, because the legal cannabis agriculture sector is a global industry. Thus, licensed cannabis businesses in the U.S. routinely import processing machinery and other equipment from foreign companies like Eteros to conduct their operations. Federal and state legal cannabis businesses they rely on lawful commerce in equipment across borders. Eteros, as a Canadian-founded company with U.S. operations, is one of many legitimate businesses serving the legal agricultural needs of these regulated markets. Our compliance with 21 U.S.C. § 863(f)(1) is precisely what allows such interstate and international commerce in cannabis equipment to occur *lawfully*, as confirmed by the CIT, even while marijuana remains a controlled substance under federal law in other contexts. In summary, cannabis is legal in many U.S. states, and the state-legal industry in those states depends on companies like ours for equipment and technology. By operating in full compliance with state laws and the cited federal exemption, Eteros contributes equipment to an above-board supply chain that supports regulated industries without violating any law.

7.      Eteros's Multinational Footprint and U.S. Presence: Eteros is a multinational company with substantial operations in both Canada and the United States. Eteros Canada currently employs approximately 50 employees (all Canadian nationals) in its British Columbia and Ontario facilities. These employees include engineers, manufacturing technicians, support staff, and managers who design and build our equipment. Eteros USA, our U.S. affiliate, maintains

DECLARATION OF PLAINTIFF
AARON MCKELLAR
[CASE NO. 2:25-cv-00181-KKE] - 5

NEVILLE PETERSON LLP
701 FIFTH AVE., STE. 4200-2159
SEATTLE, WA 98104-4089
(206) 905-3648

a significant presence as well – we have a U.S. workforce of 11 full-time employees based in the United States. Our U.S. team is composed of sales, marketing and customer support personnel, logistics and warehouse staff, and other professionals who manage U.S. operations out of our Las Vegas, NV facility. Eteros USA is a lawfully organized Nevada corporation and operates fully above board in all respects. We pay U.S. federal, state, and local taxes as required, and we comply with all applicable U.S. laws and regulations in our business. The company's structure is a common and lawful arrangement for cross-border businesses. I made a point of explaining this during my interactions with U.S. officials: Eteros USA is an American company that, employs U.S. citizens and residents, and contributes to the U.S. economy. There are no criminal charges or allegations against Eteros in either the U.S. or Canada; to my knowledge, no government authority has ever accused the company itself of any wrongdoing. Our entire business model is predicated on serving lawful enterprises in a lawful manner.

8.    <u>CBP Incident on October 4, 2024 – Background</u>: On October 4, 2024, I traveled from Canada to the United States, seeking to enter at the Port of Entry in Blaine, Washington. My purpose on that date was purely personal: I planned to do some leisure shopping in Bellingham, Washington (specifically, to visit a grocery store, Trader Joe's). I was not traveling for work at that time. Although I hold a valid and unrevoked L-1A intracompany transferee work visa petition valid until April 30, 2026 (see Exhibit B, copies of my L-1A approval notices), I was not seeking to enter under that work authorization for this trip. I approached the border as a Canadian visitor for pleasure, using my NEXUS trusted traveler card at primary inspection. I answered the primary CBP officer's routine questions and presented my identification. The officer directed me to park and report to secondary inspection for further questioning.

DECLARATION OF PLAINTIFF
AARON MCKELLAR
[CASE NO. 2:25-cv-00181-KKE] - 6

NEVILLE PETERSON LLP
701 FIFTH AVE., STE. 4200-2159
SEATTLE, WA 98104-4089
(206) 905-3648

9.    <u>Secondary Inspection and Questioning by CBP</u>: In secondary inspection, I was questioned at length by CBP officers, particularly an Officer McMillen (as I recall his name). Immediately, three officers, led by McMillen began questioning me, honing in on Eteros's involvement in the cannabis industry. The officers were not concerned with my stated reason for travel (they did not ask further about my shopping trip). Instead, they began aggressively interrogating me about Eteros's business activities, suggesting that our company was somehow involved in illicit drug operations. Officer McMillen repeatedly implied or asserted that Eteros's equipment business "facilitates the proliferation of the marijuana industry" in the U.S., and thus that Eteros (and by extension I, as its CEO) was engaged in drug trafficking. He asked me pointed questions along the lines of: "Isn't it true that your company manufactures equipment used to process marijuana?" and "So you admit your machines are helping produce a Schedule I controlled substance, correct?" At one point, an Officer even stated that our customer should buy from American company, to which I responded that we are an American company, and to which he replied, "They should buy from American citizens."

10.    <u>My Responses – Emphasizing Lawful Equipment Only</u>: I answered the officers' questions truthfully and to the best of my ability. I clarified repeatedly that Eteros manufactures lawful agricultural equipment, and that our machines are used for legal purposes, including in jurisdictions where cannabis is permitted by law. I stressed that neither I nor anyone at Eteros is involved in the cultivation or sale of marijuana. I attempted to explain the distinction between selling equipment and trafficking in drugs. In particular, I recall informing the officers that Eteros's activities had already been reviewed in a federal court case and found to be legal (referring to the CIT decision mentioned above). I also mentioned that Eteros USA is an American company with

DECLARATION OF PLAINTIFF
AARON MCKELLAR
[CASE NO. 2:25-cv-00181-KKE] - 7

NEVILLE PETERSON LLP
701 FIFTH AVE., STE. 4200-2159
SEATTLE, WA 98104-4089
(206) 905-3648

American employees and that we pay taxes and comply with U.S. laws. My goal was to dispel any notion that we were doing anything illicit. Despite my explanations, the CBP officers were dismissive of my responses claiming the CIT case and federal exemption applied only to merchandise, not people. Officer McMillen and others appeared fixated on the idea that because our equipment *could be* used in the cannabis industry, Eteros must be complicit in illegal drug production. They suggested that our Canadian ownership made us suspect and even insinuated that this allowed them to treat Eteros personnel as traffickers. It became clear that the officers had already made up their minds about our business before I even had a chance to fully explain.

11.    CBP's Allegation and My Attempt to Withdraw Application: The secondary inspection escalated when the officers decided to take a formal sworn statement from me. Realizing that my answers were not persuading them and sensing that anything I said was being twisted to fit their narrative, I politely requested permission to withdraw my application for admission and return to Canada, which is a common remedy for someone who fears they may be found inadmissible. I made this request to avoid a mischaracterization of my statements and the drastic outcome of a removal order. However, CBP denied my request to withdraw. The officers insisted on proceeding with the sworn statement. They presented me with a written transcript of questions and answers (the limited answers I had given) and asked me to sign. I declined to sign the transcript because it did not accurately reflect the situation, and I did not want to concede to their characterizations. At the conclusion of this process, on October 4, 2024, CBP officers informed me that they found me inadmissible to the United States. They stated that I was being expeditiously removed and banned from reentry for five years. They served on me an Expedited Removal Order (Form I-860). The paperwork cited INA § 212(a)(7)(A)(i)(I)—which pertains to

DECLARATION OF PLAINTIFF
AARON MCKELLAR
[CASE NO. 2:25-cv-00181-KKE] - 8

NEVILLE PETERSON LLP
701 FIFTH AVE., STE. 4200-2159
SEATTLE, WA 98104-4089
(206) 905-3648

an immigrant not in possession of a valid entry document—as the legal ground for my removal. A true and correct copy of the Expedited Removal Order issued to me is attached as Exhibit C (this document was also filed in the record at ECF No. 1-2).

12.    CBP's Stated Basis for Removal: I was taken aback that CBP chose to remove me under § 212(a)(7)(A)(i)(I) (essentially claiming I lacked proper documents), given that I had not attempted to enter as an immigrant or without documentation. I entered as a visitor, and I had presented my NEXUS card and had a valid passport and had a valid L-1A visa petition in my back pocket if needed. It was apparent to me that the real issue in the officers' minds was the allegation of involvement in cannabis. In fact, during the process, one of the CBP officers explicitly accused me of "knowingly and intentionally contributing to the proliferation of the marijuana industry in the United States." This accusation was read into the record or noted by the officers even though I had provided no new information in the sworn statement. In substance, CBP was treating me as inadmissible under INA § 212(a)(2)(C)(i) (the controlled substance trafficker provision), which bars any alien whom there is reason to believe is or has assisted drug trafficking. However, CBP did not formally charge me under § 212(a)(2)(C), which would have required further proceedings. Instead, they invoked the expedited removal process under § 212(a)(7) (documentation ground). This meant I was removed without hearing, and I was immediately subjected to the mandatory five-year ban from reentry that accompanies an expedited removal. I want to be clear: at no time did CBP find or accuse me of being involved with any specific illicit substances in hand (no drugs were found on me or in my vehicle – there were none to find), and their entire concern was based on a mistaken legal conclusion that providing legal machinery to state-regulated cannabis producers equates to illicit drug trafficking.

DECLARATION OF PLAINTIFF
AARON MCKELLAR
[CASE NO. 2:25-cv-00181-KKE] - 9

NEVILLE PETERSON LLP
701 FIFTH AVE., STE. 4200-2159
SEATTLE, WA 98104-4089
(206) 905-3648

13.    <u>Aftermath of Removal – Personal and Professional Impact:</u> As a result of the October 4, 2024 incident, I was summarily returned to Canada with a forbidden entry status. CBP officers also confiscated and revoked my NEXUS trusted traveler card on the spot and made it clear to me that if I attempted to reenter, I would be arrested. The expedited removal order and the attached five-year entry bar have had serious consequences for me and for Eteros. Immediately, I was (and remain) unable to travel to the United States in any capacity – whether for business or personal reasons. This is a severe impediment to my role as CEO of a company with U.S. operations. It has prevented me from being physically present at our Las Vegas facility or anywhere in the U.S. to oversee Eteros USA's activities, meet with our U.S. employees, clients, and partners, or conduct any in-person business. More importantly, it has forced me to change any plans to expand our operations in the United States, which had included setting up new manufacturing operations and hiring a number of new US personnel. On a personal level, I was and am deeply distressed by being branded with an expedited removal. I own a residence in Las Vegas, Nevada (for when I stay in the U.S. to work or visit) that I can no longer access, causing financial and emotional strain. Perhaps most pointedly, I have been labeled – at least in government records – as a person tied to drug trafficking, which is an allegation utterly contrary to my lifelong record of obeying the law. The stigma and potential legal consequences of this label (including the threat that if I even attempt to re-enter within five years I could be prosecuted) have caused me great harm and I worry about the impact on my reputation and on my family and colleagues who know about these events.

14.    <u>CBP Reconsideration Request:</u> Shortly after the expedited removal, through immigration counsel, I filed a Motion to Reconsider and Vacate the Expedited Removal Order

DECLARATION OF PLAINTIFF
AARON MCKELLAR
[CASE NO. 2:25-cv-00181-KKE] - 10

NEVILLE PETERSON LLP
701 FIFTH AVE., STE. 4200-2159
SEATTLE, WA 98104-4089
(206) 905-3648

with CBP. This motion, dated October 16, 2024, was submitted to the Area Port Director of Blaine (Director Harmit Gill), and it detailed the factual and legal errors in my case, and explained how the CIT already determined Eteros—and by extension, myself—are properly considered "any person authorized," under 21 U.S.C. § 863(f)(1) and therefore the conduct CBP cites is not "illicit" in any way, but rather, entirely lawful. In essence, we urged CBP to reopen my case, vacate the removal, and allow me to resume travel for lawful business purposes, pointing out that CBP had exceeded its authority by using expedited removal for an issue (suspected § 212(a)(2)(C) trafficking) that I understand should have been addressed by a proper hearing, if at all. We attached supporting documentation, including evidence of Eteros's lawful operations (such as the CIT decision and other legal analysis demonstrating compliance with 21 U.S.C. § 863(f)(1)). A true copy of that motion (without exhibits) was included in the Complaint as Exhibit B (ECF 1-2).

15.    <u>Defendant CBP Port Director Gill Denies Reconsideration Motion</u>: On November 12, 2024, I received a written decision from CBP's Area Port Director denying my motion for reconsideration. The denial letter (signed by Director Gill) is attached hereto as Exhibit D. In that letter, CBP refused to vacate the removal order. The decision did not substantively engage with the points we raised. It simply asserted that CBP had "acted within its discretion" and maintained that I had insufficient documentation, which was perplexing given the circumstances. The denial reiterated the result of the removal without addressing our arguments about the officers' procedural violations (such as not permitting withdrawal or misusing the expedited removal when their real concern was § 212(a)(2)(C)). Notably, the denial letter failed to acknowledge the legal precedent we cited, including the CIT ruling and the § 863(f)(1) exemption that should apply to Eteros's

DECLARATION OF PLAINTIFF
AARON MCKELLAR
[CASE NO. 2:25-cv-00181-KKE] - 11

NEVILLE PETERSON LLP
701 FIFTH AVE., STE. 4200-2159
SEATTLE, WA 98104-4089
(206) 905-3648

equipment. It offered no response to our evidence that Eteros's imports are lawful. Effectively, CBP shut the door on any administrative remedy, leaving the five-year ban in place.

16.    <u>Vacatur of Prior Removal</u>: U.S. Customs and Border Protection ("CBP") issued a letter to my counsel on April 21, 2025, vacating the expedited removal order that had been entered against me on October 4, 2024. This letter formally removed the five-year ban that had barred me from entering the United States because of the October 4, 2024 removal. I understood this development to mean that the prior removal order was nullified and that I would no longer be considered inadmissible on the basis of that order.

17.    <u>Appearance at Vancouver Preclearance (April 29, 2025)</u>: In light of the vacatur of the expedited removal, and pursuant to my L-1A visa, I made plans to travel to the United States to resume my normal business activities. On April 29, 2025, I presented myself for U.S. preclearance at Vancouver International Airport in Canada, seeking to board a flight to Las Vegas, Nevada, in order to visit Eteros USA's headquarters and meet with my colleagues there. I carried with me additional materials disclosing my recent immigration and litigation history. I proactively provided this packet of documents to the CBP officers during primary inspection so that they would be fully informed of my situation.

18.    <u>Secondary Inspection and Questioning</u>: Despite my transparency and the documentation I provided, CBP officers directed me to secondary inspection once again. In secondary, the officers subjected me to renewed questioning similar in tone and focus to what I experienced during the October 4, 2024 encounter. The officers' questions centered almost entirely on Eteros's business and its involvement in the cannabis industry. They asked about the nature of Eteros's products and implied connections to illicit trafficking, even though I had furnished

DECLARATION OF PLAINTIFF
AARON MCKELLAR
[CASE NO. 2:25-cv-00181-KKE] - 12

NEVILLE PETERSON LLP
701 FIFTH AVE., STE. 4200-2159
SEATTLE, WA 98104-4089
(206) 905-3648

1  evidence of our company's prior legal victories confirming the lawfulness of our cannabis-related

2  equipment. I answered all questions truthfully and pointed to the materials I had provided

3      19.    CBP's Inadmissibility Determination: After reviewing my case and conducting this

4  secondary interview, the CBP officers informed me that they found me inadmissible to the United

5  States under the controlled substance trafficking provision of the immigration laws. Specifically,

6  the officers stated that, notwithstanding the vacatur of the prior order, they continued to have

7  "reason to believe" that I am or have been involved in illicit drug trafficking (due to my role in

8  Eteros's business), rendering me inadmissible under INA § 212(a)(2)(C). In other words, CBP

9  refused my admission on the exact same grounds that had been cited previously, effectively

10  treating the vacatur letter and supporting documentation as insufficient to alleviate their suspicions.

11      20.    Withdrawal of Application for Admission: Unlike the October 4, 2024 encounter,

12  however, the CBP officers apparently could not have issued a new expedited removal order against

13  me on April 29, 2025, because I remained on Canadian soil during the encounter. Instead, I was

14  permitted to withdraw my application for admission pursuant to INA § 235(a)(4). I accepted this

15  withdrawal offer in order to avoid another formal removal. I was not permitted to board my flight

16  to Las Vegas and, after the paperwork was completed, I returned to Canada that same day (April

17  29, 2025). Because I was allowed to withdraw my application, no new removal order was issued

18  against me during this encounter – but the end result was that I was still excluded from entering

19  the United States.

20      21.    Sworn Statement and Form I-275: During the secondary inspection on April 29,

21  2025, the CBP officers prepared a written "sworn statement" for me to sign, as well as a Form I-

22  275, Withdrawal of Application for Admission, documenting my withdrawal. I carefully reviewed

DECLARATION OF PLAINTIFF
AARON MCKELLAR
[CASE NO. 2:25-cv-00181-KKE] - 13

NEVILLE PETERSON LLP
701 FIFTH AVE., STE. 4200-2159
SEATTLE, WA 98104-4089
(206) 905-3648

1
2
3
4
5

the sworn statement that the officers had written up but refused to sign. True and correct copies of the unsigned sworn statement from the April 29, 2025 encounter and the completed Form I-275 (Withdrawal of Application for Admission) are attached hereto as Exhibit E and Exhibit F, respectively.

6
7
8
9
10
11
12
13
14
15
16
17

22.    Ongoing CBP Policy/Pattern: The events of April 29, 2025 make clear that, despite CBP's April 18, 2025 vacatur of the prior removal order, CBP continues to bar my entry on the same INA § 212(a)(2)(C) grounds as before. In other words, even after nullifying the expedited removal order that was previously issued against me, CBP officers persisted in treating me as inadmissible based on an alleged "reason to believe" I am involved in illicit drug trafficking. This demonstrates that the unlawful policy or pattern of action challenged in this case – namely, CBP's targeting and exclusion of Eteros's personnel under false accusations of drug trafficking – is ongoing. CBP has effectively reaffirmed the very position that we contend is unlawful, showing a continuing pattern of excluding me (and by extension other Eteros employees) from the United States due to our association with entirely legal cannabis industry activities.

18
19
20
21
22
23
24
25
26
27

23.    Continuing Exclusion and NEXUS Revocation: As of the date of this declaration, I remain excluded from the United States because CBP officers are apparently still enforcing a *de facto* ban on my travel. In other words, even after nullifying the expedited removal order that was previously issued against me—and despite Defendants' representations that this vacatur mooted this action and the dispute between the parties—CBP officers have persisted in treating me as inadmissible based on an alleged "reason to believe" I am involved in illicit drug trafficking. This demonstrates that the unlawful policy or pattern of action challenged in this case, namely, CBP's targeting and exclusion of Eteros's personnel under false accusations of drug trafficking, is

28

DECLARATION OF PLAINTIFF
AARON MCKELLAR
[CASE NO. 2:25-cv-00181-KKE] - 14

NEVILLE PETERSON LLP
701 FIFTH AVE., STE. 4200-2159
SEATTLE, WA 98104-4089
(206) 905-3648

ongoing. Additionally, my membership in the NEXUS trusted traveler program has not been restored. My NEXUS card was confiscated by CBP on October 4, 2024, and to date it remains revoked, which further inhibits my ability to travel freely. In sum, I continue to face the same exclusion from the United States that I have since October 2024, and the harm to my business activities and personal liberties is ongoing.

24.    <u>Consequences for Eteros – Business Harm</u>: CBP's actions against me (and similarly against Ms. James, which I describe below) have caused significant harm to Eteros's business. The inability of key executives to enter the U.S. has disrupted our operations and growth. I will outline several specific impacts that I have observed since October 2024:

a)    <u>Loss of Leadership Presence</u>: Eteros's U.S. operations rely on active involvement from senior leadership. Prior to my ban, either I or other Canadian executives (such as Ms. James) would regularly travel to our Las Vegas office, typically on a monthly basis, to oversee logistics, ensure quality control, meet with staff, and engage with customers. Since my removal, no senior executive from Eteros Canada can be present in the U.S. The absence of on-site leadership has led to operational inefficiencies. For example, without my oversight, we encountered inventory management issues and at least one significant delay in delivering products, which resulted in an estimated $115,000 in lost sales when we were unable to fulfill orders on time. Day-to-day decision-making has been hampered, and our U.S. team, while very capable, has had to function without in-person guidance for many months now.

b)    <u>Customer Relationships and Industry Perception</u>: My inability to meet U.S. customers and partners in person has created misperceptions in the industry. I have heard

DECLARATION OF PLAINTIFF
AARON MCKELLAR
[CASE NO. 2:25-cv-00181-KKE] - 15

NEVILLE PETERSON LLP
701 FIFTH AVE., STE. 4200-2159
SEATTLE, WA 98104-4089
(206) 905-3643

through colleagues that some customers and prospective clients are wondering if Eteros's leadership is "disengaged" or if something is wrong at the company, because I and Ms. James have been unexpectedly absent from all U.S. industry events since late 2024. These events are critical for maintaining our visibility and relationships. Eteros has invested substantial resources (over $250,000 annually) to exhibit at and sponsor at U.S. industry events, but without my presence or that of other top executives, Eteros's participation was far less effective. The industry took note that Eteros's CEO and strategy director were not there, which has led to speculation and rumors (some worry that perhaps we encountered legal trouble or that the company is pulling back). This kind of reputational hit is difficult to quantify but certainly damaging.

c)    <u>Recruitment and Staffing Challenges</u>: The travel bans have also affected our ability to hire and retain talent as we have struggled to fill key positions like Eteros's U.S. Director of Marketing. Normally, I or Ms. James would personally interview candidates and help onboard new hires in Las Vegas. Because we cannot travel, U.S. positions have remained open for an extended period at significant costs to Plaintiff to cover the gap. More broadly, I worry that the cloud of these CBP allegations will continue to scare off prospective employees concerned that working for us might somehow implicate them or make travel difficult. Existing employees, both in Canada and the U.S., are also on edge. We have tried to shield our staff from the worst of this, but I fear some employees would lose confidence or even leave if CBP's unlawful position is not resolved.  It has already become harder to recruit new talent in the U.S., as we cannot meet candidates in person and they inevitably ask why we cannot come to the U.S.

DECLARATION OF PLAINTIFF
AARON MCKELLAR
[CASE NO. 2:25-cv-00181-KKE] - 16

NEVILLE PETERSON LLP
701 FIFTH AVE., STE. 4200-2159
SEATTLE, WA 98104-4089
(206) 905-3648

d)    <u>Sales and Market Development</u>: Eteros's growth depends on expanding our customer base in the U.S. We had plans to visit several client sites and attend regional agriculture trade shows in different states in 2025. All those plans have been put on hold or scaled back. Some sales opportunities have been curtailed or lost because we could not be present to show equipment or finalize deals. The uncertainty about whether our Canadian staff can travel freely has had a chilling effect – we have been reluctant to schedule new U.S. initiatives, and this undoubtedly limits our U.S. market engagement. In an industry that is very relationship-driven, being physically absent is a serious disadvantage.

e)    <u>Reputational Harm and Business Partnerships</u>: Perhaps the most damaging consequence of CBP's conduct is the reputational harm it has caused and continues to cause, both to me personally and to Eteros as a company. Although CBP's allegations have not resulted in formal criminal charges, the implication—conveyed through repeated inadmissibility findings under INA § 212(a)(2)(C), a provision reserved for suspected narcotics traffickers—is unmistakable and deeply harmful. These allegations have now entered the public domain, including through the filing of our lawsuits in the Western District of Washington and the Court of International Trade, which have been reported in at least two media outlets. A simple search of my name now yields public association with drug trafficking accusations—albeit entirely unfounded—made by U.S. border officials. This has already had a chilling effect on our business. Several employees became aware of the allegations almost immediately after the lawsuits were filed. We believe at least one employee resigned, in part due to concerns over the reputational cloud hanging over the

DECLARATION OF PLAINTIFF
AARON MCKELLAR
[CASE NO. 2:25-cv-00181-KKE] - 17

NEVILLE PETERSON LLP
701 FIFTH AVE., STE. 4200-2159
SEATTLE, WA 98104-4089
(206) 905-3648

company. We also recently had a promising candidate decline a job offer, citing concerns raised by what they had read online. Unfortunately, the allegation that I or my company is involved in narcotics trafficking—even when baseless—creates stigma that is difficult to dispel without a court decision declaring that Eteros's conduct does not constitute a violation of the narcotics trafficking laws. We are now effectively locked out of institutional borrowing; efforts to raise capital have stalled as lenders are unwilling to take the reputational risk until these allegations are resolved. Worse still, we have serious concerns that our access to basic banking services may be in jeopardy in the near future. It is increasingly clear that the government's actions are not only baseless but retaliatory—an effort to circumvent or undermine the judgment rendered by the CIT in our favor. By persisting in branding Eteros with the stigma of narcotics trafficking, while shielding the allegations from judicial review, CBP appears determined to achieve through reputational destruction what it could not achieve through litigation: to put Eteros out of business. The government knows that merely making these allegations—no matter how meritless—effectively poisons our ability to secure capital investment, maintain banking relationships, or continue operating in good standing within our industry. The longer these allegations remain uncorrected, the greater the risk that we will lose longstanding customers, suppliers, investors, and even the ability to function as a business. Eteros has always prided itself on compliance and integrity. To now be wrongfully and publicly associated with illicit conduct strikes at the core of our identity as a law-abiding business and has placed our entire future in jeopardy.

DECLARATION OF PLAINTIFF
AARON MCKELLAR
[CASE NO. 2:25-cv-00181-KKE] - 18

NEVILLE PETERSON LLP
701 FIFTH AVE., STE. 4200-2159
SEATTLE, WA 98104-4089
(206) 905-3648

f)    <u>Amanda James's Encounter with CBP</u>: Although this declaration is primarily about my own experience, it is relevant to note that Ms. Amanda James, our Director of Strategy and Business Development, faced a similar ordeal with CBP a few months earlier, which is when these outlandish narcotics trafficking allegations were first put forward by CBP. Ms. James had been working in the United States under an L-1A visa (as a managerial employee for Eteros USA) for approximately three years without incident. On June 11, 2024, she went to the Blaine, WA Port of Entry to renew or extend her L-1 status (a process that is often done directly at the border for Canadian L-1 applicants). She was, however, detained in secondary inspection and questioned extensively about Eteros and its role in the cannabis industry, very much like I was. At the conclusion of her interview, CBP officers denied her admission and refused to renew her visa. In fact, they told Ms. James that her activities for Eteros (which, again, consist of selling legal equipment) were considered unlawful and that if she attempted to re-enter the United States, she would be criminally prosecuted. This threat of prosecution was extremely frightening to her, as it would be to anyone. Consequently, Ms. James has remained in Canada since that incident. She has been unable to return to her U.S. work location and has been trying to perform her duties remotely. The loss of her ability to travel has further compounded the harms to Eteros that I described above. (For instance, Ms. James is usually the point person for many customer relationships, and without her in the U.S., those have suffered.) Like me, Ms. James is not accused of any specific crime; her inability to travel is solely based on CBP's generalized accusation that our work "facilitates" the cannabis industry, which CBP mischaracterizes as illicit despite CIT and CBP Headquarters rulings holding otherwise.

DECLARATION OF PLAINTIFF
AARON MCKELLAR
[CASE NO. 2:25-cv-00181-KKE] - 19

NEVILLE PETERSON LLP
701 FIFTH AVE., STE. 4200-2159
SEATTLE, WA 98104-4089
(206) 905-3648

Also like me, Ms. James has scrupulously followed all U.S. laws. The actions against us both appear to be part of a pattern where CBP is targeting Eteros's personnel as though we were involved in narcotics trafficking, when we are not.

g)      USCIS Notice of Intent to Revoke (NOIR): The fallout from these CBP actions has also spilled over into other agencies. I am aware that on March 28, 2025, U.S. Citizenship and Immigration Services ("USCIS") issued a Notice of Intent to Revoke ("NOIR") the L-1A petition approval for Ms. Amanda James. (Because CBP refused her L-1 renewal at the border, Eteros USA subsequently petitioned USCIS directly for her L-1A, which was approved on February 11, 2025. We thought this USCIS approval recognized the legitimacy of her employment. But shortly thereafter, USCIS revisited the approval.) In the NOIR, USCIS indicates that it believes the approval of Ms. James's petition was in "gross error" due to information suggesting that Eteros's U.S. operations might be unlawful. The NOIR explicitly references the CBP encounter and the assertions that Eteros is engaged in cannabis-related activities. It cites our counsel's support letter (from the petition filing) where we had explained that Eteros's sale of equipment is legal and noted the CIT decision confirming the legality of our imports. The USCIS notice then contends that this characterization was "not quite accurate," and it attempts to distinguish the CIT ruling by saying that the court found our merchandise was exempt under § 863(f)(1) rather than declaring it not drug paraphernalia. In essence, USCIS is intimating that because our products are "drug paraphernalia" absent the exemption (even though the exemption does apply), our business might still be considered in violation of federal law in some way. This is a puzzling and, in my view, misguided position, because an item that is exempt by law

DECLARATION OF PLAINTIFF
AARON MCKELLAR
[CASE NO. 2:25-cv-00181-KKE] - 20

NEVILLE PETERSON LLP
701 FIFTH AVE., STE. 4200-2159
SEATTLE, WA 98104-4089
(206) 905-3648

is lawful to import and sell – that was the whole point of the CIT case. Nonetheless, the threat of revocation now hangs over Ms. James's ability to work in the U.S. A true and correct copy of USCIS's March 28, 2025 NOIR letter is attached as Exhibit G. It is worth noting that USCIS's actions have not (to my knowledge) resulted in any final revocation yet; the petition is still valid as of now, but we have had to respond to the NOIR to defend the petition. This development is further evidence of the ongoing harm and uncertainty caused by CBP's stance. Not only were we removed or barred at the border, but the justifications CBP used are now being echoed to jeopardize our company's immigration approvals and workforce stability.

25.    <u>Summary of Current Situation</u>: In summary, the situation is as follows: Eteros is a lawful enterprise that provides agricultural equipment and has a strong record of compliance with U.S. law. Cannabis-related activities that our customers engage in are legal under state law, and our provision of equipment to them is protected by a federal statutory exemption and backed by court precedent. Neither I, Ms. James, nor any Eteros entity is engaged in the trafficking of controlled substances. Despite this, U.S. border officials have treated us as such, resulting in my expedited removal and five-year ban, and Ms. James's exclusion and banning, which in turn have triggered additional adverse consequences (like the USCIS NOIR). These actions have caused severe personal and professional harm, and they continue to threaten the viability of our U.S. operations. We have pursued remedies: we filed the motion to vacate the removal with CBP (denied), and we initiated this litigation in the U.S. District Court for the Western District of Washington (among other legal actions) to seek relief from these wrongful designations. We simply seek to have our status as law-abiding businesspeople reaffirmed, so that we can travel

freely to the United States to conduct our lawful business without the shadow of unfounded accusations. All of the factual matters stated in this declaration are drawn from my personal knowledge, my direct involvement in Eteros's business, and documents and records I have reviewed (such as the exhibits referenced).

26.     I remain ready and willing to travel to the United States to continue leading Eteros's U.S. operations as soon as I am legally permitted to do so—this would give me the assurance needed to return to my plan of increasing Eteros's investment in the United States and to seek US citizenship. Eteros's mission is to support agricultural producers with innovative equipment, and we have done so in full compliance with the law. It is my sincere hope that this Court will recognize the discrepancy between the Defendants' characterization of our activities and the reality of our lawful conduct. Our company—and my career—depend on being able to operate without being mistakenly treated as criminals. We have already been cleared by a federal court in the import context, and we respectfully seek the chance to clear our names in the immigration context as well, so that we can put these events behind us and get back to growing our business on a level playing field.

27.     Further declarant sayeth not.

*                          *                          *

I declare under penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed on this 12th day of May, 2025.

DECLARATION OF PLAINTIFF
AARON MCKELLAR
[CASE NO. 2:25-cv-00181-KKE] - 22

NEVILLE PETERSON LLP
701 FIFTH AVE., STE. 4200-2159
SEATTLE, WA 98104-4089
(206) 905-3648

1

2

3          Location:   Carleton Place, Ontario, Canada

4

5          Signature:

6                       Aaron McKellar
                        CEO
7                       Eteros Technologies, Inc.
                        Eteros Technologies USA, Inc.
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF PLAINTIFF
AARON MCKELLAR
[CASE NO. 2:25-CV-00181-KKE] - 23

NEVILLE PETERSON LLP
701 FIFTH AVE., STE. 4200-2159
SEATTLE, WA 98104-4089
(206) 905-3648

# EXHIBIT A

Slip Op. 22-111

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **ETEROS TECHNOLOGIES USA, INC.**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**UNITED STATES,**<br><br>**Defendant.** | **Before: Judge Gary S. Katzmann**<br>**Court No. 21-00287** |

## <u>OPINION</u>

[The court grants Eteros' Motion for Judgment on the Pleadings and denies the United States'
Cross-Motion for Judgment on the Pleadings.]

Dated: <u>September 21, 2022</u>

<u>Richard F. O'Neill</u>, Neville Peterson LLP, of Seattle, WA, argued for Plaintiff Eteros Technologies
USA, Inc. With him on the briefs were <u>John M. Peterson</u>, of New York, N.Y., and <u>Patrick B.
Klein</u>.

<u>Guy R. Eddon</u>, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of
Justice, of New York, N.Y., argued for Defendant United States. With him on the brief were <u>Brian
M. Boynton</u>, Acting Assistant Attorney General, <u>Patricia M. McCarthy</u>, Director, <u>Justin R. Miller</u>,
Attorney In Charge, International Trade Field Office, <u>Aimee Lee</u>, Assistant Director. Of Counsel
on the briefs were <u>Mathias Rabinovitch</u> and <u>Alexandra Khrebtukova</u>, Office of the Assistant Chief
Counsel for International Trade Litigation, U.S. Customs and Border Protection, of New York, N.Y.

      Katzmann, Judge: This case concerns the interplay between the federal and state systems,

specifically the Washington State system, governing marijuana-related drug paraphernalia. It

arises from Customs and Border Protection ("CBP")'s exclusion from entry at the Port of Blaine,

Washington of Plaintiff's motor frame assemblies -- component parts of an agricultural machine

designed to separate the leaf from the flower of cannabis or other plant material -- on the grounds

that the machine constituted drug paraphernalia prohibited by the federal Controlled Substances

Act ("CSA"). The resultant dispute presents a matter of first impression: whether Washington

State's repeal of certain prohibitions attending marijuana-related drug paraphernalia "authorize[s]" Plaintiff such that Plaintiff's importation through the Port of Blaine is exempted by the CSA from the federal prohibition on importing drug paraphernalia. The court finds that Plaintiff is so authorized.

## BACKGROUND

### I.    *Legal Background*

Under section 1595a of 19 U.S.C., "[m]erchandise which is introduced or attempted to be introduced into the United States" "may be seized and forfeited if," inter alia, "its importation or entry is subject to any restriction or prohibition which is imposed by law relating to health, safety, or conservation and the merchandise is not in compliance with the applicable rule, regulation, or statute." 19 U.S.C. § 1595a(c)(2)(A).[1] Where "merchandise may be seized and forfeited," Customs may instead "deny entry and permit the merchandise to be [re]exported." 19 C.F.R. § 151.16(j).[2] One "law relating to health" for the purposes of 19 U.S.C. § 1595a is the Controlled

---

[1] 19 U.S.C. § 1595a -- Aiding unlawful importation -- provides in relevant part:

. . .

(c) Merchandise introduced contrary to law

Merchandise which is introduced or attempted to be introduced into the United States contrary to law shall be treated as follows:

. . .

   (2) The merchandise may be seized and forfeited if—

      (A) its importation or entry is subject to any restriction or prohibition which is imposed by law relating to health, safety, or conservation and the merchandise is not in compliance with the applicable rule, regulation, or statute.

[2] 19 C.F.R. § 151.16(j) instructs that:

. . .

If otherwise provided by law, detained merchandise may be seized and forfeited. In lieu of seizure and forfeiture, where authorized by law, Customs may deny entry

Substances Act ("CSA"), see 21 U.S.C. §§ 801–904, a federal statute with the "long title"[3] "An

Act to amend the Public Health Service Act and other laws to provide increased research, into, and

prevention of, drug abuse and drug dependence; to provide for treatment and rehabilitation of drug

abusers and drug dependent persons; and to strengthen existing law enforcement authority in the

field of drug abuse."  Pub. L. No. 91-513, 84 Stat. 1236, 1236 (1970).

### A.    The Federal System on Drug Paraphernalia

Under the CSA, Congress made it unlawful for any person:

(1) to sell or offer for sale drug paraphernalia;

(2) to use the mails or any other facility of interstate commerce to transport drug paraphernalia; or

(3) to import or export drug paraphernalia.

21 U.S.C. § 863(a)(1)–(3).[4]  "Any drug paraphernalia involved in any violation of subsection (a)"

"shall be subject to seizure and forfeiture upon the conviction of a person for such violation."  Id.

§ 863(c).  However, the CSA specifies that "[t]his section shall not apply to" "any person

authorized by local, State, or Federal law to manufacture, possess, or distribute such items."  Id. §

863(f)(1).  What constitutes "authoriz[ation]" by local, state, or federal law for the purposes of the

(f)(1) exemption is otherwise undefined.

---

and permit the merchandise to be exported, with the importer responsible for paying all expenses of exportation.

[3] "The long title generally summarizes or describes the purpose of the bill" and "appears after the bill number and also immediately following the prefatory words 'A BILL.'"  Victoria L. Killion, Cong. Rsch. Serv., R46484, Understanding Federal Legislation: A Section-by-Section Guide to Key Legal Considerations 17 (2022).

[4] Subsection 863(d) of 21 U.S.C. provides the federal definition of "drug paraphernalia."  As established infra, Eteros has stipulated for the purposes of this litigation that its merchandise qualifies as "drug paraphernalia" under § 863(d).  See Pl.'s Br. at 1.  As such, the court need not parse the federal definition.

### B.    The Washington State System on Drug Paraphernalia

In November 2012, Washington State legalized adult recreational use of marijuana.  See Initiative 502 to the Legislature, 2013 Wash. Sess. Laws ch. 3 (codified as amended at Wash. Rev. Code §§ 69.50.101–710) ("Initiative 502").[5]  As part of Initiative 502, the Washington legislature amended its prohibitions on drug paraphernalia to read:

> (1) It is unlawful for any person to use drug paraphernalia to plant, propagate, cultivate, grow, harvest, manufacture, compound, convert, produce, process, prepare, test, analyze, pack, repack, store, contain, conceal, inject, ingest, inhale, or otherwise introduce into the human body a controlled substance other than marijuana.  Any person who violates this subsection is guilty of a misdemeanor.

> (2) It is unlawful for any person to deliver, possess with intent to deliver, or manufacture with intent to deliver drug paraphernalia, knowing, or under circumstances where one reasonably should know, that it will be used to plant, propagate, cultivate, grow, harvest, manufacture, compound, convert, produce, process, prepare, test, analyze, pack, repack, store, contain, conceal, inject, ingest, inhale, or otherwise introduce into the human body a controlled substance other than marijuana.   Any person who violates this subsection is guilty of a misdemeanor.

Wash. Rev. Code § 69.50.412 (2013) (emphasis added).  Moreover:

> (1) Every person who sells or gives, or permits to be sold or given to any person any drug paraphernalia in any form commits a class I civil infraction under chapter 7.80 RCW.  For purposes of this subsection, "drug paraphernalia" means all equipment, products, and materials of any kind which are used, intended for use, or designed for use in planting, propagating, cultivating, growing, harvesting, manufacturing, compounding, converting, producing, processing, preparing, testing, analyzing, packaging, repackaging, storing, containing, concealing, injecting, ingesting, inhaling, or otherwise introducing into the human body a controlled substance other than marijuana.

---

[5] The parties agree that Initiative 502 -- as codified as part of the Revised Code of Washington ("RCW") at chapter 69.50 -- legalized adult recreational marijuana use in Washington State.  See, e.g., Pl.'s Resp. in Opp. to Def.'s Cross-Mot. for J. on Pleadings and Reply in Supp. of Pl.'s Mot. for J. on Pleadings at 7–18, Dec. 10, 2021, ECF No. 20 ("Pl.'s Reply"); Def.'s Reply Br. in Supp. of Cross-Mot. for J. on Pleadings at 4, Jan. 31, 2022, ECF No. 25 ("Def.'s Reply") ("We do not contend that Washington state has 'not legalized' marijuana or marijuana-related drug paraphernalia").  However, as discussed infra, the parties disagree as to whether such legalization by Washington State confers "authoriz[ation]" for the purposes of the federal exemption at 21 U.S.C. § 863(f)(1).  See, e.g., Def.'s Reply at 9; Pl.'s Reply at 20–23.

Id. § 69.50.4121 (emphasis added).[6]

## II.    *Factual Background*

The parties assert that the material facts of this case are not in dispute.[7]  At issue is the Plaintiff corporation Eteros Technologies USA, Inc. ("Eteros")'s attempted importation into the United States of the Subject Merchandise -- certain motor frame assemblies for an agricultural machine,  dubbed the "Mobius M108S Trimmer," designed to separate the leaf from the flower of cannabis and/or other plant material -- through the Port of Blaine, Washington on or around April 10, 2021.  Compl. at 1–2, June 11, 2021, ECF No. 4; Answer to Compl. at 2, July 16, 2021, ECF No. 10 ("Answer").   After the Subject Merchandise was presented to Customs and Border Protection ("CBP") for examination, CBP issued a Notice of Detention to Eteros.  Compl. at 2; Answer at 2.

On April 16, 2021, CBP sent Eteros a CF 28 Request for Information inquiring about the Subject Merchandise, particularly its intended end-use, to which Eteros timely responded on April 19, 2021.  See Compl. at 6; Answer at 2.  On April 27, 2021, CBP sent Eteros a second CF 28 Request for Information, this time asking whether the Subject Merchandise would "be used at any

---

[6] The court notes that the statute as amended in 2013 applies to this dispute.  Later amendments to sections 69.50.412 and 69.50.4121 in 2021 and 2022 -- which removed certain uses of drug paraphernalia and replaced "marijuana" with "cannabis" -- took effect after the May 10, 2021 CBP decision here at issue.  Importantly, these amendments did not remove the marijuana exemptions established in sections 69.50.412 and 69.50.4121.

[7] Before the court, parties have each moved for judgment on the pleadings pursuant to USCIT Rule 12(c).  See Pl.'s Mot. for J. on Pleadings, Sept. 10, 2021, ECF No. 15 ("Pl.'s Br."); Def.'s Cross-Mot. for J. on Pleadings, Nov. 5, 2021, ECF No. 19 ("Def.'s Br.").  In so moving, both parties acknowledge that "[j]udgment on the pleadings is appropriate where there are no material facts in dispute."  Pl.'s Br. at 10 (quoting Forest Labs., Inc. v. United States, 476 F.3d 877, 881 (Fed. Cir. 2007)); see also Def.'s Br. at 9 (quoting United States v. Inn Foods, Inc., 27 CIT 698, 699, 264 F. Supp. 2d 1333, 1334 (2003), rev'd on other grounds, 383 F.3d 1319 (Fed. Cir. 2004)) (same).

point, in any way, to manufacture, produce, or process a product that has a [THC][8] concentration over 0.3 percent."  Compl. at 7, Ex. E (footnote not in original); Answer at 3.  Eteros responded that although it lacked access to end-user records necessary to know the THC content of cannabis products used with the Subject Merchandise, the machine is capable of use with marijuana.  Compl. at 7, Ex. E; Answer at 3.

Anticipating that CBP was seeking to discern whether the Subject Merchandise meets the federal definition of "drug paraphernalia" under 21 U.S.C. § 863(d) -- and thereby, whether the Subject Merchandise contravened the import prohibition of § 863(a)(3) -- Eteros further submitted that:

(i)     the Subject Merchandise does not qualify as "drug paraphernalia" because the primary intended use of the Mobius M108S is with hemp, not marijuana; and

(ii)    even if the Mobius M108S qualifies as "drug paraphernalia" under § 863(d), the exemption established in § 863(f)(1) renders § 863(a)(3)'s import prohibition inapplicable in light of Washington State's legalization of marijuana and marijuana-related paraphernalia.

Compl. at 7–9, Ex. E; Answer at 3 (admitting the allegations to the extent supported by Plaintiff's Protest Memorandum and Exhibits, but otherwise denying).

---

[8] "THC" stands for delta-9 tetrahydrocannabinol, the primary psychoactive component of cannabis.  See Ziva D. Cooper & Margaret Haney, Actions of Delta-9-tetrahydrocannabinol in Cannabis: Relation to Use, Abuse, Dependence, 21 Int'l Rev. Psychiatry 104, 104 (2009).  The CSA distinguishes hemp -- which is federally legal -- from marijuana -- which is federally illegal -- by THC levels.  See 7 U.S.C. § 1639o (defining "hemp" as "the plant Cannabis sativa L. and any part of that plant . . . with a delta-9 tetrahydrocannabinol concentration of not more than 0.3 percent on a dry weight basis").

On May 10, 2021, CBP informed Eteros by email that it was excluding the Subject Merchandise under the authority of 19 C.F.R. § 151.16(j).[9]  Compl. at 9–10, Ex. F; Answer at 3. In the Notice of Exclusion, CBP explained that Eteros' Subject Merchandise constitutes "drug paraphernalia" under 21 U.S.C. § 863(d) and that "§ 863(f)(1) does not provide an importer a means to enter drug paraphernalia."  Compl. at 10, Ex. F; Answer at 3 (admitting the allegations to the extent supported by Plaintiff's Protest Exhibits, but otherwise denying).

Eteros timely protested CBP's exclusion of the Subject Merchandise on or around May 11, 2021, see Compl. at 10; Answer at 3, which was denied by operation of law, pursuant to 19 U.S.C. § 1499(c)(5)(B),[10] on June 11, 2021, see Compl. at 10; Answer at 3.

### III.    Procedural Background

On June 11, 2021, Eteros timely filed this action against the United States to challenge CBP's denial of its protest.  Compl. at 11; Answer at 3.  On September 10, 2021, Eteros moved for judgment on the pleadings pursuant to USCIT Rule 12(c).  See Pl.'s Mot. for J. on Pleadings, Sept. 10, 2021, ECF No. 15 ("Pl.'s Br.").  In said motion, Eteros stipulated for the purpose of the litigation that the Subject Merchandise satisfies the federal statutory definition of "drug paraphernalia" under 21 U.S.C. § 863(d).  Id. at 1.  Defendant the United States ("the Government") responded with a cross-motion for judgment on the pleadings on November 5, 2021, see Def.'s Cross-Mot. for J. on Pleadings, Nov. 5, 2021, ECF No. 19 ("Def.'s Br."), to which Eteros responded in opposition and in support of its own motion on December 10, 2021, see Pl.'s

---

[9]  Supra note 2.

[10]  19 U.S.C. § 1499(c)(5) -- Effect of failure to make determination -- provides in relevant part:
      . . .
            (B) For purposes of section 1581 of title 28, a protest against the decision to exclude the merchandise which has not been allowed or denied in whole or in part before the 30th day after the day on which the protest was filed shall be treated as having been denied on such 30th day.

Resp. in Opp. to Def.'s Cross-Mot. for J. on Pleadings and Reply in Supp. of Pl.'s Mot. for J. on

Pleadings, Dec. 10, 2021, ECF No. 20 ("Pl.'s Reply").  The Government replied in kind on January

31, 2022.  See Def.'s Reply Br. in Supp. of Cross-Mot. for J. on Pleadings, Jan. 31, 2022, ECF No.

25 ("Def.'s Reply").

    In preparation for oral argument, the court issued questions on May 4, 2022, see Ct.'s Qs.

for Oral Arg., May 4, 2022, ECF No. 29, and the parties responded in writing on May 16, 2022,

see Pl.'s Resp. to Ct.'s Oral Arg. Qs., May 16, 2022, ECF No. 31 ("Pl.'s Oral Arg. Subm."); Def.'s

Resp. to Ct.'s Oral Arg. Qs., May 16, 2022, ECF No. 32 (Def.'s Oral Arg. Subm.").  Oral argument

was held on May 19, 2022.  See Oral Arg., May 19, 2022, ECF No. 33.  Thereafter, on May 26,

2022, the parties each submitted a post-argument brief.  See Pl.'s Post Oral Arg. Subm., May 26,

2022, ECF No. 35 ("Pl.'s Suppl. Br."); Def.'s Post Oral Arg. Subm., May 26, 2022, ECF No. 34

("Def.'s Suppl. Br.").

## JURISDICTION AND STANDARD OF REVIEW

    The court has jurisdiction over this action pursuant to 28 U.S.C. § 1581(a).  The standard

of review is de novo based upon the record developed before the court.  See 28 U.S.C. § 2640(a)(1).

The court will grant a party's motion for judgment on the pleadings pursuant to USCIT Rule 12(c)

"where there are no material facts in dispute and the party is entitled to judgment as a matter of

law."  Forest Labs., 476 F.3d at 881; see also N.Z. Lamb Co. v. United States, 40 F.3d 377, 380

(Fed. Cir. 1994).

## DISCUSSION

    Before the court Eteros contends that even if -- as it has stipulated -- the Subject

Merchandise is "drug paraphernalia" under 21 U.S.C. § 863(d), Washington State law

"authorize[s]" Plaintiff to manufacture, possess, and distribute cannabis paraphernalia, such that

Eteros is not subject to § 863(a)(3)'s import prohibition by operation of the federal exemption at

§ 863(f)(1); accordingly, Eteros asks the court to enter judgment on the pleadings for Plaintiff and to direct the Port Director of CBP in Blaine, Washington, to release Eteros' goods.  See Pl.'s Br. at 1–2; Pl.'s Reply at 33.  By contrast, the Government argues that Eteros' arguments fail as a matter of law because Washington State's mere legalization of marijuana and its paraphernalia does not constitute "authoriz[ation]" for the purposes of 21 U.S.C. § 863(f)(1), such that Eteros is still subject to and in contravention of § 863(a)(3)'s import prohibition.  See Def.'s Reply at 3. Defendant, accordingly, asks the court to enter judgment on the pleadings for the Government.  Id. at 2.

For the reasons articulated below, the court discerns that Eteros is "authorized" under 21 U.S.C. § 863(f)(1) and thereby exempted in Washington State from subsection 863(a)'s prohibition on importing drug paraphernalia.  As such, the court holds that 21 U.S.C. § 863 does not justify seizure or forfeiture of Eteros' Subject Merchandise required for exclusion under 19 C.F.R. § 151.16(j).

## I.    *The Parameters of the Federal Exemption.*

The court begins by parsing the parameters of the federal exemption found at 21 U.S.C. § 863(f)(1), before attempting to apply the exemption to the particular facts of the case at bar.  The court addresses two issues: (i) the scope of the (f)(1) exemption; and (ii) the conditions that trigger the exemption's applicability.

Recall that section 863 of the CSA instructs in relevant part:

**(a) In general**

It is unlawful for any person—

    **(1)** to sell or offer for sale drug paraphernalia;

    **(2)** to use the mails or any other facility of interstate commerce to transport drug paraphernalia; or

**(3)** to import or export drug paraphernalia.

…

**(c) Seizure and forfeiture**

Any drug paraphernalia involved in any violation of subsection (a) of this section shall be subject to seizure and forfeiture upon the conviction of a person for such violation.

. . .

**(f) Exemptions**

This section shall not apply to—

**(1)** any person authorized by local, State, or Federal law to manufacture, possess, or distribute such items.

21 U.S.C. § 863(a), (c), (f)(1).

### A.    *The Scope of 21 U.S.C. § 863(f)(1)'s Exemption*

The court first discerns that the phrase "[t]his section shall not apply" within the (f)(1) exemption establishes that when the exemption is implicated, <u>none</u> of the provisions under section 863 apply -- including neither the three prohibitions enumerated in 21 U.S.C. § 863(a)(1)–(3), nor the basis for seizure and forfeiture provided in § 863(c).  Such a construction accords with both the conventional meaning of "section" and standard interpretive guides.  For example, the Supreme Court has explained that "Congress ordinarily adheres to a hierarchical scheme in" drafting statutes, <u>see</u> <u>Koons Buick Pontiac GMC, Inc., v. Nigh</u>, 543 U.S. 50, 51 (2004), with "[a] bill . . . divided into numbered sections," which "are not repeated," <u>see</u> D. Hirsch, <u>Drafting Federal Law</u> § 3.8, p. 27 (2d ed. 1989).  From there, a section is generally broken into—

(A) subsections (starting with (a));

(B) paragraphs (starting with (1));

(C) subparagraphs (starting with (A));

(D) clauses (starting with (i))

<u>Koons</u>, 543 U.S. at 60–61 (first reproducing instructions from the House Legislative Counsel's Manual on Drafting Style, HLC No. 104–1, p. 24 (1995); then reproducing substantively identical instructions from the Senate Office of the Legislative Counsel, Legislative Drafting Manual 10 (1997)).[11]    Congress followed this hierarchical scheme in drafting the CSA, including section 863.[12]    Accordingly, the court agrees that "[t]here can be no question that subsection (f)'s use of the word 'section' refers to the entirety of 21 U.S.C. § 863," Pl.'s Br. at 20, such that when the (f)(1) exemption is implicated, none of the provisions under section 863 -- including, as just one example, the federal prohibition on importing or exporting drug paraphernalia established at 21 U.S.C. § 863(a)(3) -- apply.

### B.    *The Conditions Triggering 21 U.S.C. § 863(f)(1)'s Applicability*

The court next considers what conditions are sufficient to trigger the (f)(1) exemption's applicability.  The exemption instructs "[t]his section shall not apply to" "any person authorized by local, State, <u>or</u> Federal law to manufacture, possess, <u>or</u> distribute such items."  21 U.S.C. § 863(f)(1) (emphasis added).  In light of the exemption's double disjunctive "or," the court discerns that "authoriz[ation]" (putting aside the precise meaning of this term for the moment) by <u>one</u> relevant legislative body -- be it local, state, or federal -- to engage in <u>one</u> of the enumerated

---

[11] Although these Manuals post-date the enactment of section 863 of the CSA, <u>see, e.g.</u>, <u>Posters 'N' Things, Ltd. v. United States</u>, 511 U.S. 513, 516 n.5 (1994) (detailing Congress's enactment of 21 U.S.C. § 863 in 1990), they are consistent with earlier drafting guides, <u>see, e.g.</u>, Hirsch, <u>supra</u>, at 27 ("A bill is divided into numbered sections . . . The major subdivisions of a section are subsections.  They appear as small letters in parentheses ('(a)', etc.) . . . Subsections are divided into numbered paragraphs ('(1)', '(2)', etc.) . . . Paragraphs are divided into tabulated lettered subparagraphs ('(A)', '(B)', etc.) . . . Subparagraphs are divided into clauses bearing small roman numerals ('(i)', '(ii)', '(iii)', '(iv)').").

[12] In the CSA, the word "section" is used to refer to a division preceded by a non-repeating number and the word "subsection" is used to refer to a subdivision preceded by a lower-case letter.  <u>See, e.g.</u>, 21 U.S.C. § 863(b) ("Anyone convicted of an offense under <u>subsection (a) of this section</u> shall be imprisoned for not more than three years and fined under title 18." (emphasis added)).

activities -- be it manufacture, possession, or distribution of drug paraphernalia -- would be sufficient to trigger the (f)(1) exemption's applicability.  This construction accords with "the ordinary meaning of that language," see Milner v. Dep't of Navy, 562 U.S. 562, 569 (2011) (quoting Park 'N Fly, Inc. v. Dollar Park & Fly, Inc., 469 U.S. 189, 194 (1985)), as Merriam-Webster defines "or" in part "as a function word to indicate an alternative // coffee or tea," see Or, Merriam-Webster Online Dictionary, www[.]merriam-webster[.]com/dictionary/or (last visited Sept. 15, 2022).[13]

In light of the preceding discussion, the court finds that, for example, "authoriz[ation]"[14] by a relevant state to possess drug paraphernalia would alone be sufficient to implicate the (f)(1) exemption, thereby rendering the entirety of section 863 -- including the prohibitions contained at 21 U.S.C. § 863(a) and the basis for seizure and forfeiture under § 863(c) -- inapplicable.

## II.    *The Interplay between the Federal and Washington State Systems Necessitates Construing the Term "Authorized" in 21 U.S.C. § 863(f)(1) as a Matter of First Impression.*

Applying the above parameters to the case at bar, the court finds that the interplay between the federal and Washington State systems on marijuana-related drug paraphernalia necessitates construing the term "authorized" in 21 U.S.C. § 863(f)(1) as a matter of first impression.

Recall that consistent with Washington State's legalization of adult recreational marijuana use, the Washington legislature amended its prohibitions on drug paraphernalia to read in relevant part:

(2) It is unlawful for any person to deliver, possess with intent to deliver, or manufacture with intent to deliver drug paraphernalia, knowing, or under

---

[13] Please note the court has removed the "http" designations and bracketed the periods within all hyperlinks to outside webpages in order to disable those links.  For archived copies of the webpages cited in this opinion, please consult the docket.

[14] Again, putting aside the precise meaning of this term for the moment.

circumstances where one reasonably should know, that it will be used to plant, propagate, cultivate, grow, harvest, manufacture, compound, convert, produce, process, prepare, test, analyze, pack, repack, store, contain, conceal, inject, ingest, inhale, or otherwise introduce into the human body a controlled substance <u>other than marijuana</u>.   Any person who violates this subsection is guilty of a misdemeanor.

Wash. Rev. Code § 69.50.412 (2013) (emphasis added).  By including the phrase "other than marijuana," the Washington legislature established that it is not unlawful -- or that, in other words, it is legal[15] -- to deliver, possess, and/or manufacture marijuana-related drug paraphernalia.

Above, the court discerned that it need only find "authoriz[ation]" by <u>one</u> enumerated legislative body -- local, state, <u>or</u> federal -- to engage in <u>one</u> enumerated activity -- possession, distribution, <u>or</u> manufacture -- to trigger the (f)(1) exemption, and here, Washington State has made it legal to, inter alia, possess marijuana-related drug paraphernalia.  Thus, the next question is whether this legalization of possession afforded by section 69.50.412 of the Revised Code of Washington amounts to "authoriz[ation]" for the purposes of the federal exemption under 21 U.S.C. § 863(f)(1).  The court turns now to this matter of statutory interpretation.

### III.    Washington State "Authorize[s]" Eteros for the Purposes of 21 U.S.C. § 863(f)(1).

The Government maintains that Washington State law does not "authorize[]" Eteros for the purposes of the federal exemption because "21 U.S.C. § 863(f)(1) explicitly requires a person to [be] specifically . . . authorized" -- through, for example, the grant of a personal license, permit, or the like -- such that "a [S]tate's legalization of marijuana-related drug paraphernalia does not satisfy th[is] specific personal authorization" requirement.  <u>See</u> Def.'s Reply at 2, 10–11.  By contrast, Eteros argues that Washington State law, specifically Wash. Rev. Code § 69.50.412,

---

[15] Merriam-Webster enumerates the words "lawful," "legal," and "legitimate" as antonyms to the word "unlawful."  <u>See</u> <u>Unlawful</u>, <u>Merriam-Webster Online Dictionary</u>, www[.]merriam-webster[.]com/dictionary/unlawful#synonyms (last visited Sept. 15, 2022).

"authorize[s]" Eteros for the purposes of 21 U.S.C. § 863(f)(1) and that the Government's

requirement of person-specific authorization is impermissible.  See Pl.'s Reply at 20–23.

In adjudicating this dispute, the court -- informed by fundamental principles of statutory

construction -- looks to the plain meaning of the statute, caselaw, as well as legislative history and

other indicia of Congressional intent, as available and appropriate.  See, e.g., Cook v. Wilkie, 908

F.3d 813, 817 (Fed. Cir. 2018) (discerning statutory meaning "by employing the traditional tools

of statutory construction," including "the statute's text, structure, . . . legislative history, and . . .

relevant canons of interpretation" (internal quotation marks omitted) (quoting Delverde, SrL v.

United States, 202 F.3d 1360, 1363 (Fed. Cir. 2000))).  See generally Robert A. Katzmann, Judging

Statutes (2014).  Upon deploying these "traditional tools," the court adopts Eteros' interpretation.

### A.    Ordinary Meaning is Inconclusive

The court construes the statutory exemption of 21 U.S.C. § 863(f)(1) de novo[16] and begins

the inquiry, as it must, with the text.  See, e.g., Bates v. United States, 522 U.S. 23, 29 (1997).

Again, the text reads in relevant part:

**(f) Exemptions**

This section shall not apply to—

    **(1)** any person authorized by local, State, or Federal law to manufacture,
    possess, or distribute such items;

---

[16] The Government has not requested deference for its statutory interpretation under the framework
developed in Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.  See 467 U.S. 837
(1984); see also Oral Arg. at 1:07:12–25 (Government Counsel's assertion at oral argument that
"[t]he Government does not seek deference to the agency's interpretation of (f)(1).  In fact, here,
there is really no applicable administrative interpretation to which the court can defer"); see also
Wilkie, 908 F.3d at 817 (reviewing a matter of statutory interpretation de novo where "[t]he
Secretary [did] not request[] Chevron deference for his interpretation" and the Federal Circuit
agreed "that no such deference [wa]s warranted").  Because the court agrees that there is no
applicable administrative interpretation here to defer to, the court proceeds to construe the federal
statute de novo.

21 U.S.C. § 863(f)(1) (emphasis added).  The Government argues that by its plain terms, the

combination of "person"[17] and "authorized" in 21 U.S.C. § 863(f)(1) "explicitly requires a person

to [be] specifically . . . authorized to engage in the conduct at issue."  See Def.'s Reply at 11; see

also Oral Arg. at 1:04:15–25.  For its part, Plaintiff contends that Washington plainly "authorized"

Eteros for purposes of 21 U.S.C. § 863(f)(1) by repealing its prior prohibitions on marijuana-

related drug paraphernalia, see Pl.'s Reply at 20, and that the court cannot accept the Government's

person-specific construction without adding words to the statute, see Pl.'s Oral Arg. Subm. at 3.

   Proceeding on "the assumption that the ordinary meaning of . . . language accurately

expresses the legislative purpose," Milner, 562 U.S. at 569 (quoting Park 'N Fly, 469 U.S. at 194),

the court notes that Merriam-Webster defines "authorize" as (1) "to endorse, empower, justify, or

permit by or as if by some recognized or proper authority (such as custom, evidence, personal

right, or regulating power) // a custom authorized by time" and (2) "to invest especially with legal

authority: EMPOWER // He is authorized to act for his father."  Authorize, Merriam-Webster

Online Dictionary, www[.]merriam-webster[.]com/dictionary/authorize (last visited Sept. 15,

2022).  In addition, Black's Law Dictionary defines "authorize" as "[t]his enables a person to act;

it gives the authority for a person to carry out an act."  Authorize, Black's L. Online Dictionary,

thelawdictionary[.]org/authorize/ (last visited Sept. 15, 2022).

   The court assesses that it can derive support for either party's proposed construction from

these definitions.  For example, on the one hand, Merriam-Webster's partial definition to "permit

. . . by . . . regulating power" could be found to accommodate Eteros' position that the repeal of a

prohibition by state legislative act permits the previously prohibited activity, thereby conferring

---

[17] The parties do not dispute that the term "person" in 21 U.S.C. § 863(f)(1) encompasses both
human and corporate persons, like Eteros.  See Pl.'s Br. at 26; Def.'s Br. at 18; Def.'s Reply at 9.

"authoriz[ation]."  On the other hand, Black's Law Dictionary's definition to "enable[] a person

to act" and "give[] the authority for a person to carry out an act" could be found to support the

Government's position that "authoriz[ation]" requires an individual endowment of authority.

The court must further consider that (f)(1) specifies that "[t]his section shall not apply to"

"any person authorized."  21 U.S.C. § 863(f)(1) (emphasis added).  The term "any" "has a diversity

of meaning and may be employed to indicate 'all' or 'every' as well as 'some' or 'one' and its

meaning in a given statute depends upon the context and the subject matter of the statute."  Any,

Black's Law Dictionary (6th ed. 1996).  Thus, accounting for the ordinary meaning of "any," the

phrase "any person authorized" could conceivably be construed to encompass a class of persons

authorized, as advocated by Eteros -- i.e., if "any" means "every" person authorized -- or a single

person authorized, as advocated by the Government -- i.e., if "any" means "one" person authorized.

Because the court cannot discern the proper meaning of the phrase "any person authorized"

by considering ordinary meaning in vacuo, the court next turns to relevant case law for guidance.

### B.        Supreme Court Case Law Suggests that Eteros is "authorized"

Eteros argues that the Supreme Court case -- Murphy v. NCAA, 138 S. Ct. 1461 (2018) --

establishes that Eteros is "authorized" and that the Government's person-specific "authorization"

requirement directly conflicts with this precedent.  See Pl.'s Reply at 1–2, 20–21.  By contrast, the

Government maintains that Murphy is inapposite, see Def.'s Reply at 12–14, and that Eteros lacks

the requisite authorization the (f)(1) exemption plainly contemplates, see Def.'s Oral Arg. Subm.

at 3, 8.  Although the Government is correct that Murphy adjudicates a different statute than the

one here at issue, nevertheless, the court adheres to the reasoning of Murphy to hold that Eteros is

"authorized" for the purposes of 21 U.S.C. § 863(f)(1).

The court proceeds by first laying out <u>Murphy</u>'s holding, then by establishing the pertinence of this holding to the task of interpreting the CSA, and finally by applying <u>Murphy</u>'s holding to the particular facts of the case at bar.

### 1.    *<u>Murphy's Holding</u>*

In <u>Murphy</u>, the Supreme Court considered, in part, whether a New Jersey state law, <u>see</u> 2014 N.J. Laws 602 (codified at N.J. Rev. Stat. §§ 5:12A-7 to -9) (repealed 2018) ("the 2014 Act" or "the Act"), contravened the federal Professional and Amateur Sports Protection Act ("PASPA"), <u>see</u> 28 U.S.C. §§ 3701–3704; <u>see also</u> <u>Murphy</u>, 138 S. Ct. at 1473–75. Until its invalidation by the <u>Murphy</u> Court in 2018, PASPA made it unlawful for a state to "authorize" sports gambling schemes. <u>See</u> 28 U.S.C. § 3702(1).[18] In 2014, the New Jersey Legislature enacted the contested Act, which "repeal[ed] provisions of [New Jersey] state law [that] prohibit[ed] sports gambling insofar as they concerned the 'placement and acceptance of wagers' on sporting events by persons 21 years of age or older at a horseracing track or a casino or gambling house in Atlantic City." <u>Murphy</u>, 138 S. Ct. at 1472 (describing New Jersey's 2014 Act). The Supreme Court was, thereafter, called on to resolve whether New Jersey's repeal of these certain state prohibitions

---

[18] The since-invalidated PAPSA read in relevant part:

> It shall be unlawful for—
>
>> (1) a governmental entity to sponsor, operate, advertise, promote, license, or <u>authorize</u> by law or compact, or
>>
>> . . .
>
> a lottery, sweepstakes, or other betting, gambling, or wagering scheme based, directly or indirectly (through the use of geographical references or otherwise), on one or more competitive games in which amateur or professional athletes participate, or are intended to participate, or on one or more performances of such athletes in such games.

28 U.S.C. § 3702(1) (emphasis added).

"authorized" sports gambling such that the 2014 Act violated PASPA.

The Murphy Court answered this question in the affirmative. Writing for the Majority, Justice Alito explained that "[t]he repeal of a state law banning sports gambling . . . gives those now free to conduct a sports betting operation the 'right or authority to act.'" Id. at 1474. In fact, the Court explained, "[t]he concept of state 'authorization' makes sense only against a backdrop of prohibition or regulation. . . . [as] [w]e commonly speak of state authorization only if the activity in question would otherwise be restricted." Id. Thus, on the grounds that "[w]hen a State completely or partially repeals old laws banning sports gambling, it 'authorize[s]' that activity," id. (second alteration in original), the Court held that the 2014 New Jersey Act repealing certain state prohibitions on sports gambling "authorized" those activities such that the 2014 Act violated section 3702 of PASPA.[19]

### 2.    *Pertinence of Murphy to Interpreting the CSA*

Eteros argues that "[a]pplying the U.S. Supreme Court's decision in Murphy . . . as this Court must, Eteros' conduct is clearly authorized by Washington State law." Pl.'s Suppl. Br. at 2 (emphasis in original). Disagreeing, the Government argues that Murphy is inapposite because the "case interpreted a different Federal statute that uses meaningfully different language." Def.'s Reply at 14.

As a general proposition, the Government is correct that just "because words used in one statute have a particular meaning[,] they do not necessarily denote an identical meaning when used in another and different statute." United States ex rel. Chi., N.Y. & Bos. Refrigerator Co. v. Interstate Com. Comm'n, 265 U.S. 292, 295 (1924) ("Boston Refrigerator Co."); see also Yates v.

---

[19] Having found that the New Jersey Act violated PASPA's prohibition on state "authorization" of sports gambling, the Court next considered whether such a federal prohibition was constitutional and determined that it was not. Murphy, 138 S. Ct. at 1478–85.

United States, 574 U.S. 528, 537 (2015) ("We have several times affirmed that identical language may convey varying content when used in different statutes . . . ."). However, this proposition does not preclude, in appropriate circumstances, using the same or similar definitions across statutes. See, e.g., Owen v. United States, 861 F.2d 1273, 1274 (Fed. Cir. 1988) (asserting "[w]e are shown no reason and no authority for applying a different interpretation because the term as defined appears in different statutes"). While Murphy does not explicitly direct lower courts to use its definition of "authorize" to construe statutes beyond PASPA, the court finds there are good reasons for doing so here.

First, the Murphy Court's interpretation of "authorize" turned on the word's ordinary meaning. In Boston Refrigerator Co., the Supreme Court rejected the contention that its prior construction of the words "common carrier by railroad" "was confined to the words as used in the Employers' Liability Act" where "the definition was not made to rest upon any peculiarity in the act under review, but was said to 'accord with the ordinary acceptation of the words.'" 265 U.S. at 295 (quoting Wells Fargo & Co. v. Taylor, 254 U.S. 175, 187 (1920)). Pertinently, in Murphy, the Court dedicated much discussion to the ordinary meaning of "authorize":

> One of the accepted meanings of the term "authorize," . . . is "permit." Brief for Petitioners in No. 16–476, p. 42 (citing Black's Law Dictionary 133 (6th ed. 1990); Webster's Third New International Dictionary 146 (1992)). [Petitioners] therefore contend that any state law that has the effect of permitting sports gambling, including a law totally or partially repealing a prior prohibition, amounts to an authorization. Brief for Petitioners in No. 16–476, at 42.

> Respondents interpret the provision more narrowly. They claim that the primary definition of "authorize" requires affirmative action. Brief for Respondents 39. To authorize, they maintain, means "'[t]o empower; to give a right or authority to act; to endow with authority.'" Ibid. (quoting Black's Law Dictionary, at 133).

138 S. Ct. at 1473 (emphasis in original).[20]  In concluding that New Jersey's repeal of certain

prohibitions on sports gambling "authorized" those activities, the Court explained how its holding

comports with the ordinary meaning of the term:  "The repeal of a state law banning sports

gambling not only 'permits' sports gambling (petitioners' favored definition); it also gives those

now free to conduct a sports betting operation the 'right or authority to act'; it 'empowers' them

(respondents' and the United States'[] definition)."  Id. at 1474.  In short, because the Murphy

Court's construction of "authorize" "was not made to rest upon any peculiarity in the" PASPA,

but rather "accord[s] with the ordinary acceptation of the word[]," see Boston Refrigerator Co.,

265 U.S. at 295, this court assesses that Murphy's definition is relevant to the CSA.[21]

Moreover, Murphy suggests that the Court anticipated the relevance of its construction of

"authorize" to realms beyond PASPA, including to marijuana-related contexts.  For example,

immediately after stating "[t]he concept of state 'authorization' makes sense only against a

backdrop of prohibition or regulation . . . [and] [w]e commonly speak of state authorization only

if the activity in question would otherwise be restricted," 138 S. Ct. at 1474, the Court quoted an

---

[20] The court notes that its own discussion of the ordinary meaning of "authorize," supra p. 14–16, relies on the same Dictionaries and largely the same definitions as those discussed in Murphy.

[21] The Government disagrees, arguing that "the language of section 863 is not only dissimilar, but opposite to the language in PASPA."  Def.'s Reply at 13 (emphasis in original).  This is so, in the Government's estimation, because Congress sought with PASPA to ban States from enacting laws authorizing certain activities, and bans -- by nature -- should be interpreted broadly; whereas, Congress seeks with the (f)(1) exemption of the CSA to recognize state laws authorizing certain activities, and exemptions -- by nature -- should be interpreted narrowly.

While this argument has some initial appeal, it is undercut because the Government ultimately asks the court "to give ['authorize'] its plain meaning under its primary definition, which is '[t]o empower, to give a right or authority to act,'" Def.'s Reply at 13–14 (quoting Black's Law Dictionary (6th ed. 1990)); the Murphy Court explained that "the repeal of a state law ban[] . . . gives those now free to conduct [the implicated activity] the 'right or authority to act'; it 'empowers' them," 138 S. Ct. at 1474.  As such, Murphy's construction encompasses Defendant's own assessment of the "primary" -- or "plain meaning" -- of "authorize."

online newspaper article on Vermont's legalization of recreational marijuana, see id. at 1474 n.28 ("'Vermont . . . bec[ame] the first [State] in the country to authorize the recreational use of [marijuana] by an act of a state legislature.'" (emphasis and alterations in original)).[22]  In addition, the Court opined that "one might well say" that a person is acting "pursuant to" state law "if the person previously was prohibited from engaging in the activity," and gave as a hypothetical example "[n]ow that the State has legalized the sale of marijuana, Joe is able to sell the drug pursuant to state law." Id. at 1474.  This marijuana-specific reference further convinces the court that Murphy's definition of "authorize" should inform the construction of the same term as used in the CSA.

Having determined that Murphy is pertinent to interpreting the CSA, the court proceeds to apply Murphy's holding to the case at bar.

### 3.    *Applying Murphy*

Applying a generalized version of Murphy's ruling[23] -- namely, that the repeal of a state law banning an activity gives those now free to conduct the activity in question the "right or authority" to so act -- the court concludes that Eteros is "authorized" for the purposes of 21 U.S.C. § 863(f)(1).

Consistent with Murphy's declaration that "[t]he concept of state 'authorization' makes sense only against a backdrop of prohibition or regulation," when Congress enacted section 863 of the CSA in 1990,[24] Washington State prohibited the use, delivery, manufacture, possession, and

---

[22] The court notes that Vermont's "act of state legislature" is pertinently entitled "An act relating to eliminating penalties for possession of limited amounts of marijuana by adults 21 years of age or older" (emphasis added)).

[23] Recall that Murphy held "[t]he repeal of a state law banning sports gambling . . . gives those now free to conduct a sports betting operation the 'right or authority to act.'"  138 S. Ct. at 1474.

[24] See Posters 'N' Things, 511 U.S. at 516 n.5.

Court No. 21-00287                                                                                    Page 22

advertisement of drug paraphernalia.  See, e.g., Kerry Murphy Healey, Nat'l Inst. Just., State and

Local Experience with Drug Paraphernalia Laws 135 (1988):

| STATE/STATUTE | OFFENSE | CLASSIFICATION | SENTENCE |
|---|---|---|---|
| **WASHINGTON:** Rev. Code of WA. 69.50.102 (1981) | | | |
| 69.50.412(1) (1981) | use | misdemeanor | imprisonment in county jail not more than 90 days, or fine not [more] than $1,000, or both |
| 69.50.412(2) (1981) | delivery, manufacture, possession | misdemeanor | (see above) |
| 69.50.412(3) (1981) | delivery to minor at least 3 yrs. younger | gross misdemeanor | imprisonment in county jail not more than 1 yr., or fine not [more] than $5,000, or both |
| 69.50.412(4) (1981) | advertisement | misdemeanor | (see above) |

Part and parcel to Washington State's legalization of adult recreational marijuana use via Initiative

502 in November 2012, supra p. 4, the Washington legislature amended its prohibitions on drug

paraphernalia to read in relevant part:

> (1) It is unlawful for any person to use drug paraphernalia to plant, propagate, cultivate, grow, harvest, manufacture, compound, convert, produce, process, prepare, test, analyze, pack, repack, store, contain, conceal, inject, ingest, inhale, or otherwise introduce into the human body a controlled substance other than marijuana.  Any person who violates this subsection is guilty of a misdemeanor.

> (2) It is unlawful for any person to deliver, possess with intent to deliver, or manufacture with intent to deliver drug paraphernalia, knowing, or under circumstances where one reasonably should know, that it will be used to plant, propagate, cultivate, grow, harvest, manufacture, compound, convert, produce, process, prepare, test, analyze, pack, repack, store, contain, conceal, inject, ingest, inhale, or otherwise introduce into the human body a controlled substance other than marijuana.  Any person who violates this subsection is guilty of a misdemeanor.

Wash. Rev. Code § 69.50.412 (2013) (emphasis added).  Moreover:

> (1) Every person who sells or gives, or permits to be sold or given to any person any drug paraphernalia in any form commits a class I civil infraction under chapter 7.80 RCW.  For purposes of this subsection, "drug paraphernalia" means all equipment, products, and materials of any kind which are used, intended for use, or designed for use in planting, propagating, cultivating, growing, harvesting, manufacturing, compounding, converting, producing, processing, preparing, testing, analyzing, packaging, repackaging, storing, containing, concealing,

injecting, ingesting, inhaling, or otherwise introducing into the human body a controlled substance <u>other than marijuana</u>.

Id. § 69.50.4121 (emphasis added).  As previously discussed, <u>supra</u> p. 13, by including the phrase "other than marijuana," the Washington legislature established that it is no longer "unlawful" -- or in other words, that it is now legal -- to deliver, possess, and/or manufacture marijuana-related drug paraphernalia in Washington State.  Thus, per <u>Murphy</u>, against this "backdrop of prohibition," Washington State's "repeal[ of] old laws banning" certain conduct surrounding drug paraphernalia "'authorize[s]' that activity."  <u>See</u> 138 S. Ct. at 1474.[25]

---

[25] Having determined that <u>Murphy</u> applies, the court disposes of several of the Government's counterarguments on the basis of <u>Murphy</u>'s reasoning:

First, the Government contends that Wash. Rev. Code § 69.50.412 does not "authorize" anyone for the purposes of the (f)(1) exemption because "[t]he word 'authorize . . . ordinarily denotes affirmative enabling action.'"  Def.'s Reply at 6 (quoting <u>County of Washington v. Gunther</u>, 452 U.S. 161, 169 (1981)).  In <u>Murphy</u>, the Respondent National Collegiate Athletic Association made just such an argument, <u>see</u> 138 S. Ct. at 1473 ("[Respondents] claim that the <u>primary</u> definition of 'authorize' requires affirmative action." (emphasis in original)), but the <u>Murphy</u> Majority instead adopted the Petitioner's view, <u>see id.</u> at 1474 ("In our view, petitioners' interpretation is correct:  When a State completely or partially repeals old laws banning sports gambling, it 'authorize[s]' that activity." (alteration in original)).  Here, Washington State repealed certain prohibitions on marijuana-related drug paraphernalia, and thus, per <u>Murphy</u>'s instruction, "authorized" the implicated activities.

Next, the Government asserts that "[a]uthorization . . . requires a person-specific endowment of authority" and that mere "legality" is not the standard.  <u>See</u> Def.'s Oral Arg. Subm. at 9.  Noting that Washington administers a "marijuana retailer license" under section 314-55-079 of the Washington Administrative Code, the Government contends that "[i]f legalization constituted the type of blanket authorization suggested by Eteros, then Washington would not have needed to create a licensing regime."  <u>See</u> Def.'s Reply at 10.  Such an argument resembles the United States' position in <u>Murphy</u> that the Court should reject Petitioners' interpretation of "authorize" because "one 'would not naturally describe a person conducting a sports-gambling operation that is merely left unregulated as acting "pursuant to" state law.'"  138 S. Ct. at 1474 (citation omitted).  The Court disagreed, asserting "one might well say exactly that if the person previously was prohibited from engaging in the activity."  <u>Id.</u>  Here, Washington State previously prohibited, inter alia, the possession of marijuana-related drug paraphernalia, <u>supra</u> p. 22; today, Washington State allows such possession, <u>see</u> Wash. Rev. Code § 69.50.412 (2022).  As previously established, Washington's "authorization" of Eteros to possess marijuana-related drug paraphernalia is alone sufficient to render all of section 863 inapplicable under the (f)(1) exemption.  <u>Supra</u> p. 12.  Per <u>Murphy</u>, that Washington does not now require a license or other person-specific endorsement to possess marijuana-related drug paraphernalia -- or in other words,

Accordingly, the court concludes that Washington State "authorize[s]" Eteros for the purposes of 21 U.S.C. § 863(f)(1).[26]

---

has "left [possession] unregulated," 138 S. Ct. at 1474 -- does not vitiate the authorization conferred by Washington's repeal.  (The court, however, notes that even though Washington State's "authorization" of possession is sufficient to render section 863 of the CSA inapplicable, persons must -- of course -- abide by remaining applicable laws, including if relevant, Washington's retail license requirement.)

Finally, the Government argues that Eteros' construction of "authorize" "effectively nullif[ies] section 863."  Def.'s Oral Arg. Subm. at 6.  This is so, in the Government's view, because the (f)(1) exemption only requires "authorization" by one legislative body -- be it local, state, or federal -- to engage in one enumerated activity -- be it manufacturing, possessing, or distributing drug paraphernalia -- and "[p]ossession of drug paraphernalia has always been legal under Federal law."  Id. at 2.  Thus, the Government maintains that "under Eteros'[] interpretation, every person already qualifies for the (f)(1) exemption."  Id.  The Government's argument overlooks a critical component of Murphy's holding, namely that "[t]he concept of state 'authorization' makes sense only against a backdrop of prohibition or regulation."  138 S. Ct. at 1474.  The Court explained:

> A State is not regarded as authorizing everything that it does not prohibit or regulate.  No one would use the term in that way.  For example, no one would say that a State "authorizes" its residents to brush their teeth or eat apples or sing in the shower.  We commonly speak of state authorization only if the activity in question would otherwise be restricted.

Id.  The Government itself acknowledges that "[p]ossession of drug paraphernalia has always been legal under Federal law."  Def.'s Oral Arg. Subm. at 2; see also Mellouli v. Lynch, 575 U.S. 798, 803–04 (2015) ("Federal law criminalizes the sale of or commerce in drug paraphernalia, but possession alone is not criminalized at all.").  Thus, there is no "backdrop of prohibition" against which to find the Federal Government has "authorized" possession of marijuana-related drug paraphernalia.  Where the Federal Government simply has "not prohibit[ed] or regulate[d]" drug paraphernalia possession, see Murphy, 138 S. Ct. at 1474, this court cannot find authorization for the purposes of 21 U.S.C. § 863(f)(1).

In short, the Government's counterarguments fail to displace Eteros' construction in light of Murphy.

---

[26] Because the court deems Eteros "authorized" on the basis of Murphy, the court need not address Plaintiff's additional arguments that the Government's proposed construction violates the constitutional anticommandeering doctrine or 21 U.S.C. § 903 (instructing that no provision of the subchapter within which section 863 falls "shall be construed as indicating an intent on the part of the Congress to occupy the field . . . to the exclusion of any State law . . . unless there is a positive conflict . . . so that the two cannot consistently stand together").  See Pl.'s Reply at 24–30, 33–36.

### C.    The Court's Holding Is Consistent with the Statute's Purpose.

Having applied <u>Murphy</u> to hold that Washington State law "authorize[s]" Eteros under 21 U.S.C. § 863(f)(1), the court pauses briefly to consider the Government's arguments that such a construction is incompatible with the purpose of the CSA.  While courts must indeed "be sensitive to the possibility [that] a statutory term that means one thing . . . in one context might . . . mean something different in another context," <u>Bostock v. Clayton Cnty.</u>, 140 S. Ct. 1731, 1750 (2020), the court discerns no inconsistency here.

To start, the plain text of the (f)(1) exemption suggests Congress contemplated non-uniform applications of subsection 863(a)'s prohibitions on selling, transporting, and importing/exporting drug paraphernalia.  This is so because Congress used a disjunctive "or" to make local, state, and federal "authoriz[ation]" each individually sufficient to render all of section 863 inapplicable.  <u>See</u> 21 U.S.C. § 863(f)(1) ("This section shall not apply to" "any person authorized by local, State, <u>or</u> Federal law to manufacture, possess, or distribute such items." (emphasis added)); <u>see also</u> <u>supra</u> p. 11–12.  Because "courts must presume that a legislature says in a statute what it means and means in a statute what it says there," <u>Conn. Nat. Bank v. Germain</u>, 503 U.S. 249, 253–54 (1992), the court assesses that it is Congress's design that subsection 863's applicability can -- and will -- vary state to state and even locality to locality.

For its part, the Government invokes the legislative history of the Mail Order Drug Paraphernalia Control Act -- which became 21 U.S.C. § 857 and was ultimately transferred to the current 21 U.S.C. § 863 -- to argue that Congress's overarching intent was "to create national uniformity with regard to drug paraphernalia."  Def.'s Br. at 17.  Quite apart from the argument's incongruity with Congress's use of the disjunctive "or," <u>see</u> <u>Bostock</u>, 140 S. Ct. at 1750 ("[L]egislative history can never defeat unambiguous statutory text."), this legislative history -- which concerns a predecessor of section 863 that contained no exemptions at all, let alone an

exemption akin to that of (f)(1) -- is inapposite.  See Mail Order Drug Paraphernalia Control Act:

Hearing on H.R. 1625 Before the Subcomm. on Crime of the H. Comm. on the Judiciary, 99th

Cong. 2–5 (1986) (text of the bill referred to the Committee).    The Government itself

acknowledges that "there is no legislative history specific to the text that became the 21 U.S.C. §

863(f)(1) exemption."  Def.'s Oral Arg. Subm. at 11.  As such, the court privileges -- as it must --

the current text of the statute to discern Congress's purpose, which clearly contemplated

nonuniform applications of section 863's provisions.[27]

　　　Nor does the court agree with the Government's implication that Congress intended with

the exemptions provided at 21 U.S.C. § 863(f) to shield only persons from prosecution, but not

items from seizure.  See Def.'s Br. at 18 n.17; Def.'s Reply at 7.[28]  Such an interpretation does not

comport with a full reading of section 863.  While it is true that "subsection 863(f)(2) exempts an

---

[27] The court is also unpersuaded that the holding here will "recreate…[a] loophole" "whereby the prohibition of drug paraphernalia in one state [will] easily [be] overcome by the lack of such prohibition in other states."  Def.'s Br. at 17.  Washington State can only "authorize" persons to partake in the enumerated activities of the (f)(1) exemption within the confines of its own borders; if the drug paraphernalia leaves Washington, the "authoriz[ation]" inquiry begins anew in the context of the new state.  Perhaps, as the Government suggests, "requir[ing] an authorization that is specific to the person" would "ensur[e] greater tracking and verifiability" of drug paraphernalia. See Def.'s Oral Arg. Subm. at 13–14.  However, these are policy considerations best left to Congress's sound discretion.

[28] The Government quotes an unpublished opinion from the United States District Court for the District of New Mexico.  See United States v. Assorted Drug Paraphernalia Valued at $29,627.07 & Jason Fernandez, No. 18-143, 2018 WL 6630524, at *8 (D.N.M. Dec. 19, 2018) ("Jason Fernandez") ("Congress intended to shield from prosecution those persons who were 'authorized by [law] to manufacture, possess, or distribute [drug paraphernalia],' but did not intend to also shield the drug paraphernalia itself from lawful forfeiture." (alterations in original)).  This court notes that Jason Fernandez dealt with a cause of action brought under 21 U.S.C. § 881, a civil forfeiture provision that provides, in relevant part, "[t]he following [property] shall be subject to forfeiture to the United States and no property right shall exist in . . . any drug paraphernalia (as defined in section 863 of this title)."  21 U.S.C. § 881(a)(10).  The parties to the case at bar have not submitted any briefing on 21 U.S.C. § 881 and the court takes no view on whether section 881 -- or any other basis -- could justify excluding merchandise similar to the Subject Merchandise in future cases.

entire category of <u>items</u>,[29] while subsection 863(f)(1) . . . applies to . . . <u>person[s]</u>," Def.'s Br. at

17–18 (emphasis in original) (footnote and alterations added), recall that when the (f)(1) exemption

is implicated, the entirety of section 863 no longer applies, including subsection 863(c)'s basis for

seizure and forfeiture, <u>see</u> 21 U.S.C. § 863(c) (instructing "[a]ny drug paraphernalia involved in

any violation of subsection (a) of this section shall be subject to seizure and forfeiture <u>upon the</u>

<u>conviction of a person for such violation</u>" (emphasis added)).  Thus, at least for the purposes of 21

U.S.C. § 863, where a person is "authorized" and cannot be convicted under subsection 863(a),

there can correspondingly be no "seizure and forfeiture" of the implicated drug paraphernalia

"upon the conviction of a person" under subsection 863(c).

     In sum, upon consideration of the ordinary meaning of the statutory terms, relevant case

law, and Congress's purpose, the court determines that Eteros is "authorized" under 21 U.S.C. §

863(f)(1) such that § 863(a)(3)'s federal prohibition on importing drug paraphernalia does not

apply to Eteros' Subject Merchandise at the Port of Blaine, Washington.  The court reiterates that

it is not within its province to weigh policy arguments regarding the merits of legislation or to

entertain invitations to rewrite legislation; its charge is to interpret and apply the statute as enacted

by Congress.  Insofar as the Government seeks a different statute, that argument can be addressed

---

[29] 21 U.S.C. § 863(f)(2) provides in relevant part:

> (f) Exemptions
>
> This section shall not apply to—
>
>      . . .
>
>      (2) <u>any item</u> that, in the normal lawful course of business, is imported, exported,
>      transported, or sold through the mail or by any other means, and traditionally
>      intended for use with tobacco products, including any pipe, paper, or accessory.

21 U.S.C. § 863(f)(2) (emphasis added).

to Congress.  See Bostock, 140 S. Ct. at 1753 ("The place to make new legislation, or address unwanted consequences of old legislation, lies in Congress.").

## CONCLUSION

CBP excluded Eteros' Subject Merchandise "under the authority of 19 C.F.R. § 151.16(j)," see Compl. at 9–10, Ex. F; Answer at 3, which allows for the seizure, forfeiture, and/or exclusion of detained merchandise "[i]f otherwise provided by law," 19 C.F.R. § 151.16(j) (emphasis added). In so excluding, CBP reasoned that "[21 U.S.C.] § 863(f)(1) does not provide an importer a means to enter drug paraphernalia," like the Subject Merchandise.  Compl. at 9–10, Ex. F; Answer at 3. The court now holds that Washington State "authorize[s]" Eteros under the exemption at 21 U.S.C. § 863(f)(1) such that section 863 -- including the prohibitions of subsection (a) and the basis for seizure and forfeiture under subsection (c) -- is inapplicable to Eteros' Subject Merchandise at the Port of Blaine, Washington.  In so holding, the court concludes that in light of the particular circumstances, 21 U.S.C. § 863 does not justify the seizure or forfeiture of the Subject Merchandise required for exclusion under 19 C.F.R. § 151.16(j).

Accordingly, the court directs CBP to release Eteros' Subject Merchandise at the Port of Blaine, Washington.

**SO ORDERED.**

*/s/  Gary S. Katzmann*
Gary S. Katzmann, Judge

Dated: September 21, 2022
New York, New York

# EXHIBIT B



# THE UNITED STATES OF AMERICA

## I-797B | NOTICE OF ACTION | DEPARTMENT OF HOMELAND SECURITY
U.S. CITIZENSHIP AND IMMIGRATION SERVICES

| Receipt Number | | Case Type |
|---|---|---|
| ▓▓▓▓▓ | | I129 - PETITION FOR A NONIMMIGRANT WORKER |

| Received Date | Priority Date | Petitioner |
|---|---|---|
| 06/11/2024 | | ETEROS TECHNOLOGIES INC , |

| Notice Date | Page | Beneficiary |
|---|---|---|
| 07/09/2024 | 1 of 2 | MCKELLAR , AARON GEORGE |

CROSS BORDER VISAS U S BUSINESS IM
c/o DOUGLAS A COWGILL
808 NELSON STREET FL 17
VANCOUVER  BC  V6Z 2H2
CANADA

**Notice Type:** Approval Notice
Class: L1A
Valid from 04/30/2024 to 04/30/2026
ETA Case Number: N/A
POE: BLAINE, WA

This is to confirm the approval of the above petition. It was filed at the port of entry pursuant to the provisions of the North American Free Trade Agreement (NAFTA). The petition is valid for the period shown above.

This completes our action on this petition.

The lower portion of this notice should be shown at the port of entry whenever the named worker(s) wants to enter the U.S. in the classification above, during the period of validity of the petition.

Please read the back of this form carefully for more information. If you have any questions about tax withholding, please contact the Internal Revenue Service.

The approval of this visa petition does not in itself grant any immigration status and does not guarantee that the alien beneficiary will subsequently be found to be eligible for a visa, for admission to the United States, or for an extension, change, or adjustment of status.

**THIS NOTICE IS NOT A VISA AND MAY NOT BE USED IN PLACE OF A VISA.**

Number of workers: 1

Please see the additional information on the back. You will be notified separately about any other cases you filed.
**USCIS encourages you to sign up for a USCIS online account. To learn more about creating an account and the benefits, go to https://www.uscis.gov/file-online.**

California Service Center
U.S. CITIZENSHIP & IMMIGRATION SVC
P.O. Box 30111
Laguna Niguel CA 92607-0111
USCIS Contact Center: www.uscis.gov/contactcenter

Please tear off portion below and forward it to the alien worker.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

The alien may use this portion when applying for a visa at an American consulate abroad, or if no visa is required, when applying for admission to the U.S.

Receipt#: ▓▓▓▓▓          Case Type: I129
Notice Date: July 09, 2024          Petitioner: ETEROS TECHNOLOGIES INC ,
Petitioner Validity Dates: Valid from  04/30/2024 to 04/30/2026   Number of Workers: 1

| Name | DOB | COB | Class | Consulate/POE | OCC |
|---|---|---|---|---|---|
| MCKELLAR , AARON GEORGE | ▓▓▓▓ | CANADA | L1A | BLAINE, WA | 010 |

FORM I-797B [REV. 08/01/16]



# I-797B | NOTICE OF ACTION | DEPARTMENT OF HOMELAND SECURITY
U.S. CITIZENSHIP AND IMMIGRATION SERVICES



| Receipt Number | | | Case Type |
|---|---|---|---|
| | | | I129 - PETITION FOR A NONIMMIGRANT WORKER |
| Received Date 06/11/2024 | | Priority Date | Petitioner ETEROS TECHNOLOGIES INC , |
| Notice Date 07/09/2024 | | Page 2 of 2 | Beneficiary MCKELLAR , AARON GEORGE |

| Name | DOB | COB | Class | Consulate/POE | OCC |
|---|---|---|---|---|---|
| MCKELLAR , AARON GEORGE | | CANADA | L1A | BLAINE, WA | 010 |

The Small Business Regulatory Enforcement and Fairness Act established the Office of the National Ombudsman (ONO) at the Small Business Administration. The ONO assists small businesses with issues related to federal regulations. If you are a small business with a comment or complaint about regulatory enforcement, you may contact the ONO at www.sba.gov/ombudsman or phone 202-205-2417 or fax 202-481-5719.

**NOTICE:** Although this application or petition has been approved, USCIS and the U.S. Department of Homeland Security reserve the right to verify this information before and/or after making a decision on your case so we can ensure that you have complied with applicable laws, rules, regulations, and other legal authorities. We may review public information and records, contact others by mail, the internet or phone, conduct site inspections of businesses and residences, or use other methods of verification. We will use the information obtained to determine whether you are eligible for the benefit you seek. If we find any derogatory information, we will follow the law in determining whether to provide you (and the legal representative listed on your Form G-28, if you submitted one) an opportunity to address that information before we make a formal decision on your case or start proceedings.

Please see the additional information on the back. You will be notified separately about any other cases you filed.

USCIS encourages you to sign up for a USCIS online account. To learn more about creating an account and the benefits, go to https://www.uscis.gov/file-online.

California Service Center
U.S. CITIZENSHIP & IMMIGRATION SVC
P.O. Box 30111
Laguna Niguel CA 92607-0111
USCIS Contact Center: www.uscis.gov/contactcenter



Please tear off portion below and forward it to the alien worker.

The alien may use this portion when applying for a visa at an American consulate abroad, or if no visa is required, when applying for admission to the U.S.

| INTENTIONALLY LEFT BLANK | INTENTIONALLY LEFT BLANK |
|---|---|
| INTENTIONALLY LEFT BLANK | INTENTIONALLY LEFT BLANK |
| INTENTIONALLY LEFT BLANK | INTENTIONALLY LEFT BLANK |
| INTENTIONALLY LEFT BLANK | INTENTIONALLY LEFT BLANK |
| INTENTIONALLY LEFT BLANK | INTENTIONALLY LEFT BLANK |
| INTENTIONALLY LEFT BLANK | INTENTIONALLY LEFT BLANK |
| INTENTIONALLY LEFT BLANK | INTENTIONALLY LEFT BLANK |
| INTENTIONALLY LEFT BLANK | INTENTIONALLY LEFT BLANK |

FORM I-797B [REV. 08/01/16]

# EXHIBIT C

U.S. Department of Homeland Security

# Notice and Order of Expedited Removal

## ACKNOWLEDGEMENT

I acknowledge receipt of this notification    **REFUSED TO SIGN**

*Digitally Acquired Signature*    Signature of alien

U.S. Department of Homeland Security                    Continuation Page for Form I-860

| Alien's Name<br>MCKELLAR, AARON GEORGE | File Number<br>SIGMA Event:<br>Event No: | Date<br>October 4, 2024 |

STATES PURSUANT TO THE FOLLOWING PROVISION(S) OF LAW:
=====================================================================================

Section 212(a)(7)(A)(i)(I) of the Immigration and Nationality Act (Act), as amended, as an immigrant who, at the time of application for admission, is not in possession of a valid unexpired immigrant visa, reentry permit, border crossing card, or other valid entry document required by the Act, and a valid unexpired passport, or other suitable travel document, or document of identity and nationality as required under the regulations issued by the Attorney General under section 211(a) of the Act.

| Signature<br>MCMILLEN, Kyle O | Title<br>CBP OFFICER |

*Digitally Acquired Signature*

3 of 3 Pages

Form I-831 Continuation Page (Rev. 08/01/07)

U.S. DEPARTMENT OF HOMELAND SECURITY
# NOTICE TO ALIEN ORDERED REMOVED/DEPARTURE VERIFICATION

Event No: ▮▮▮▮▮▮▮    FINS: ▮▮▮▮▮▮    A-File No: ▮▮▮▮▮▮

SIGMA Event: ▮▮▮▮    Date: 10/04/2024

Alien's name: MCKELLAR  AARON GEORGE

You have been found to be inadmissible to the United States under the provisions of section 212(a), or are ineligible to be admitted as a stowaway under 235(a)(2), of the Immigration and Nationality Act (Act) or are deportable under the provisions of section 237 of the Act as a Visa Waiver Program violator. In accordance with the provisions of section 212(a)(9) of the Act, you are prohibited from entering, attempting to enter, or being in the United States:

[X] For a period of 5 years from the date of your departure from the United States as a consequence of your having been found inadmissible as an arriving alien in proceedings under section 235(b)(1) or 240 of the Act.

[ ] For a period of 10 years from the date of your departure from the United States as a consequence of your having been ordered removed in proceedings under any section of the Act other than section 235(b)(1) or 240, or of being ordered excluded under section 236 of the Act in proceedings commenced prior to April 1, 1997.

[ ] For a period of 10 years from the date of your removal as a stowaway pursuant to section 235(a)(2) of the Immigration and Nationality Act.

[ ] For a period of 20 years from the date of your departure from the United States as a consequence of being found inadmissible and being previously excluded, deported, or removed from the United States.

[ ] At any time because in addition to being found inadmissible, you have been convicted of a crime designated as an aggravated felony.

After your removal has been effected, you must request and obtain permission from the Secretary of Homeland Security to reapply for admission to the United States during the period indicated. You must obtain such permission before commencing your travel to the United States. Application forms for requesting permission to reapply for admission may be obtained by contacting any United States Consulate or U.S. Department of Homeland Security office. Refer to the above file number when requesting forms or information.

WARNING FOR ALL REMOVED ALIENS: It is a crime under Title 8 United States Code, Section 1326, for an alien who has been removed from the United States to enter, attempt to enter, or be found in the United States without the Secretary of Homeland Security's express consent. Depending on the circumstances of the removal, conviction for this crime can result in imprisonment of a period of from 2 to 20 years and/or a fine up to $250,000.

SPECIAL NOTICE TO SEX OFFENDERS: Federal Law requires a convicted sex offender, including an alien who has been removed from or otherwise departed the United States and subsequently returns, to register in each jurisdiction in the United States in which he or she resides, is employed, or is a student. Violation of this requirement can result in prosecution and imprisonment for up to 10 years under Title 18 United States Code, Section 2250.

| | MCMILLEN  Kyle O | |
| --- | --- | --- |
| *(signature)* | CBP OFFICER | BLAINE, WA, USA |
| (Signature of officer serving warning) | (Title of officer) | (Location of DHS Office) |
| *Digitally Acquired Signature* | | |

## Verification of Removal
(Complete this section for file copy only)

| Departure Date 10/04/2024 | Port of Departure BLAINE, WA | Manner of Departure POV |
| --- | --- | --- |
| Signature of Verifying Officer *Digitally Acquired Signature* | | Title of Officer CBP OFFICER |

MCMILLEN, Kyle O



Photograph of Alien



Right Index Finger

REFUSED TO SIGN

(Signature of alien whose fingerprint and photograph appear above)
*Digitally Acquired Signature*

(Signature of official verifying fingerprint)
*Digitally Acquired Signature*

DHS Form I-296 (1/12)    Page 1 of 1

# Record of Sworn Statement in Proceedings
## under Section 235(b)(1) of the Act

U.S. Department of Homeland Security

| | |
|---|---|
| Office: **BLAINE, WA, USA** | SIGMA Event: _____<br>File No: _____<br>**Event Number** : _____ |

Statement by: **MCKELLAR, AARON GEORGE**

In the case of: **MCKELLAR, AARON GEORGE**

Date of Birth: _____   Gender (circle one): (Male) Female

At: **BLAINE (BLA)**   Date: **10/04/2024**

Before: **MCMILLEN, Kyle O - CBP OFFICER**   _Digitall) Acquired Signature_

(Name and Title)

In the **ENGLISH** _____ language. Interpreter _____   Employed by _____

I am an officer of the United States Department of Homeland Security. I am authorized to administer the immigration laws and to take sworn statements. I want to take your sworn statement regarding your application for admission to the United States. Before I take your statement, I also want to explain your rights, and the purpose and consequences of this interview.

You do not appear to be admissible or to have the required legal papers authorizing your admission to the United States. This may result in your being denied admission and immediately returned to your home country without a hearing. If a decision is made to refuse your admission into the United States, you may be immediately removed from this country, and if so, you may be barred from reentry for a period of 5 years or longer.

This may be your only opportunity to present information to me and the Department of Homeland Security to make a decision. It is very important that you tell me the truth. If you lie or give misinformation, you may be subject to criminal or civil penalties, or barred from receiving immigration benefits or relief now or in the future.

Except as I will explain to you, you are not entitled to a hearing or review.

U.S. law provides protection to certain persons who face persecution, harm or torture upon return to their home country. If you fear or have a concern about being removed from the United States or about being sent home, you should tell me so during this interview because you may not have another chance. You will have the opportunity to speak privately and confidentially to another officer about your fear or concern. That officer will determine if you should remain in the United States and not be removed because of that fear.

Until a decision is reached in your case, you will remain in the custody of the Department of Homeland Security.

Any statement you make may be used against you in this or any subsequent administrative proceeding.

Q. Do you understand what I've said to you?

A. I think for the most part.

Q. Are you willing to answer my questions at this time?

A. No.

Q. To be clear, you are refusing to answer questions regarding your admissibility?

A. Yes.

...(CONTINUED ON I-831)

REFUSED TO SIGN   I-867A (08/01/07)

_Digitally Acquired Signature_

U.S. Department of Homeland Security                    Continuation Page for Form I-867A

| Alien's Name | File Number | Date |
|---|---|---|
| MCKELLAR, AARON GEORGE | SIGMA Event: ▊ | October 4, 2024 |
| | Event No: ▊ | |

Q. As I just explained to you, you do not appear to be admissible, or to have the required
legal papers authorizing your admission to the United States. This may result in your being
denied admission and immediately returned to your home country without a hearing. If a
decision is made to refuse your admission into the United States, you may be immediately
removed from this country, and if so, you may be barred from reentry for a period of 5
years or longer.

This may be your only opportunity to present information to me and the Department of
Homeland Security to make a decision.  Do you understand?

A. Yes.


Q. Even though you are unwilling to answer my questions at this time, I am going to ask you
some specific biographic questions to establish your identity.  Do you understand?

A. Yes.


Q. Following those questions, I will be asking you about your application for admission to
the United States today.  Do you understand?

A. Yes.


Q. I am going to continue asking you these questions because the answers you provide are
necessary to determine if you are admissible to the United States.  Do you understand?

A. I don't feel comfortable with what's going on.


Q. Do you swear or affirm that all statements you are about to make are true and complete?

A.   Refuse to answer.


Q. What is your true and complete name?

A.   Refuse to answer.


Q. What is your date of birth?

A.  Refuse to answer.


...(CONTINUED ON NEXT PAGE)


| Signature | Title |
|---|---|
| *(signature)*  MCMILLEN, Kyle O | CBP OFFICER |

Digitally Acquired Signature

REFUSED TO SIGN        <u>2</u> of <u>5</u> Pages

Form I-831 Continuation Page (Rev. 08/01/07)        Digitally Acquired Signature

U.S. Department of Homeland Security                    Continuation Page for Form I-867A

| Alien's Name | File Number | Date |
|---|---|---|
| MCKELLAR, AARON GEORGE | SIGMA Event: | October 4, 2024 |
| | Event No: | |

Q. Of what county are you a citizen?

A.   Refuse to answer.


Q. Do you have any claim to United States citizenship?

A.   I would like to withdraw my application.


Q. Are you a United States legal permanent resident?

A.   Refuse to answer.


Q. Are you an American Indian born in Canada with at least fifty percent American Indian blood?

A.   Refuse to answer.


Q. What is the purpose of your trip to the United States today?

A.   I would like to withdraw my application.


Q. You are currently in L1A status as the current CEO of Eteros Technologies USA, Inc. Is this correct?

A. Refuse to answer. I want to withdraw.


Q. Your company manufactures equipment that is used in the cultivation and production of cannabis.  Other companies buy your equipment to be used to cultivate and produce cannabis that can include THC.  Is this correct?

A. Refuse to answer. I would like to withdraw.


Q. Under 21 USC 1907, "Narcotics Trafficking" is defined as "any illicit activity to cultivate, produce, manufacture, distribute, sell, finance, or transport narcotic drugs, controlled substances, or listed chemicals, or otherwise endeavor or attempt to do so, or assist, abet, conspire, or collude with others to do so."  Do you understand?

A. Refuse to answer. I want to withdraw.
... (CONTINUED ON NEXT PAGE)


| Signature | Title |
|---|---|
| MCMILLEN, Kyle O | CBP OFFICER |

Digitally Acquired Signature

REFUSED TO SIGN            3  of  5  Pages

Form I-831 Continuation Page (Rev. 08/01/07)        Digitally Acquired Signature

U.S. Department of Homeland Security                    **Continuation Page for Form** I-867A

| Alien's Name<br>MCKELLAR, AARON GEORGE | File Number<br>SIGMA Event:<br>Event No: | Date<br>October 4, 2024 |

Q. The legal definition of "aid and abet" is, "assist someone in committing or to encourage someone to commit a crime." Do you understand?

A. Refuse to answer. I want to withdraw my application.


Q. Under 21 USC 841, it is unlawful to knowingly or intentionally, "manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance." Do you understand?

A. Refuse to answer. I want to withdraw.


Q. Under Title 21 USC 812, "marihuana" or "marijuana" is listed a schedule I controlled substance and is defined as, "All parts of the plant Cannabis sativa L., whether growing or not; the seeds thereof; the resin extracted from any part of such plant; and every compound, manufacture, salt derivative, mixture, or preparation of such plant, its seeds or resin". Do you understand?

A. Refuse to answer. I want to withdraw.


Q. As the CEO of Eteros Technologies USA, Inc., you appear to be knowingly and intentionally contributing to the proliferation of the marijuana industry in the United States in violation of 21 USC 841. Do you understand?

A. Refuse to answer. I want to withdraw.


| Signature<br>MCMILLEN, Kyle O | Title<br>CBP OFFICER |

*Digitally Acquired Signature*

Form I-831 Continuation Page (Rev. 08/01/07)          REFUSED TO SIGN        4 of 5 Pages

*Digitally Acquired Signature*

# EXHIBIT D



**9901 Pacific Highway
Blaine, WA 98230**

**U.S. Customs and
Border Protection**

November 12, 2024

TO:             Douglas A. Cowgill
                Attorney-at-Law
                Vancouver, B.C.

FROM:           Harmit S. Gill
                Area Port Director
                Blaine, Washington

SUBJECT:        Request to Reconsider and Vacate ERO of Aaron McKellar

Mr. McKellar presented himself for admission to the United States at the Peace Arch Crossing
for the Blaine Port of Entry in Blaine, WA on October 4, 2024. Mr. McKellar was seeking
admission as a L1A as the Chief Executive officer and owner of Eteros Technologies USA, Inc.
During secondary examination Mr. McKellar repeatedly refused to answer questions as recorded
under I-867A Record of Sworn Statement in Proceedings under Section 235(b)(1) of the
Immigration and Naturalization Act (INA). At the conclusion of Mr. McKellar's examination, he
was found inadmissible under section 212(a)(2)(C)(i) of the INA due to the involvement of the
Eteros Technologies USA, Inc in the production of marijuana and the proliferation of the
marijuana industry, which results in reason to believe that employees of the organization are
engaged in narcotics trafficking and inadmissible under section 212(a)(2)(C)(i) of the INA.

The petitioning entity, of which Mr. McKellar is an owner, Eteros Technologies USA, Inc.
manufactures and sells harvesting equipment for the hemp and cannabis industry. Their products
include the Mobius Cannabis Automation suite, MBX Bucker, M108S Trimmer, M9 Sorter,
conveyors, and M210 and M60 Mills, all of which are manufactured and marketed for use in the
cannabis and marijuana industries. The customers shown on the Mobius Trimmer website
include marijuana dispensaries.

Under Title 21 USC 1907 Narcotics Trafficking is defined as "any illicit activity to cultivate,
produce, manufacture, distribute, sell, finance, or transport narcotic drugs, controlled substances,
or listed chemicals, or otherwise endeavor or attempt to do so, or assist, abet, conspire, or collude
with others to do so".

The legal definition of "aid and abet" is, "assist someone in committing or to encourage someone
to commit a crime".

Under Title 21 USC 841 it is unlawful to knowingly or intentionally, "manufacture, distribute, or
dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance".

Under Title 21 USC 812 "marihuana" or "marijuana" is listed a schedule I controlled substance and is defined as, "All parts of the plant Cannabis sativa L., whether growing or not; the seeds thereof; the resin extracted from any part of such plant; and every compound, manufacture, salt derivative, mixture, or preparation of such plant, its seeds or resin".

Under the regulations and definitions contained within Title 21, the petitioning entity, Eteros Technologies USA, Inc., and the beneficiary, Mr. McKellar, are encouraging, promoting and assisting in the production of marijuana for the purpose of distributing and dispensing and thus, are aiding and abetting the narcotics trafficking of marijuana in the United States in violation of 21 USC 841.

In the lawsuit Eteros Technologies USA, Inc. v, United States argued before the United States Court of International Trade (CIT), the petitioning entity stipulated for the purpose of the litigation that the merchandise which they were importing into the United States for distribution to their customers, satisfies the federal statutory definition of "drug paraphernalia". While the ruling in this lawsuit was in favor of Eteros Technologies USA, Inc., it did not determine their business was outside the scope of federally illegal marijuana production, it simply granted them an exemption from the importation prohibitions in Title 21 USC 863. This ruling solely addressed the import restrictions associated with marijuana drug paraphernalia. 21 USC 863, and in particular, 21 USC 863(f), has no basis on the federal legality or immigration consequences pertaining to an individual's involvement in the marijuana industry by a noncitizen. By stipulating that their products are drug paraphernalia, Eteros Technologies USA, Inc. has demonstrated that they are knowingly and intentionally contributing to the proliferation of the marijuana industry in the United States and are therefore in violation of 21 USC 841. The CIT is a court of limited jurisdiction and lacks authority to set precedent over U.S. immigration law. The CIT ruling does not form a basis to argue that Mr. McKellar is admissible in states that have legalized marijuana.

Based on the aforementioned, Mr. McKellar is inadmissible under section 212(a)(2)(C)(i) of the INA.

# <u>EXHIBIT E</u>

**Record of Sworn Statement in Administrative Proceedings**

U.S. Department of Homeland Security     SIGMA Event: ▮▮▮▮

Event Number: ▮▮▮▮

Office: YVR/CYVR/7922 - Vancouver International
　　　Airport. BC. Canada

File No: ▮▮▮▮

Statement by: MCKELLAR, AARON GEORGE

In the case of: MCKELLAR, AARON GEORGE

At: VANCOUVER (VCV)　　　　　　　　　　　　Date: 04/29/2025

Before: GUTIERREZ, CAR05457 - CBP OFFICER
　　　　　　(Name and Title)

*[signature]*
*Digitally Acquired Signature*

In the ___ENGLISH___ language. Interpreter: _____ Interpreter employed by: _____

I am an officer of the United States Department of Homeland Security, authorized by law to administer oaths and take
testimony in connection with the enforcement of the Immigration and Nationality laws of the United States.
I desire to take your sworn statement regarding
　Your application for admission into the U.S.

Q. Do you understand what I've said to you?
A. Yes.

Q. Do you have any questions?
A. No.

Q. Any statement you make must be given freely and voluntarily. Are you willing to
answer my questions at this time?
A. Yes.

Q. Do you swear or affirm that all the statements you are about to make are true and
complete?
A. Yes.

Q. What is your complete and correct name?
A. Aaron George MCKELLAR.

Q. Have you ever used or been known by any other name?
A. No.

Q. What is your date of birth?
A. ▮▮▮▮

Q. How old are you?
A. 45 years old.

Q. Where were you born?
A. Surrey. B.C. Canada.

Q. What country are you a citizen of?
A. Canada.

Q. Do you have dual nationality with any other country?
A. No.

Q. What is your marital status?
...(CONTINUED ON I-831)

Initials: _____　REFUSED TO SIGN
*Digitally Acquired Signature*

I-877 (Rev. 08/01/07)

U.S. Department of Homeland Security        **Continuation Page for Form** I-877

| Alien's Name<br>MCKELLAR, AARON GEORGE | File Number<br>SIGMA Event:<br>Event No: | Date<br>April 29, 2025 |
|---|---|---|

A. Divorced.

Q. What is your ex wife's name?
A. Amanda Mckellar.

Q. In what country was your ex wife born in?
A. Same, Surrey, B.C. Canada.

Q. What country is your exwife a citizen of?
A. Canada.

Q. Do you have any children?
A. Three children.

Q. What is the citizenship of your children?
A. All Canadian.

Q. Are there any petitions on file for you to become a permanent resident of the U.S.?
A. No.

Q. Do you claim to have any First Nations status?
A. No.

Q. Are your parent's Lawful Permanent Residents or citizens of the United States?
A.  No.

Q. What is your father's name?
A. Gordon Mckellar.

Q. What country was your father born in?
A.  Scotland.

Q. What country is your father a citizen of?
A.  Here B.C. Canada.

Q. What is your mother's name?
A. Cindy Mckellar.

Q. What country was your mother born in?
A.  Here Canada, Surrey.

Q. What country is your mother a citizen of?
A.  Canada.

Q. Do you have any immediate, family members that are either United States Citizens, or
Lawful Permanent Residents?
A.  No.

Q. Have you ever been arrested or convicted of a crime in Canada, the U.S. or anywhere else
in the world?
A. No.

...(CONTINUED ON NEXT PAGE)

| Signature<br>GUTIERREZ, CAR05457 | Title<br>CBP OFFICER |
|---|---|

*Digitally Acquired Signature*

**REFUSED TO SIGN**      2 of 7 Pages

Form I-831 Continuation Page (Rev. 08/01/07)     *Digitally Acquired Signature*

U.S. Department of Homeland Security                 **Continuation Page for Form** I-877

| Alien's Name<br>MCKELLAR, AARON GEORGE | File Number<br>SIGMA Event:<br>Event No: | Date<br>April 29, 2025 |
|---|---|---|

Q. What is the address where you reside and phone number?
A. ████████████████████

Q. Who do you live with at this address?
A. Just my three kids on and off.

Q. Are you currently employed?
A. Yes through Eteros.

Q. What is your title at Eteros?
A. CEO.

Q. Where is Eteros headquarters?
A. Surrey, B.C. Canada.

Q. When did you establish Eteros in Canada?
A. In 2016.

Q. What type of services does Eteros provide?
A. Machine shop, fabrication shop, mechanical design.

Q. What is your educational background?
A. High School and an apprenticeship as a marine mechanic.

Q. Does Eteros have a U.S. office?
A. Yes.

Q. What is the name of the U.S. office?
A. Eteros as well.

Q. When was the U.S. office established?
A. Approximately three of four years ago.

Q. What type of service does the U.S. office provide?
A. They do assembly, warehousing, and we have sales that use the U.S. as a home base.

Q. Where is the head office of Eteros in the U.S. located?
A. 6175 Sandhill Rd Las Vegas, Nevada.

Q. What are your primary responsibilities as CEO on a day to day basis?
A. I'm involved pretty heavily in the design of the equipment and I sit in all the design meetings.  I am also involved in a lot of legal stuff.  I have all the heads report to me. We have operations, sales, and marketing.

Q. What are the key decisions that fall solely under your purview?
A. Financials, banking, legal, pattens, final decision on new designs if we will go ahead with it or not.

Q. How many employees of your company report directly to you?
A. Six, we have a pretty opened door policy so people do come to me.

Q. Do those six employees include both the U.S. and Canadian office?
... (CONTINUED ON NEXT PAGE)

| Signature<br>*[signature]* GUTIERREZ, CAR05457 | Title<br>CBP OFFICER |
|---|---|

*Digitally Acquired Signature*

Form I-831 Continuation Page (Rev. 08/01/07)          *Digitally Acquired Signature*

**U.S. Department of Homeland Security**                     **Continuation Page for Form** I-877

| Alien's Name | File Number | Date |
|---|---|---|
| MCKELLAR, AARON GEORGE | SIGMA Event:<br>Event No: | April 29, 2025 |

A. Yes.

Q. The machines that Eteros manufactures are harvesting machines, correct?
A. No it is one of the machines that we manufacture.

Q. So one of the machines that Eteros manufactures is a harvesting machine, correct?
A. No it is not we do not harvesting machine.

Q. How many machines does Eteros manufacture?
A. Close to twenty machines, I believe the machine that is being questioned is the trimming machine. That was the machine that was seized a couple of years ago.

Q. What is the trimming machine called?
A. Movius the model is M108S.

Q. What do your other machines that you manufacture do?
A. Conveyers, sorting machines, grinding machines, vision system for sorting as well.

Q. Can you explain the crops that fall under the cannabis industry?
A. Hemp and marijuana. Please reference the statement that I provided.

Q. Are you referring to the statement that you presented dated April 28th, 2025?
A. Correct, yes.

Q. What industry do you sell your machines to?
A. Mainly the cannabis industry.

Q. To what countries do you sell your machines to?
A. Obviously to Canada and the U.S, Portugal, Germany, Australia.

Q. Are the machines capable of processing marijuana, or are they intended only for hemp?
A. There is absolutely no way to tell. It is like asking what a shovel is used for. I cannot tell you anything about the cannabis I can tell you about the machines.

Q. Are the machines that you sell to the Cannabis industry used in the processing of illegal marijuana?
A. My answer to that would be I don't know. I have no way of telling where they are being used. Please reference letter.

Q. How does Eteros market its harvesting machines?
A. We have our website, there is a big Las Vegas Trade show that we attend, for our European side we have another company that helps us with the marketing up there.

Q. What is the name of the Las Vegas Trade show that you attend to market your products?
A. MJBIZ Conference.

Q. What does MJ stand for?
A. I would only be guessing.

Q. What is your guess?
A. If I had to guess it would probably Marijuana.

...(CONTINUED ON NEXT PAGE)

| Signature | Title |
|---|---|
| ~~Figure~~ GUTIERREZ, CAR05457 | CBP OFFICER |

*Digitally Acquired Signature*

REFUSED TO SIGN                     **4** of **7** Pages

Form I-831 Continuation Page (Rev. 08/01/07)          *Digitally Acquired Signature*

U.S. Department of Homeland Security                    **Continuation Page for Form** I-877

| Alien's Name<br>MCKELLAR, AARON GEORGE | File Number<br>SIGMA Event:<br>Event No: | Date<br>April 29, 2025 |
|---|---|---|

Q. How many companies in the U.S. do you sell your manufactured product to?
A. I cannot answer that. Over the years over 100 and less than 1000 would be my best
guess.

Q. What companies do you sell the Movius M108S to?
A. Cannabis companies.

Q. What specific companies do you sell the Movius M108S?
A. I can name a couple of big ones like Trueleaf and Crestco.

Q. Where are these companies located?
A. Multistate in the U.S., they are referenced as license producers, we refer to them as
LP's.

Q. Licensed producers of what crop?
A. Cannabis.

Q. When you say cannabis are you referring to the production of hemp and illegal marijuana?
A. Again, reference my statement. Equipment manufacturers do not know. I'm just an
equipment manufacturer; I am not a plant expert.

Q. Does Trueleaf or Crestco produce Marijuana with more than .3% THC?
A. I do not know.

Q. When you first started the this manufacturing business Eteros who did you which industry
did you market to or specifically make the machines for?
A. The Canadian Cannabis Industry.

Q. When did you start selling to the U.S. Cannabis Industry?
A. That is somewhere in the statement that I reference, but I believe June 2019.

Q. How frequently do you collaborate with the Director of Strategy and Business Development
(Amanda James)?
A. On a daily basis.

Q. What is your involvement in vetting and implementing new business development
opportunities with Ms. James?
A. We are collaborating daily on any big decisions we would be collaborating with one
another and day to day business.

Q. How closely do you work with Ms. James in identifying new markets and clients?
A. Not very close.

Q. Have you ever approved or signed off on marketing campaigns or strategies aimed at
expanding marketing campaigns or strategies aimed at clients that cultivate marijuana
products?
A. Not that I am aware of.

Q. Have you ever consulted with marijuana growers to develop product improvements or
customizations?
A. The short answer yes, but so much of our development was done years ago on this
equipment in Canada.

...(CONTINUED ON NEXT PAGE)

| Signature<br>GUTIERREZ, CAR05457 | Title<br>CBP OFFICER |
|---|---|

*Digitally Acquired Signature*

REFUSED TO SIGN            5    of    7    Pages

Form I-831 Continuation Page (Rev. 08/01/07)        *Digitally Acquired Signature*

U.S. Department of Homeland Security                  **Continuation Page for Form** I-877

| Alien's Name<br>MCKELLAR, AARON GEORGE | File Number<br>SIGMA Event:<br>Event No: | Date<br>April 29, 2025 |
|---|---|---|

Q. Are you aware that marijuana is illegal under United States Federal law?
A. Yes.

Q. Are you aware that your equipment is used to harvest both legal hemp and illegal marijuana?
A. Again, please refer to the statement I provided.

Q. What measures do you take to ensure that your machines are not used for illegal cultivation?
A. Again just refer to the statement. I would got back to the shovel analogy. I manufacture a shovel and you will not know what it will be used for. We are a equipment manufacture and operating within U.S. Federal Law.

Q. Where are traveling today?
A. Hopefully Las Vegas.

Q. How long do you intend to be in the U.S. on this trip?
A. Just one day, coming back tomorrow night.

Q. What is the purpose of your trip?
A. Business work.

Q. Under what class of admission are you entering as?
A. L1A.

Q. You have found to be inadmissible to the United States pursuant to section 212(a)(2)(C)(i)(I) (Trafficker in Controlled Substance) and 212(a)(7)(A)(i)(I) (Immigrant without Documents) of the INA. Do you understand?
A. Yes.

Q. You will require an approved Waiver for your inadmissibility for all future entries into the United States and your L1A visa status is being revoked. Do you understand?
A. Yes.

| Signature<br>GUTIERREZ, CAR05457 | Title<br>CBP OFFICER |
|---|---|

*Digitally Acquired Signature*

Form I-831 Continuation Page (Rev. 08/01/07)          *Digitally Acquired Signature*

REFUSED TO SIGN          6 of 7 Pages

I have read (or have had read to me) the foregoing statement, consisting of ___7___ pages. I state that the answers made therein by me are true and correct to the best of my knowledge and belief and that this statement is a full, true, and correct record of my interrogation on the date indicated by the above-named officer of the Department of Homeland Security. I have initialed each page of this statement (and the correction(s) noted on page(s) _____ ).

REFUSED TO SIGN

Signature _____
*Digitally Acquired Signature*

Subscribed and sworn to before me at   YVR/CYVR/7922 - Vancouver International Airport, BC, Canada

_____ on 04/29/2025 14:34
                              *Digitally Acquired Signature*

GUTIERREZ, CAR05457
CBP OFFICER

Officer, United States Department of Homeland Security

*Digitally Acquired Signature*

Witnessed by: _____

LAU, CAR32126 - CBP OFFICER

## RECORD OF SWORN STATEMENT

UNITED STATES DEPARTMENT OF HOMELAND SECURITY

Form I-263A (Rev. 08/01/07)

# EXHIBIT F


**DEPARTMENT OF HOMELAND SECURITY**
**U.S. Customs and Border Protection**

# WITHDRAWAL OF APPLICATION FOR ADMISSION/CONSULAR NOTIFICATION

SIGMA Event: ▮                    File No. ▮

Basis for Action (Check all that apply):                    Date    04/29/2025

- ☒ Application for Admission Withdrawn
- ☐ Visa/BCC Canceled
- ☐ VWP Refusal
- ☐ Ordered removed (inadmissible) by immigration judge - Section 235(b)(2) (order attached)
- ☐ Ordered removed (inadmissible) by DHS - Section 235(b)(1) (order attached)
- ☐ Waiver revoked (212(d)(3)) (order attached)
- ☐ Departure required (8 CFR 240.25) (Form I-213 attached)

Notice to: American Consul Vancouver, British Columbia, Canada          From: DHS Vancouver International Airport

| (Location) | (Location) |
|---|---|

Name (Family, Given, Middle):

MCKELLAR. AARON GEORGE

| Citizenship: | Country of Birth: | Date of Birth: |
|---|---|---|
| CANADA | SURREY, BRITISH COLUMBIA, CANADA | ▮ |

Complete Foreign Mailing Address (Street Address, City, Country):

▮

Complete U.S. Address (Street Address, City, State, Zip):

▮

| Airline/Vessel of Arrival: | Port of Arrival: | Date of Arrival: |
|---|---|---|
| AIR CANADA, Flt#: 1058 | Vancouver International Airport | 04/29/2025 |

| Visa Number/Type: | Date/Place of Visa Issuance: | Social Security Number: |
|---|---|---|
| None | None | None |

Reasons (Include all pertinent facts concerning denial of application for admission, including use of altered, counterfeit or fraudulent document):

**WD**

On April 29, 2025, subject Aaron George MCKELLAR (D.O.B: ▮ applied for entry into the United States at Vancouver International Airport Preclearance. Subject presented a valid Canadian Passport with #P370539PC to the primary Customs and Border Protection Officer and was referred to passport control secondary for further questioning.

Mr. MCKELLAR was placed under oath and sworn statement was taken. After review of subject's sworn statement it was determined that subject was inadmissible into the United States.

At the time of his application for admission Aaron George MCKELLAR was inadmissible to the United States pursuant to Section 212(a)(2)(C)(i) (Trafficker in Controlled Substance) and 212(a)(7)(A)(i)(I) (Immigrant without documents). Subject was processed for a WD with the approval of SCBPO Ascencio and the concurrence of Chief Holliday.

(Continue on reverse or attach separate sheet, as needed)

| Officer's Name and Title: | Officer's Signature: |
|---|---|
| GUTIERREZ, CAR05457 | |
| Last Name          First Name          M.I. | _Digitally Acquired Signature_ |
| CBP OFFICER | |

| Supervisor's Name and Title: | Supervisor's Signature: |
|---|---|
| ASCENCIO, CAQ04803 | |
| Last Name          First Name          M.I. | |
| SUPERVISORY CBP OFFICER | |

**TO BE COMPLETED BY ALIEN WHEN APPLICATION FOR ADMISSION IS WITHDRAWN.**

I understand that my admissibility is questioned for the above reasons, which I have read or which have been read to me in the     **ENGLISH**     language. I request that I be permitted to withdraw my application for admission and return abroad. I understand that my voluntary withdrawal of my application for admission is in lieu of a formal determination concerning my admissibility:

☐ by a CBP Officer

☒ in removal proceedings before an immigration judge.

04/29/2025                    **REFUSED TO SIGN**

| Date | Signature of Alien |
|------|--------------------|

*Digitally Acquired Signature*

## INSTRUCTIONS

Aliens who appear inadmissible pursuant to section 235(b)(2) of the INA who elect to withdraw application for admission may choose at any time to appear before an immigration judge for a hearing in removal proceedings. Aliens who appear inadmissible pursuant to section 235(b)(1) or inadmissible pursuant to 8 CFR 217.4 are not entitled to a hearing before an immigration judge.

If a visa is canceled pursuant to 22 CFR 41.122 or a Border Crossing Card is voided under authority of 22 CFR 41.32 or 8 CFR 212.6, forward a copy of CBP Form I-275 to consular post that issued the canceled or voided document.

When forwarding to consular post, attach:

- Any lifted document
- Relating Form I-213 or I-862 (Notice to Appear)
- Relating removal or waiver revocation order
- Any relating memorandum report or sworn statement

# **<u>EXHIBIT G</u>**

March 28, 2025

**U.S. Department of Homeland Security**
U.S. Citizenship and Immigration Services
California Service Center
2642 MICHELLE DRIVE
TUSTIN, CA 92780

ETEROS TECHNOLOGIES USA INC
c/o AARON MCKELLAR
6175 SOUTH SANDHILL RD STE 600
LAS VEGAS, NV 89120

 **U.S. Citizenship and Immigration Services**



Form I-129, Petition for a Nonimmigrant Worker

## NOTICE OF INTENT TO REVOKE

On October 25, 2024, you, ETEROS TECHNOLOGIES USA INC (petitioner), filed a Petition for a Nonimmigrant Worker (Form I-129) with U.S. Citizenship and Immigration Services (USCIS), seeking nonimmigrant classification for AMANDA JAMES (beneficiary) under section 101(a)(15)(L) of the Immigration and Nationality Act (INA). USCIS approved the petition on February 11, 2025.

After careful consideration of the record, and in accordance with the INA and Title 8 of the Code of Federal Regulations (8 CFR), USCIS intends to revoke the petition.

USCIS may revoke an L-1 petition at any time, even after the expiration of the petition, subject to the conditions set forth in 8 CFR 214.2(l)(9). USCIS is sending you this notice of intent to revoke your L-1 petition pursuant to 8 CFR 214.2(l)(9)(iii)(A)(5), based on its determination that the approval of the petition involved gross error.

Upon the initial filing of the instant petition, you provided a letter of support dated October 16, 2024, which was signed by Aaron McKeller, CEO on behalf of your company. In his letter, Mr. McKeller explains:

> "Eteros' sale of this equipment in the US does not present issues of illegality. However, should the Department of Homeland Security, USCIS, or USCBP, want to explore this issue, Eteros directs the reader to **Appendix 1**, which consists of a letter from Eteros' Customs Counsel supported by three attachments. The letter details the legal framework surrounding the importation of Eteros cannabis-related merchandise, citing the favorable determination from the U.S. Court of International Trade (CIT) that Eteros is authorized to import such merchandise under 21 U.S.C. § 863(f)(1)…
>
> The CIT rulings in Eteros Technologies USA Inc. v. United States…established that Eteros' importation of cannabis-related merchandise is lawful and not subject to federal prohibitions."

However, Mr. McKeller's characterization is not quite accurate. In the ruling of your case, the U.S. Court of International Trade ("CIT") did not find that your cannabis-related merchandise does not constitute drug paraphernalia under the Controlled Substances Act ("CSA"). Instead, the court found that your cannabis-related merchandise fell under the exemption at 21 U.S.C. § 863(f) which states, in



part:

> This section shall not apply to
>
> > (1) any person authorized by local, State, or Federal law to manufacture, possess, or distribute such [paraphernalia] items;

In November 2012, the state of Washington amended its prohibitions on drug paraphernalia to exclude items related to marijuana. In doing so, the CIT found that the state of Washington effectively "authorized" your company to manufacture, possess, or distribute your cannabis-related merchandise in Washington State. However, the CIT ruling only applies to the state of Washington, and therefore, although you may have an exemption under 21 U.S.C. § 863(f)(1) for activities you conduct in Washington, the evidence in the record does not indicate that you restrict the marketing, distribution, and sale of your cannabis-related merchandise to only Washington State.

On November 15, 2024, USCIS issued a request for evidence ("RFE") notice but did not address the issue as to whether the activities your business conducts in areas outside of Washington would also qualify for an exemption under 21 U.S.C. § 863(f)(1).

You have stated that the beneficiary will spend 20% of her time "Directing the Sales department," 20% "Directing the Marketing department," and 20% "Directing the Customer Experience department," all of which are related to your cannabis-related merchandise, which, as will be discussed in more detail below, appears to indicate that the beneficiary's proposed employment involves aiding and abetting the cultivation of marijuana, a Schedule I controlled substance. USCIS's decision here is based on a finding that the beneficiary's employment would be in violation of 21 U.S.C. § 812, 841(a)(1) which is not discussed in the CIT ruling.

Due to the fact that USCIS did not address this issue prior to its initial decision, it is determined that approval of the petition involved gross error because the proposed employment involves aiding and abetting the cultivation, distribution, and possession of marijuana in violation of the Controlled Substances Act (CSA).



## Procedural History

On June 10, 2021, the beneficiary appeared at the Port of Entry in Blaine, Washington with a prior *Form I-129, Petition for Nonimmigrant Worker* (receipt # ▮▮▮▮▮▮▮) requesting an L-1A classification. The beneficiary provided documentation indicating that your company is an "equipment manufacturer" and that the beneficiary would perform in an executive capacity as the Director of Strategy and Business Development. The evidence submitted with the initial Form I-129 also indicated that the beneficiary's job responsibilities would include directing the management, responsibility for the organization's strategic planning efforts, overseeing unique partnership and sales arrangements, and serving as a subject matter expert on Good Manufacturing Practices with respect to processing equipment. CBP approved the petition filed on behalf of the beneficiary for a validity period of three (3) years, from June 10, 2021 until June 9, 2024.

After the expiration of the beneficiary's first Form I-129, the beneficiary appeared at the Port of Entry in Blaine, Washington on June 11, 2024, requesting an L-1A classification with a new Form I-129 (receipt # ▮▮▮▮▮▮▮). This time, the beneficiary was interviewed. The interview revealed that your company is engaged in the sale and distribution of agricultural equipment for processing of cannabis, including marijuana. As a result, on June 11, 2024, the beneficiary was refused admission

into the United States. CBP forwarded the petition to USCIS with a recommendation for denial. On August 30, 2024, you requested to withdraw that petition. USCIS processed a withdrawal on September 11, 2024.

On November 25, 2024, you filed the current L-1A petition directly with USCIS. This petition was approved by USCIS on February 11, 2025, in error. USCIS now intends to revoke the approval of the petition.

### Legality of Employment

USCIS's primary responsibility is to adjudicate immigration benefit requests available under applicable immigration law. However, USCIS will also take into account other intersecting areas of law, including federal criminal law. In other words, USCIS cannot approve a visa petition that is based on employment that contravenes another federal law.

Here, USCIS must determine whether the employment in question violates federal law under the Controlled Substances Act (CSA) found at 21 of the U.S. Code, Section 801 et seq. Specifically, the CSA imposes restrictions on the manufacture and distribution of marijuana in the United States. 21 U.S.C. § 812, 841(a)(1). Although certain states have legalized and decriminalized marijuana, marijuana remains a Schedule I controlled substance under 21 USC § 812(c). The CSA states that "it shall be unlawful for any person knowingly or intentionally … manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance. 21 U.S.C. §841(a)(1). It is also illegal under federal law to conspire to **or aid and abet the cultivation, distribution, and possession of marijuana** as defined in the CSA. 21 U.S.C. § 846; 18 U.S.C. § 2; 18 U.S.C. § 371.

The CSA defines marijuana as the following:

> A.   Subject to subparagraph (B), the term "marihuana" means all parts of the plant Cannabis sativa L., whether growing or not; the seeds thereof; the resin extracted from any part of such plant; and every compound, manufacture, salt,       derivative, mixture, or preparation of such plant, its seeds or resin.

> B.   The term 'marihuana' does not include –

>> (i)   hemp, as defined in section 297A of the Agricultural Marketing Act of 1946;

The term 'hemp' in section 297A of the Agricultural Marketing Act of 1946 is added as:

> The term 'hemp' means the plant Cannabis sativa L. and any part of that plant, including the seeds thereof and all derivatives, extracts, cannabinoids, isomers, acids, salts, and salts of isomers, whether growing or not, with a delta-9 tetrahydrocannabinol concentration of not more than 0.3 percent on a dry weight basis. P.L. 115-334, Sec. 10113.

The mere presence of cannabidiol (CBD) does not determine whether a substance is within the scope of the CSA. If the CBD is derived from the viable seeds, leaves, and flower of a plant containing more than 0.3 percent of tetrahydrocannabinol (THC), then it is referred to as cannabis or marijuana CBD and is subject to CSA regulation. Although certain states have legalized and decriminalized marijuana for medicinal and/or recreational use, marijuana remains Schedule I controlled substance under 21 USC § 812(c).



USCIS encourages you to sign up for a USCIS online account. To learn more about creating an account and the benefits, go to https://www.uscis.gov/file-online.

On the other hand, if the CBD is derived from a plant containing less than 0.3 percent THC, it is referred to as hemp CBD and is not regulated by the CSA but may be subject to other regulations.

Notably, the Agriculture Improvement Act of 2018 (commonly known as the "2018 Farm Bill"), generally authorized the cultivation, processing, distribution, and possession of hemp that is produced in a manner consistent with the 2018 Farm Bill and any of its associated restrictions and regulations. P.L. 115-334, §§10113-10114. The 2018 Farm Bill also removed hemp, as defined above, from the statutory definition of marijuana under the CSA. P.L. 115-334 §12619(a) and (b). Importantly, as mentioned above, products made from hemp generally contain no more than 0.3 percent THC.

In implementing the 2018 Farm Bill, the Drug Enforcement Agency states in 85 FR 51639:

> Therefore, the [Agriculture Improvement Act of 2018, Public Law 115-334 (AIA)] limits the control of tetrahydrocannabinols (for Controlled Substance Code Number 7370). For tetrahydrocannabinols that are naturally occurring constituents of the plant material, Cannabis sativa L., any material that contains 0.3% or less of $\Delta^9$-THC by dry weight is not controlled, unless specifically controlled elsewhere under the CSA. Conversely, for tetrahydrocannabinols that are naturally occurring constituents of Cannabis sativa L., any such material that contains greater than 0.3% of $\Delta^9$-THC by dry weight remains a controlled substance in schedule I.

> The AIA does not impact the control status of synthetically derived tetrahydrocannabinols (for Controlled Substance Code Number 7370) because the statutory definition of "hemp" is limited to materials that are derived from the plant Cannabis sativa L. For synthetically derived tetrahydrocannabinols, the concentration of $\Delta^9$-THC is not a determining factor in whether the material is a controlled substance. All synthetically derived tetrahydrocannabinols remain schedule I controlled substances.

> 85 FR 51639.



Any person who aids, abets, counsels, commands, induces or procures the commission of an offense against the United States is punishable as a principal. 18 U.S.C. §2

During the June 11, 2024 interview with CBP, the beneficiary stated that the petitioner manufactures and distributes machinery used for processing a Schedule I controlled substance, namely marijuana. While the beneficiary indicated that she does not know the THC level of products that the petitioner's clients are producing, the beneficiary stated that roughly ninety (90) percent of the machinery the petitioner sells is used in the production of marijuana and is specifically marketed for that purpose. When asked if she knew what percentage of the machines are sold to cannabis businesses versus hemp businesses, the beneficiary stated "Most of these businesses are producing products that are both cannabis and hemp so if they have 20 different skews some of them might be hemp product and some of them might be cannabis skews. So I would say roughly 10 percent would be for hemp products and the rest would be mixed." The beneficiary was then asked a follow up question: "so roughly 90 percent of your product is used in the production of cannabis marijuana products?" She responded "it would be a step along the way. Our equipment separates flower from leaf but that doesn't make a complete product, so it is the first in the post-harvest production steps."

The beneficiary indicated that she knowingly and purposefully markets the equipment for that use, using various methods, such as trade shows, email campaigns, and web-based search engine optimization marketing.

When asked about the equipment marketed and sold by the petitioner, the beneficiary stated that "we

manufacture harvesting equipment" that is "used to break down plant material into different components" and is "primarily for cannabis plants but it could be used on any other plants with a similar morphology to it".

Also, when asked to elaborate regarding who the equipment is marketed to, the beneficiary stated that the petitioning business is "targeting cultivators and cannabis processors". The beneficiary further indicated that the petitioning business specifically targets "licensed cannabis and hemp producers. Some come from the pharmaceutical side and some come from the agriculture side. Both have similar needs".

The beneficiary has been working with your company in an executive capacity as the Director of Strategy and Business Development since 2017 and is thus intimately familiar with your company's operations and clients. The interview revealed that the beneficiary directs the management of your company and helps you market your machinery to the marijuana industry, business to business, and also provides demonstrations of your equipment at trade shows. The beneficiary stated that your business knowingly and purposefully markets the equipment for use in the production of marijuana. As such, the evidence in the record as well as the beneficiary's sworn testimony to CBP suggests that the proposed employment involves aiding and abetting the cultivation of marijuana, a Schedule I controlled substance.

Moreover, the evidence suggests that your company is directly involved in manufacturing and selling harvesting equipment that is specifically designed and marketed to process marijuana plants. It is noted that the petitioner's offices are located in the state of Nevada and the petitioning organization markets and sells the product nationwide and not only in the state of Washington. As such, while the petitioning organization may be "authorized" under 21 U.S.C. § 863(f)(1) and thereby exempted in Washington State from subsection 863(a)'s prohibition on importing the harvesting equipment, your organization's business activities and the beneficiary's employment appear to aid and abet the cultivation, distribution, and possession of marijuana in violation of the Controlled Substances Act.



Except where a different standard is specified by law, a petitioner must prove eligibility for the requested immigration benefit by a preponderance of the evidence. *Matter of Chawathe*, 25 I&N Dec. 369, 375-76 (AAO 2010). Under the preponderance of the evidence standard, the evidence must demonstrate that the petitioner claim is "probably true." Id. at 376. It is the petitioner's burden to show by a preponderance of the evidence that the proposed employment is lawful under federal law. However, it has not been demonstrated that it is more likely than not that the beneficiary's employment would not violate federal law.

The beneficiary's employment appears to aid and abet the cultivation, distribution, and possession of marijuana in violation of the Controlled Substances Act. Thus, in accordance with 8 CFR 214.2(l)(9)(iii)(A)(5), it is the intent of the USCIS to revoke the petition because the approval of the petition involved gross error.

You are afforded 30 days from the date of this notice to submit additional information, evidence or arguments to support the petition. Additionally, when USCIS serves a notice by mail, three days are added to the prescribed period in which to respond. Any such information, evidence or arguments will be carefully reviewed prior to a final determination in this matter. Failure to respond, however, will result in adjudication of the petition on the basis of the record, as it is now constituted, including the information referred to above.

**Your response must be received in this office by April 30, 2025.**

USCIS encourages you to sign up for a USCIS online account. To learn more about creating an account and the benefits, go to https://www.uscis.gov/file-online.

Any response to this notice should be sent to the following address:

## U.S. CITIZENSHIP AND IMMIGRATION SERVICES
**Texas Service Center**
**6046 N Belt Line Rd**
**Irving, TX 75038**

For more information, visit our website at www.uscis.gov or call us at **1-800-375-5283.**

Telephone service for the hearing impaired: **1-800-767-1833.**

## PLACE THE ATTACHED COVERSHEET AND THIS ENTIRE LETTER ON TOP OF YOUR RESPONSE.

Sincerely,

John M. Allen
SCOPS Deputy Associate Director of Adjudications



USCIS encourages you to sign up for a USCIS online account. To learn more about creating an account and the benefits, go to https://www.uscis.gov/file-online.

# COVERSHEET
## SCANNING REQUIRED
### PLEASE RETURN THE REQUESTED INFORMATION AND
### ALL SUPPORTING DOCUMENTS WITH
### THIS PAGE ON TOP TO:
### USCIS TSC
### Attn: RFE/NOIT/NOIR/NOID RESPONSE
### 6046 N Belt Line Rd. STE 172
### Irving, TX 75038-0015

Please check the appropriate box regarding if there is a new Form G-28, Notice of Entry of Appearance as Attorney or Accredited Representative, additional fees, additional forms, etc. Please place the new Form G-28, additional fees, additional forms directly under this sheet.

### Yes, there is:

☐ **A New G-28**       ☐ **Additional Fees**

☐ **Additional Forms**   ☐ **Other:**

If you have moved, write your current address in the blank area below. Please be sure to write clearly.

**(Select appropriate check box)**

☐ **Applicant/Beneficiary**       ☐ **Petitioner**

**New Address:**

As required by Title 8, Code of Federal Regulations (8 CFR) section 265.1, *Reporting change of address*: Except for those exempted by section 263(b) of the Act, all aliens in the United States required to register under section 262 of the Act must report each change of address and new address within 10 days of such change in accordance with instructions provided by USCIS.

### NOTICE OF INTENT TO REVOKE

Form I-129, Petition for a Nonimmigrant Worker



SRC2502550232

JAMES, AMANDA

