1          The Honorable Kymberly K. Evanson

2

3          UNITED STATES DISTRICT COURT FOR THE
           WESTERN DISTRICT OF WASHINGTON
4                      AT SEATTLE

5  ETEROS TECHNOLOGIES USA, INC.; and       Case No. 2:25-cv-00181-KKE
   AARON MCKELLAR, a citizen of Canada;
6  AMANDA JAMES, a citizen of Canada; and    **DEFENDANTS'**
   RYAN BJERGSO, a citizen of Canada;        **MOTION TO DISMISS PLAINTIFFS'**
7                                            **AMENDED COMPLAINT**
                    Plaintiffs,
8                                            Noted for Consideration:
        v.                                   October 17, 2025
9
   UNITED STATES OF AMERICA;
10
   UNITED STATES DEPARTMENT OF
11 HOMELAND SECURITY, a department of the
   United States government;
12
   UNITED STATES CUSTOMS AND BORDER
13 PROTECTION, the United States Department of
   Homeland Security; and
14
   UNITED STATES CITIZENSHIP AND
15 IMMIGRATION SERVICES, the United States
   Department of Homeland Security;
16
                    Defendants.
17

18

19         Defendants, through their attorneys, respectfully move to dismiss Plaintiffs' Amended

20 Complaint (Dkt. 34) with prejudice under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

21                            **STANDARDS OF REVIEW**

22 **I.      Dismissal Under Federal Rule of Civil Procedure 12(b)(1).**

23         Federal courts are courts of limited jurisdiction. A federal court is presumed to lack

24 jurisdiction in a particular case unless jurisdiction is affirmatively established. *Kokkonen v.*

1    *Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).  Federal Rule of Civil Procedure 12(b)(1)

2    allows a party to move for dismissal based on a lack of subject matter jurisdiction.  When a court

3    lacks subject matter jurisdiction, it lacks the power to proceed, and its only remaining function is

4    to dismiss.  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998).  "A jurisdictional

5    challenge under Rule 12(b)(1) may be made on the face of the pleadings or by presenting extrinsic

6    evidence." *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003).  With a

7    factual challenge to a complaint, courts do not accept as true all facts in a complaint and may

8    evaluate extrinsic evidence and resolve factual disputes when necessary.  *See Roberts v.*

9    *Corrothers*, 812 F.2d 1173, 1177 (9th Cir. 1987).  "In resolving a factual attack on jurisdiction,

10    the district court may review evidence beyond the complaint without converting the motion to

11    dismiss into a motion for summary judgment." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035,

12    1039 (9th Cir. 2004).

13    **II.    Dismissal Under Federal Rule of Civil Procedure 12(b)(6).**

14         To survive a motion to dismiss under Rule 12(b)(6), a plaintiff's complaint must "state a

15    claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

16    A claim is facially plausible "when the plaintiff pleads factual content that allows the Court to

17    draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v.*

18    *Iqbal*, 556 U.S. 662, 678 (2009).  The Court presumes all well-pleaded allegations to be true and

19    draws reasonable inferences in favor of the non-moving party.  *See, e.g., In re Fitness Holdings*

20    *Int'l, Inc.*, 714 F.3d 1141, 1144-45 (9th Cir. 2013).  Pleading "adequate factual support" means

21    providing "more than labels and conclusions" or "a formulaic recitation of the elements of a cause

22    of action." *Twombly*, 550 U.S. at 555.  Dismissal under Rule 12(b)(6) is proper where there is

23    either a "lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a

24    cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988).

1  A court may consider documents attached or incorporated by reference to the complaint, or matters

2  of judicial notice.  *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

3  <u>**ARGUMENT**</u>

4  **I.   THE COURT SHOULD DISMISS COUNT I BECAUSE PLAINTIFFS DID
       NOT EXHAUST THEIR ADMINISTRATIVE REMEDIES**

5  **A.  Legal background for NEXUS**

6      The NEXUS program is a "Trusted Traveler Program" ("TTP"), enabled by 8 U.S.C.

7  § 1753.  NEXUS is designed to expedite the border clearance process for low-risk, approved

8  travelers into Canada and the United States.  *See* https://cbp.gov/travel/trusted-traveler-

9  programs/NEXUS/how-apply (last accessed Sept. 16, 2025).

10     An applicant may be ineligible for the NEXUS program if they, *inter alia*, have been found

11  in violation of any customs, immigration, or agriculture regulations or laws in any country; are

12  inadmissible to the U.S. under immigration regulations; or if they cannot satisfy CBP or Canada

13  Border Services Agency of their low-risk status.  *See* https://cbp.gov/travel/trusted-traveler-

14  programs/NEXUS/NEXUS-eligibility (last accessed Sept. 16, 2025).  If an applicant is denied

15  participation in the NEXUS program, "CBP will notify the applicant of the denial, and the reasons

16  for the denial."  8 C.F.R. § 235.12(j)(1).  "CBP will also provide instructions regarding how to

17  proceed if the applicant wishes to seek additional information as to the reason for the denial."  *Id.*

18  The regulations provide two redress procedures to contest a denial or removal determination from

19  the program: initiating a redress process through the DHS Traveler Redress Inquiry Program

20  ("TRIP") or filing a written request to CBP's Trusted Traveler Ombudsman.   8 C.F.R.

21  § 235.12(k)(1)-(2).  Procedures for requesting reconsideration of such a determination are also

22  available on the TTP website. *See* https://ttp.dhs.gov/faq (last accessed Sept. 16, 2025).

23

24

**B. Plaintiffs failed to exhaust their administrative remedies, thereby warranting dismissal of the Count.**

Plaintiffs failed to exhaust their administrative remedies regarding the denial or revocations of their NEXUS privileges.  With respect to Plaintiffs James, McKellar, and Bjersgo, all three received letters from the Supervisor of CBP's NEXUS Enrollment Center upon the denial or revocation of their memberships. Ex. 1.  Each letter provides specific procedures for contesting the denial or revocation of NEXUS membership.  *Id.*  The letters provide that Plaintiffs may be eligible to request reconsideration through the TTP website.  *Id.*  The letters also provide procedures for reconsideration requests to the Ombudsman, mirroring the procedures set forth in the regulations.  *Id.*; 8 C.F.R. § 235.12(k).  None of the Plaintiffs have pursued a request for reconsideration of the denial or revocation of their NEXUS memberships.  Plaintiffs have therefore not exhausted their remedies.

"The doctrine of exhaustion of administrative remedies is well established in the jurisprudence of administrative law." *McKart v. U.S.*, 395 U.S. 185, 193 (1969).  The doctrine provides "that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." *Id.*  The purpose behind the doctrine is to allow "an administrative agency to perform functions within its special competence–to make a factual record, to apply its expertise and to correct its own errors so as to moot judicial controversies." *Parisi v. Davidson*, 405 U.S. 34, 37 (1972).  In addition, "the exhaustion doctrine continues to exist under the APA to the extent that it is required by statute or by agency rule as a prerequisite to judicial review." *Darby v. Cisneros*, 509 U.S. 137, 153 (1993).[1]  Exhaustion

---

[1] The government acknowledges that while exhaustion of administrative remedies may not be required before judicial review depending on the applicable statute or agency rule, exhaustion still serves prudential purposes and the importance of developing the administrative record remains.

DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT
[Case No. 2:24-cv-00181-KKE] - 4

1    principles apply "with particular force" when the agency action in question involves: the "exercise
2    of the agency's discretionary power"; the agency's "special expertise"; and the "frequent and
3    deliberate flouting of administrative processes [which] could weaken an agency's effectiveness by
4    encouraging disregard of its procedures." *McCarthy v. Madigan*, 503 U.S. 140, 145 (1992).

5        Additionally, exhaustion promotes both judicial economy and agency efficiency.  *See SEC
6    v. G.C. George Securities, Inc.*, 637 F.2d 685, 689, n.2 (9th Cir. 1981).  First, "[w]hen an agency
7    has the opportunity to correct its own errors, a judicial controversy may well be mooted, or at least
8    piecemeal appeals may be avoided."  *McCarthy*, 503 U.S. at 145.; *see e.g.*, *Parisi*, 405 U.S. at 37;
9    *McKart*, 395 U.S. at 195.  Second, "even where a controversy survives administrative review,
10   exhaustion of the administrative procedure may produce a useful record for subsequent judicial
11   consideration[.]"  *McCarthy*, 503 U.S. at 145; *see also Weinberger v. Salfi*, 422 U.S. 749, 765
12   (1975).  The test for determining how much process an administrative agency owes under the
13   circumstances "requires analysis of the governmental and private interests that are affected,"
14   *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976); thus, a reviewing court would benefit from a fully
15   developed factual record.

16       Here, because Plaintiffs have not sought redress through the established regulatory
17   procedures at 8 C.F.R. § 235.12(k), the Court lacks a complete administrative record that would
18   be helpful in adjudicating the merits of this issue.  There is also a possibility that use of the
19   regulatory redress procedures would render the current action moot.  After Plaintiffs have satisfied
20   the regulatory administrative requirement of seeking redress, they may have grounds for review
21   by the Court, but at this juncture, the Court should refuse to review the merits of Plaintiffs' claim
22   and dismiss Count I for failure to exhaust their remedies.

23       In the NEXUS section of their amended complaint, Plaintiffs contend they "were given no
24   notice, no individualized explanation, and no opportunity to contest these adverse actions."  Dkt.

34. ¶ 73.  They further contend "McKellar's reconsideration request was summarily denied with conclusory allegations of 'aiding and abetting' drug trafficking." *Id.*  The Court should reject these contentions as inaccurate and meritless.  First, Plaintiffs were given notice, explanation, and opportunity to contest the denial and revocations of their NEXUS memberships, as evidenced by the attached letters, sent to James, McKellar, and Bjergso.  Ex. 1.  Second, Defendants respectfully submit that Plaintiffs have inadvertently erred if they mean to suggest that McKellar requested reconsideration of the revocation of his NEXUS membership.  McKellar filed a reconsideration request with CBP *to vacate his expedited removal order*, not to contest his NEXUS revocation. Ex. 2.  And Defendants do not dispute that in response to *that* inquiry, the agency indicated that he was inadmissible to the United States pursuant to 8 U.S.C. § 1182(a)(2)(C) as an alien who the agency had reason to believe was aiding or abetting in the illicit trafficking of a controlled substance.  (Notably, the government has since vacated the expedited removal order.)  But Plaintiffs did *not* file any reconsideration request regarding their NEXUS denial/revocations; thus, this is not a case in which an applicant has been given no opportunity to contest the agency's action.  Rather, Plaintiffs simply failed to avail themselves of their readily pursuable redress – which is firmly established through regulation.  8 C.F.R. § 235.12(k).

In sum, Plaintiffs have failed to pursue their administrative remedies in this matter, thereby depriving the Court of a developed record, and depriving the agency of the opportunity to correct any purported errors.  *See Shearson v. Holder*, 865 F.Supp.2d 850, 863 (N.D. Ohio, Sept. 9, 2011) ("Here, because Plaintiff has not availed herself of DHS TRIP, Plaintiff has not afforded the various federal agencies charged with correcting any errors the opportunity to formally review Plaintiff's claims and to make any changes to her records, if necessary . . . [A]llowing Plaintiff to sidestep DHS TRIP would significantly undermine the program itself and Congress' intent in creating the program."); *see also Kildare v. Saenz*, 325 F.3d 1078, 1084-85 (9th Cir. 2003) ("We

hold that . . . administrative review could correct the individual errors alleged by Appellants. Thus, there is an adequate alternative remedy."). Accordingly, the Court should dismiss Plaintiffs' claim for failure to exhaust.

## II.    THE COURT SHOULD DISMISS COUNT II FOR FAILURE TO STATE A CLAIM

The Court should also dismiss Count II for failing to state a claim upon which relief can be granted. Plaintiffs allege CBP is engaged in a "dual policy" because it has simultaneously acknowledged that it not unlawful under the Controlled Substances Act ("CSA") for Eteros to import certain cannabis-related merchandise into the state of Washington (due to a ruling by the United States Court of International Trade or "CIT"), while at the same time finding them inadmissible to the United States pursuant to 8 U.S.C. § 1182(a)(2)(C) as aliens reasonably believed to be aiding or abetting in the illicit trafficking of a controlled substance. Dkt. 34. ¶¶ 76-84. However, CBP's determination of inadmissibility with respect to James and McKellar does not implicate policy; rather these are determinations made pursuant to the Immigration and Nationality Act ("INA") based on their case-by-case individual border encounters. And despite Plaintiffs' accusations of duality, the government's position regarding the admissibility of aliens engaged in cannabis-related industries in the United States has been decidedly consistent.

### A.  Background

As an initial matter, Plaintiffs are correct in one respect: CBP is of the view they are inadmissible to the United States pursuant to 8 U.S.C. § 1182(a)(2)(C)(i), which provides in pertinent part: "[a]ny alien who the consular officer or the Attorney General knows or has reason to believe---(i) is or has been an illicit trafficker in any controlled substance or in any listed chemical (as defined in section 802 of title 21), or is or has been a knowing aider, abettor, assister, conspirator, or colluder with others in the illicit trafficking an any such controlled or listed

substance or chemical, or endeavored to do so . . . is inadmissible."  It is undisputed that Eteros

manufactures and sells harvesting equipment for the hemp and cannabis industry.  It is also a matter

of judicial record that Eteros conceded in the CIT that their products constitute "drug

paraphernalia" within the meaning of the CSA.  *See Eteros Technologies USA, Inc. v. United*

*States*, 592 F.Supp.3d 1313 (Ct. Int'l Trade 2022) (*"Eteros I"*) (noting Eteros stipulated "that the

Subject Merchandise satisfies the federal statutory definition of 'drug paraphernalia' under 21

U.S.C. § 863(d)").  And of course, though many would criticize its classification, "marihuana" or

"marijuana" remains listed as a Schedule I controlled substance pursuant to federal law under

21 U.S.C. § 812.

CBP is thus on solid legal ground in its view that Plaintiffs are not admissible to the United

States under the INA.  Plaintiffs' participation in the sale of a product/products used in the

processing of marijuana to marijuana dispensaries constitutes assistance in the sale of marijuana,

which is considered illicit trafficking under federal law.  Although Washington has legalized the

sale of marijuana, it remains a federal crime.  *See, e.g.*, *Fejes v. Fed. Aviation Admin.*, 98 F.4th

1156, 1163 (9th Cir. 2024) (noting that "state law legalizing marijuana distribution does not negate

federal law criminalizing the same action").  Washington State cannot override federal law, and

that includes immigration law.  *Arizona v. United States*, 567 U.S. 387, 394 (2012).  CBP is

responsible for enforcing the federal laws that Congress enacts with respect to individuals who

seek admission at the border, and Congress has mandated that aliens reasonably believed to be

aiding or abetting in the trafficking of marijuana are not admissible to the United States.  8 U.S.C.

§ 1182(a)(2)(C); *see Fejes*, 98 F.4th at 1163 ("marijuana is still illegal in many contexts under

federal law, even in states that provide legal allowances").  CBP's enforcement of this

Congressional mandate is not "policy"; CBP is performing its primary function in enforcing the

1  laws of the United States at the border and is not free to set policy at odds with that which Congress

2  mandates.

3        There is a plethora of case law supporting CBP's understanding of the inadmissibility

4  ground at § 1182(a)(2)(C)(i), which does not require a conviction to be found inadmissible.  The

5  Ninth Circuit has said the provision requires the Government to "'determine whether reasonable,

6  substantial, and probative evidence supports the [] reason to believe that [the alien] knew he was

7  participating in illicit drug trafficking.'"  *Gomez-Granillo v. Holder*, 654 F.3d 826, 831 (9th Cir.

8  2011) (quoting *Lopez-Molina v. Ashcroft*, 368 F.3d 1206, 1211 (9th Cir. 2004) (internal citation

9  and quotation marks omitted)).  Courts have also explained the language of the provision is

10  intended to cover a very broad swath of conduct, within which Eteros's conduct easily fits.  *See*

11  *Voronin v. Garland*, 2022 WL 3101534, at *4 (C.D. Cal. Aug. 4, 2022) (no error in USCIS's

12  decision to deny an adjustment application on the basis that the plaintiff was inadmissible under

13  § 1182(a)(2)(C)(i) where he worked at an unlicensed cannabis collective maintaining the video

14  surveillance system, explaining that the language of § 1182(a)(2)(C)(i) "aider, abettor, assister . .

15  ." indicated that "Congress meant to include a wide range of assistive conduct within the scope of

16  the statute, beyond the traditional, more narrow concept of 'aiding and abetting'"); *see also King*

17  *v. Lynch*, 623 F. App'x 861, 863 (9th Cir. 2015) (Court upholding agency's finding that the

18  petitioner colluded with her brother in the illicit trafficking of methamphetamine where the Court

19  noted that "[a]lthough [her] presence did not constitute an act of assistance, it is undisputed that

20  [she] provided a place in her house for the manufacturing."); *Morales-Del Valle v. Lynch*, 647 F.

21  App'x 709, 710-11 (9th Cir. 2016) ("even if the activity was not sufficient to constitute a

22  deportable offense, it was quite sufficient to render [the petitioner] inadmissible because a

23  reasonable observer would have reason to believe that someone who behaved in that manner was

24  involved in illicit drug trafficking—a much lower standard.").

1    CBP is well within its authority under the law in its assessment that Plaintiffs are

2    inadmissible.  Nonetheless, Plaintiffs insist that CBP is engaged in a "dual policy" because it has

3    respected and complied with the decision of the Court of International Trade in *Eteros I*.  Indeed,

4    Plaintiffs' amended complaint repeatedly emphasizes the trade case, adamantly asserting that

5    CBP's inadmissibility determinations are at odds with its holding.  While it is certainly true that

6    CBP has complied with the ruling of the trade decision, Plaintiffs' amended complaint

7    dramatically overstates the reach of its holding.

8    Specifically, the CIT held that CBP could not exclude certain cannabis-related merchandise

9    from importation into Washington State because although the merchandise constituted "drug

10   paraphernalia" under the CSA pursuant to 21 U.S.C. § 863(d), it qualified for an exemption under

11   § 863(f)(1).  *Eteros I*, 592 F.Supp.3d at 1332.  Accordingly, the Court concluded that CBP could

12   not seize the merchandise for the purposes of excluding it from the United States or criminally

13   prosecute "persons" seeking to import Eteros merchandise.  *Id.*  On its face, however, the

14   exemption is limited to 21 U.S.C. § 863.  *See* 21 U.S.C. § 863(f) ("*This section* shall not apply to-

15   -(1) any person authorized by local, State, or Federal law to manufacture, possess, or distribute

16   such items") (emphasis added).  Also, the CIT decision recognizes the limited nature of the

17   exemption—i.e., that it is limited to the authorization provided by Washington State.  *See Eteros*

18   *I*, 592 F. Supp. 3d at 1331 n.27 ("Washington State can only 'authorize' persons to partake in the

19   enumerated activities of the (f)(1) exemption within the confines of its own borders; if the drug

20   paraphernalia leaves Washington, the 'authoriz[ation]' inquiry begins anew in the context of the

21   new state.").  The limits of the ruling of the case are therefore readily apparent.  The ruling is

22   limited in scope to activities in Washington, which does not have any binding effect on CBP's

23   assessment of whether someone is admissible to the entirety of the United States.  More

24   importantly, there is nothing in the trade decision or any other legal authority supporting the notion

1    that an exemption for the importation of paraphernalia under the CSA, which by its own terms is

2    limited to a specific section of that same statute, has any bearing on the admissibility of an alien

3    under the INA, a completely different federal statute.

4          To the contrary, there is legal authority supporting the notion that the exemption at § 863(f)

5    *does not* affect other federal laws outside the CSA.  *See In Re Nat'l Concessions Grp., Inc*., No.

6    87168058, 2023 WL 3244416 (May 3, 2023).   In *Nat'l Concessions*, a cannabis company was

7    seeking to register a trademark for its product.   *Id.*   The Trademark Trial and Appeal Board

8    ("TTAB") determined the applicant's product was comprised of drug paraphernalia in violation of

9    21 U.S.C. § 863(a)(1), and the company was using the mail or facilities of interstate commerce to

10   transport the drug paraphernalia in violation of 21 U.S.C. § 863(a)(2). *See id.* at *7.  The applicant

11   argued that the exemption at § 863(f)(1) applied because the product was legal under Colorado

12   law.  *See id.*  But the TTAB rejected this argument, explaining: (1) the rights that the applicant

13   sought were not limited to Colorado because "[a] federal registration would give [the a]pplicant

14   presumptive exclusive rights to nationwide use of its mark" under trademark law, and (2) "any

15   authorization by Colorado of [a]pplicant's manufacture, possession or distribution of the goods

16   cannot override the laws of the other states or federal law outside Colorado."  *Id.* at *8 (citing

17   *Eteros I*, 592 F. Supp. at 1331 n.27).   That reasoning applies with equal force in the immigration

18   context, as the rights Plaintiffs seek are not limited to Washington State, and again, Washington

19   State cannot override the federal immigration law set forth in the INA.  *Arizona*, 567 U.S. at 394.

20         Plaintiffs will likely insist that CBP's inadmissibility determination is a matter of policy

21   rather than a legal determination.  They have in the past cited to CBP's website which provides

22   "Generally, a Canadian citizen working in or facilitating the proliferation of the legal marijuana

23   industry in Canada, coming to the U.S. for reasons unrelated to the marijuana industry will

24   generally be admissible to the U.S." *See* https://cbp.gov/sites/default/files/assets/documents/

1    2022-Sep/PAG%20Marijuana%20Legalization%20FINAL%20100918_Redacted.pdf (last

2    accessed Sept. 17, 2025).  This statement, however, says nothing about Canadian citizens who,

3    like Plaintiffs, facilitate the proliferation of the marijuana industry *in the United States*.  It is

4    notable that this statement by CBP is careful to explain that the admissibility of these individuals

5    is contingent on their reasons for coming to the United States *not* being related to the marijuana

6    industry.  In fact, the excerpted statement is part of a much larger statement issued by CBP in the

7    wake of Canada's decision to legalize recreational marijuana in 2018.  *Id.*; Ex. 3.  In the updated

8    statement, issued October 9, 2018, one week before Canada's new law took effect, CBP

9    indicated that federal marijuana laws would continue to control its admissibility determinations,

10   even with the new marijuana-related legislation coming out of Canada and various states.  Ex. 3;

11   s*ee* https://cbp.gov/newsroom/speeches-and-statements/cbp-statement-canadas- legalization-

12   marijuana-and-crossing-border (last accessed Sept. 17, 2025).  This statement was issued *before*

13   Eteros entered the United States market in 2019; thus, Eteros's decision to invest in a cannabis-

14   related business in the United States was made with CBP's views having been fully publicized.

15   For all of Plaintiffs' assertions about the supposed retaliatory conduct of CBP, they have not, and

16   cannot allege that CBP has ever had a policy of admitting aliens involved in United States-based

17   cannabis-related businesses, as no such policy has ever existed, and any such policy would be

18   contrary to federal law if it were ever adopted by CBP.

19              **B.  Plaintiffs have failed to state a claim upon which relief can be granted**

20              With the aforementioned legal and factual background properly clarified, it becomes

21   apparent that Plaintiffs' amended complaint fails to state a viable claim for relief.  CBP's actions

22   in determining that Plaintiffs are inadmissible to the United States under the INA are not controlled

23   by the trade case allowing the importation of the merchandise which meets the CSA's exemption

24   under 21 U.S.C. § 863(f)(1).  Indeed, the CIT has already said as much in Plaintiffs' collateral

1   litigation. *Eteros Technologies USA, Inc. v. United States*, --- F.Supp.3d ---, 2025 WL2238718 *5

2   (Ct. Int'l Trade Aug. 6, 2025) ("Eteros alleges that CBP has undertaken 'unlawful and retaliatory

3   conduct' against it by 'issuing an expedited removal order, denying visas, revoking NEXUS

4   memberships, and threatening criminal prosecution.' . . . These allegations pertain to CBP's

5   actions with respect to the entry of Eteros's executives into the United States.  Wrongful or not,

6   they do not pertain to . . . 'the exclusion of *merchandise* from entry.'" (emphasis added) (internal

7   citations omitted)).  Plaintiffs' entire cause of action is predicated upon the conflation of these

8   separate issues which are controlled by separate statutes.

9          Plaintiffs ask the Court to issue an order "declaring that the final judgement in [*Eteros I*]

10  is *res judicata* and binding upon Defendants."  Dkt. 34. p.39, ¶ 2b.  But Plaintiffs have already

11  conceded in the CIT that CBP has complied with that decision and released Eteros' merchandise

12  for entry into the United States.   *Eteros*, 2025 WL2238718 at *5 (explaining that Eteros

13  specifically stipulated that "CBP complied with this Court's judgment order and released Eteros'

14  merchandise for entry into U.S. commerce.").  Further, Plaintiffs correctly assert in their amended

15  complaint that CBP has issued interpretive rulings which fully comply with *Eteros I*, meaning CBP

16  will continue to respect the CIT's holding pertaining to similar subject merchandise which goes

17  through the border.  Dkt. 34. ¶¶ 80-81.  Though CBP did not agree with the CIT decision, it has

18  dutifully adhered to it, and Plaintiffs do not allege any facts to the contrary.  But CBP is not bound,

19  as Plaintiffs demand, to alter its positions regarding the scope of issues which the CIT decision

20  does not reach, and the inadmissibility of the Plaintiffs is precisely such a position.[2]

21

22  _____

23  [2] To a lesser extent, Plaintiffs also rely on CBP rulings which mirroring the holding of another CIT decision in
    *Keirton USA, Inc. v. United States*, 600 F.Supp.3d 1270 (Ct. Int'l Trade 2022).  Dkt. 34. ¶¶ 88, 90c.  But that case is
    unavailing too.  The CIT ruled there that the merchandise in question was not drug paraphernalia, in contrast to
24  Plaintiffs here who stipulated that theirs is.  *Id*. at 1275.  Thus, the fact that CBP has complied with the holding of
    that decision is of no moment either.

1        Plaintiffs request the Court "[v]acate and set aside Defendants' unlawful 'dual policy'" of

2    allowing the importation of their merchandise while preventing them from entering the United

3    States under the provisions of the INA.  Dkt. 34. p.40, ¶ 2c.  But they do not identify any actual

4    policy position taken by CBP such that the Court could determine that CBP is working in some

5    underhanded way against them.  As explained, *Eteros I* – upon which Plaintiffs so heavily rely –

6    completely undermines the notion that CBP is engaged in a "dual policy" of any sort.  CBP has

7    been entirely consistent about precluding the admission of aliens reasonably believed to be

8    engaged in the illicit trafficking of a controlled substance.  As noted above, CBP issued a public

9    statement after Canada legalized marijuana explaining that federal marijuana laws would continue

10    to govern its admissibility determinations, well before the CIT's decision was issued.  And CBP

11    has stayed true to the position set forth in its public statement, which is why it contested the

12    importation of Plaintiffs' cannabis-related merchandise in CIT in the first place.  Additionally,

13    because the CIT's decision is limited in scope, CBP's assessment that Plaintiffs are not admissible

14    to the United States under the well-established law of the INA is not in conflict with any "policy"

15    or law of any kind.  Thus, Plaintiffs' amended complaint does not set forth a viable legal theory

16    upon which relief can be granted.  Plaintiffs have not alleged actual "unlawful" conduct by CBP,

17    and the facts they allege do not actually show the "dual treatment of cannabis-related activities."

18    Accordingly, Count II should be dismissed for failure to state a claim.  *Al Otro Lado, Inc. v.*

19    *Nielsen*, 327 F. Supp. 3d 1284, 1320 (S.D. Cal. 2018) (plaintiffs did not establish an action where

20    their complaint "contain[ed] allegations about the tactics employed by various CBP officials" but

21    did not "connect[ ] any of that conduct with an unwritten policy created by the Defendants" and

22    did not "even allege that the Defendants were involved in the development of any policy in this

23    case").

24

1

2

### III.    THE COURT SHOULD DISMISS COUNT III FOR FAILURE TO STATE A CLAIM

Plaintiffs' third Count is equally problematic.  In Count III, Plaintiffs allege Defendants "failed to conduct [APA] notice-and-comment rulemaking before implementing a new policy that treats cannabis-related equipment as *per se* unlawful."  Dkt. 34. ¶ 91.  But as explained above, CBP has not implemented a new policy, nor does it make assessments of admissibility through broad *per se* rules.  CBP's assessment of Plaintiffs' inadmissibility at the border is not a matter of rulemaking, but rather an adjudication made at the border on a case-by-case basis, in accordance with the laws set forth in the INA and the relevant procedures established by regulation.  *See* Ex. 3 ("Determinations about admissibility and whether any regulatory or criminal enforcement is appropriate are made by a CBP officer based on the facts and circumstances known to the officer at the time."); 8 C.F.R. § 235.1 (setting forth the procedures for border officers to inspect aliens applying for admission); *see also Providence Yakima Medical Center v. Sebelius*, 611 F.3d 1181 (9th Cir. 2010) ("adjudications resolve disputes among specific individuals in specific cases, whereas rulemaking affects the rights of broad classes of unspecified individuals.").  In their amended complaint, Plaintiffs do not actually identify any substantive rule whatsoever, which is unsurprising as CBP does not have a rule which finds people *per se* inadmissible (such "rules" come in the form of laws enacted by Congress which control which aliens are admissible).  Dkt. 34. ¶¶ 85-93.  The root of their problems with CBP stems from the admissibility determinations made in their individual cases, but that is not a matter CBP must publish in the Federal Register.  And CBP's October 9, 2018 statement did not purport to make any substantive change in law or policy; it was simply an announcement to the public making clear that federal law was still going to be enforced at the border, even in the wake of Canada's and various states' new marijuana-related legislation.

1    Perhaps realizing that they are unable to tie their "rulemaking" claim to anything remotely

2    substantive, Plaintiffs grasp at CBP's interpretive rulings in the *Eteros* and *Keirton* trade cases,

3    weakly asserting that CBP's position on their inadmissibility is a departure from these rulings.

4    Dkt. 34. ¶¶ 88-89.  But, as explained above, these rulings have nothing to do with admissibility

5    under the INA, nor has CBP "departed" from these rulings.  Again, these rulings simply ensure

6    CBP employees have interpretive guidance as to the effect of the trade decisions on the

7    merchandise presented at the border, and CBP has allowed, and continues to allow, Eteros's

8    merchandise to be imported per those rulings, a point Plaintiffs conceded in their collateral

9    litigation.  *Eteros*, 2025 WL2238718 at *5.  That CBP has not departed from any of these rulings

10   also eviscerates Plaintiffs' claim that it violated 19 U.S.C. § 1625(c), which imposes certain

11   requirements when it actually *does* depart from a prior interpretive ruling.

12   Moreover, even if CBP were to change its position on these interpretive rulings, such

13   change would not be subject to notice and comment under the APA.  The APA specifically

14   provides that its rulemaking requirements do not apply to "interpretive rules," or "general

15   statements of policy."  5 U.S.C. § 553(b)(4)(A), (d)(1).  So even if the trade cases said what

16   Plaintiffs claim they said (which they do not), CBP would not have to follow the rulemaking

17   requirements of the APA in departing from any prior positions in their interpretive rulings.  So

18   once again, Plaintiffs fail to advance a cognizable legal theory such they could prevail on their

19   claim.  *See Nguyen v. United States Citizenship and Immigration Services*, 637 F.Supp.3d 822,

20   830 (C.D. Cal. Oct. 27, 2022) (finding the agency did not need to follow APA rulemaking

21   requirements where it issued interpretive rulings, explaining "Interpretive rules are those which

22   merely clarify or explain existing laws or regulations . . . Those rules are essentially hortatory and

23   instructional in that they go more to what the administrative officer thinks the statute or regulation

24   means, when applied in particular, narrowly defined, situations." (internal citations omitted)).

1

## IV.    THE COURT SHOULD DISMISS COUNT IV AS PREMATURE

### A.  An approved L-1 petition does not deem an alien admissible – it allows the beneficiary to *apply* for admission

Canadians seeking to enter the United States in L-1 status go through a uniquely simplified process.  8 C.F.R. § 214.2(l)(17).  An alien applying for an L-1 petition is called a beneficiary and must have a U.S.-based employer who is willing to sponsor him.  *See id.* § 214.2(l)(13).  The sponsoring U.S. employer is called the petitioner.  *See id.* § 214.2(l)(1)(i).  The typical process for an L-1 petition (not from Canada) is that the petitioner files a Form I-129 with USCIS.  *See* USCIS, I-129, *Petition for a Nonimmigrant Worker*, https://uscis.gov/i-129 (last updated June 30, 2025).  USCIS then evaluates whether the petitioner has the required affiliate relationship, whether the beneficiary has been employed at the affiliated company abroad for a specified time, and whether the job duties show the employee will be working as a manager or executive (L-1A) or in a position using specialized knowledge (L-1B).  *See* USCIS Policy Manual Vol. 2, Part L, Ch. 2, https://uscis.gov/policy-manual/volume-2-part-l-chapter-2 (last updated Aug. 29, 2025).  If USCIS determines that the petition meets the L-1 requirements, it will issue an approval notice for the I-129 petition.  *See* 8 C.F.R. § 214.2(l)(7).  Of particular note, when the petitioner requests consular or port of entry processing, USCIS does *not* make final determination on the L-1 beneficiary's admissibility at this stage.  The I-129 approval notice from USCIS is just the first step in the process.  A non-Canadian beneficiary will then need to make an appointment at a U.S. consulate abroad to obtain an L-1 visa to enter the United States.  *See id.* § 214.2(l)(13).  Before approving the L-1 visa, the U.S. consulate will evaluate the individual beneficiary's eligibility for the visa. *See id.*  Once the consulate approves the visa, the L-1 beneficiary can come to a port of entry where CBP will further evaluate the L-1 beneficiary's admissibility before determining if he can enter. *Id.*

1    For Canadians, this whole process is combined into just one step.  *Id.* § 214.2(l)(17).

2  Canadians can come to the port of entry with their paper Form I-129 petition completed by the

3  U.S. employer and present it to CBP to adjudicate.  *Id.*  CBP then evaluates whether the petition

4  qualifies for an L-1 and whether the beneficiary is admissible to the United States.  *See* CBP

5  Standards for Accepting and Adjudicating I-129 Petitions for L-1 Intracompany Transferee

6  Petitions for Canadian Citizens under the North American Free Trade Agreement (Jan. 3, 2012)

7  ("The burden of proof for establishing eligibility rests with both the petitioner who is filing the

8  petition; and the beneficiary, who is applying for admission.").  If CBP concludes the petition

9  meets the requirements for an L-1 and the beneficiary is admissible, CBP can approve the petition

10 and admit the Canadian in L-1 status—stamping the petition as approved and issuing an I-94

11 reflecting the alien's L-1 status.  *See* 8 C.F.R. § 214.2(l)(17).  CBP will then inform USCIS of the

12 approval and USCIS will issue an I-797 approval notice.  *See* USCIS Policy Manual Vol. 2, Part

13 L, Ch 9.

14    Canadians always have the option to file their L-1 petitions first with USCIS rather than

15 going straight to CBP.  8 C.F.R. § 214.2(l)(17)(iii).  However, when petitioner requests consular

16 notification or port of entry processing, even if USCIS approves the I-129 petition rather than CBP,

17 this approval notice has no impact on whether the beneficiary is admissible.  *See id*. § 214.2(l)(11).

18 CBP still has the authority to determine the beneficiary's admissibility when he comes to the port

19 of entry with the L-1 approval notice.  *See* 8 U.S.C. § 1361 ("Whenever any person makes

20 application for a visa or any other document required for entry, or makes application for admission

21 application for admission . . . the burden of proof shall be upon such person to establish that he is

22 eligible to receive such visa or such document, or is not inadmissible under any provision of this

23 chapter, and, if an alien, that he is entitled to the nonimmigrant, immigrant . . . status claimed.");

24 8 C.F.R. § 235.1(a)(1).

If CBP denies the I-129 petition at the port of entry, the company has the option to refile the I-129 with USCIS rather than CBP.  *See id.* §§ 214.2(l)(17)(iii), (iv) (providing that CBP can find the petition deficient and seek additional documentation, deny the petition, or recommend denial and forward the petition to USCIS for final action).  USCIS may approve the I-129 even after CBP denies it.  *See id.*  But USCIS's approval will only apply to whether the petition meets the requirements for an L-1.  *See id.* § 214.2(l)(11).  USCIS will *not* make a determination on the L-1 beneficiary's admissibility when the petitioner requests consular or port of entry processing—this authority remains with CBP (with the exception of certain circumstances not relevant here).  *Id.* § 235.1(a).

Finally, in the event an L petition is denied or revoked, the regulations provide administrative procedures for an appeal.  *See* 8 C.F.R. § 214.2(l)(10) (petitions denied or revoked in whole or in part "may be appealed" pursuant to 8 C.F.R. § 103).

**B.    James's L-1 petition remains approved, thus rendering Plaintiffs' claim premature**

Plaintiffs correctly allege that on March 28, 2025, USCIS issued James a Notice of Intent to Revoke ("NOIR") her approved L-1A visa petition pursuant to 8 C.F.R § 214.2(l)(9)(iii).  Dkt. 34. ¶ 96; *see* Ex. 4.  On April 24, 2025, James filed a response to the NOIR with USCIS.  Dkt. 34. ¶ 56.  As of the date of this filing, USCIS has not revoked the petition.  Accordingly, the L-1A petition remains approved.  James has therefore not yet suffered any injury which would give her standing to pursue relief.

Plaintiffs bear the burden of establishing their standing to pursue the relief they seek.  *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  The "irreducible constitutional minimum" of standing requires a plaintiff to show that it has suffered a concrete and particularized injury in fact which is actual or imminent, not "conjectural or hypothetical," that there is a causal

1  connection between the injury and the defendant's conduct, and that the injury will likely be

2  redressed by a favorable decision.  *Id.* at 560.  A "threatened injury must be certainly impending

3  to constitute injury in fact, and [ ][a]llegations of *possible* future injury are not sufficient." *Clapper*

4  *v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (second alteration in original) (internal quotation

5  marks omitted).

6       James has not yet suffered an injury and thus lacks standing.  Though USCIS has issued a

7  NOIR, her L-1 petition has not yet been revoked.  The Notice simply signals the agency's *intent*

8  to take action; it puts the alien on notice of the reasons behind that intent, and allows an opportunity

9  for the alien to file a response.  USCIS has yet to make a final determination in consideration of

10  James's response as to whether to finalize the revocation of the petition.  So long as the petition

11  remains approved, James remains eligible to apply for admission.  Until a final determination is

12  made, James has no injury, and therefore no standing to pursue this claim.

13       Even if there were standing here, there is also no final agency action such that the APA

14  claim could proceed.  For a district court to review USCIS's denial of a petition under the APA,

15  the decision must be final; "[a] preliminary, procedural, or intermediate agency action or ruling"

16  is not directly reviewable, but must await issuance of "the final agency action."  5 U.S.C. § 704.

17  "Two conditions must be satisfied for agency action to be final for purposes of the APA:  First,

18  the action must mark the 'consummation' of the agency's decision-making process — it must not

19  be of a merely tentative or interlocutory nature.  And second, the action must be one by which

20  'rights and obligations have been determined,' or from which 'legal consequences will flow.'"

21  *Mamigonian v. Biggs*, 710 F.3d 936, 942 (9th Cir. 2013) (quoting *Bennett v. Spear*, 520 U.S. 154,

22  177–78 (1997)).  The agency has not yet finalized a decision on any possible revocation of the

23  petition, and is still in the process of considering James's rebuttal to the Notice of Intent to Revoke;

24  thus, the agency's decision-making process has not been consummated.  And there are not yet any

1   legal consequences to James, as she remains eligible to apply for admission until a revocation

2   becomes finalized.

3          In their amended complaint, Plaintiffs acknowledge that USCIS has not finalized any

4   action with respect to the petition, and seek to compel a final action by the agency.  Dkt. 34. ¶¶

5   97-102.  But an order compelling agency action here would serve no purpose as the "limbo" status

6   in which they claim to be trapped is a status which renders James eligible to apply for admission.

7   If the agency never takes another action, Plaintiffs will not need to pursue any claim with the Court

8   regarding the approved petition.  Conversely, if Plaintiffs are eager to accelerate the revocation of

9   the petition, they can do that without a Court order by simply withdrawing their petition (or leaving

10  the approved petition as is).

11  ## V.    THE COURT SHOULD DISMISS COUNT V AS ETEROS HAS NO LIBERTY INTEREST IN HAVING ITS EXECUTIVES ADMITTED

12          The Supreme Court has long recognized that Congress exercises "plenary power to make

13  rules for the admission of aliens and to exclude those who possess those characteristics which

14  Congress has forbidden."  *Kleindienst v. Mandel*, 408 U.S. 753, 766 (1972).  Pursuant to that

15  longstanding doctrine, "an alien seeking initial admission to the United States requests a

16  privilege and has no constitutional rights regarding his application, for the power to admit or

17  exclude aliens is a sovereign prerogative."  *Landon v. Plasencia*, 459 U.S. 21, 32 (1982).

18  Foreign nationals applying for admission at the border thus lack any constitutional due process

19  rights with respect to admission: "[w]hatever the procedure authorized by Congress is, it is due

20  process as far as an alien denied entry is concerned."  *Shaughnessy v. United States ex rel. Mezei*,

21  345 U.S. 206, 212 (1953).  It is not within the province of any court, unless expressly authorized

22  by law, to review [that] determination.  *United States ex rel. Knauff v. Shaughnessy*, 338 U.S.

23  537, 543 (1950).

24

The Fifth Amendment provides that "[n]o person shall be ... deprived of life, liberty, or property, without due process of law."  Procedural due process is not implicated unless there has been a deprivation of one of these interests.  *See Kerry v. Din*, 576 U.S. 86, 92-94 (2015).  Eteros does not have a constitutional right to have its alien employees admitted to the United States. *Department of State v. Muñoz*, 602 U.S. 899, 908 (2024).  "[A] petitioning employer has no property right to have an alien admitted for employment purposes."  *Spencer Enterprises, Inc. v. U.S.*, 229 F.Supp.2d 1025, 1043 (E.D. Cal. 2001), *aff'd*, 345 F.3d 683 (9th Cir. 2003) ("The corporation . . . has no constitutionally protected 'property interest' to have an alien admitted into the United States for business purposes.").  Thus, Plaintiffs state no cognizable due process claim.  *See, e.g., Khachatryan v. Blinken*, 4 F.4th 841, 862 (9th Cir. 2021) ("an adult citizen lacks a constitutionally protected liberty interest, protected by the Fifth Amendment's Due Process Clause, in the Government's decision whether to admit the citizen's unadmitted nonresident alien parent into the United States.").

## VI.    THE COURT SHOULD DISMISS COUNT VI FOR FAILURE TO STATE A CLAIM

A FOIA requestor dissatisfied with an agency's response can challenge it in court but must first exhaust available administrative remedies, including an appeal within the agency. 5 U.S.C. § 552(a)(6)(A)(i)-(ii), (C)(i).  This serves to "protect[ ] administrative agency authority and promot[e] judicial efficiency."  *McCarthy*, 503 U.S. at 145.  It also allows agencies to correct their mistakes and creates a useful record "should judicial review become necessary."  *Amerco v. NLRB*, 458 F.3d 883, 888 (9th Cir. 2006).

"The statutory scheme in the FOIA specifically provides for an administrative appeal process following an agency's denial of a FOIA request . . . . Courts have consistently confirmed that the FOIA requires exhaustion of this appeal process before an individual may seek relief in

1  the courts." *Oglesby v. Dep't of Army*, 920 F.2d 57, 61-62 (D.C. Cir. 1990); *see also Aguirre v.*

2  *Unites States Nuclear Regulatory Commission*, 11 F.4th 719, 728-29 (9th Cir. 2021) (upholding a

3  District Court's dismissal or summary judgment of claims where "Aguirre failed to constructively

4  or actually exhaust his administrative remedies as to the four FOIA requests at issue in these

5  appeals"); 5 U.S.C. § 552(a)(6)(A)(i), (ii).  Where a plaintiff fails to show that he or she exhausted

6  administrative remedies, the claim should be dismissed.  *See McMillan v. DOJ, United States Dept.*

7  *of Justice*, 2025 WL 2028302 *1 (9th Cir. 2025) (unpub.) ("The district court properly dismissed

8  McMillan's FOIA claims for failure to state a claim, because he does not supply sufficient factual

9  allegations to discern what action the agency took as to any particular FOIA request, or whether

10  he administratively appealed any denials or redactions"); *Bestor v. CIA*, Civ. A. No. 04-2049, 2005

11  U.S. Dist. LEXIS 18908, at *1 (D.D.C. Sept. 1, 2005) ("Because the plaintiff has failed to allege

12  or provide proof of exhaustion and because the purposes of exhaustion do not support judicial

13  review at this stage, the defendant's motion to dismiss will be granted.").

14      The Court should dismiss Count VI of the amended complaint because it fails to set forth

15  allegations sufficient to state a claim for relief.  The core problem with Plaintiffs' complaint in this

16  regard is that it lumps together multiple FOIA requests, without sufficiently pleading to a violation

17  for each individual FOIA request made. *See Aguirre*, 11 F.4th 719 (resolving a case involving

18  multiple FOIA requests by separately assessing the merits of each individual request); *see also*

19  *Bender v. United States Dept. of Transportation*, 2025 WL 2099194 (S.D. Cal. July 25, 2025)

20  (addressing the merits of multiple FOIA requests individually).  Because Plaintiffs combine their

21  FOIA requests into one untransparent picture, there are insufficient factual allegations to discern

22  what action the agency took as to any particular FOIA request, or whether they administratively

23  appealed any denials or redactions.

24

1    In their amended complaint, Plaintiffs vaguely assert they submitted FOIA requests "on

2   multiple occasions" to both CBP and USCIS, and allege "Defendants have failed to timely and

3   lawfully respond." Dkt. 34. ¶¶ 116-17.  In total, they allege McKellar made four FOIA requests

4   and James made six requests, with all requests being made to CBP save one request by James made

5   to USCIS.  Dkt. 34. ¶¶ 35, 58.  They acknowledge, however, that the Defendants *did* provide a

6   variety of responses to their requests for both McKellar and James, though they do not specify

7   which requests received a response and which did not.  Dkt. 34. ¶ 35, 58, 117; *see Agua Caliente*

8   *Tribe of Cupeño Indians of Pala Rsrv. v. Sweeney*, 932 F.3d 1207, 1219 (9th Cir. 2019)

9   (administrative remedies not futile when agency has provided some responses and communicated

10  with requester); *see also Aguirre*, 11 F.4th at 727-28 (same).   Though Plaintiffs allege the

11  responses from Defendants were insufficient for a variety of reasons, their amended complaint

12  does not allege that they properly exhausted their remedies by pursuing administrative appeal of

13  each of these responses.

14    The lack of clarity with respect to the exhaustion issue is particularly problematic and

15  warrants dismissal of the Count.  To that point, though Plaintiffs allege they "have constructively

16  exhausted their administrative remedies under 5 U.S.C. § 552(a)(6)(C)," Dkt. 34. ¶ 118, this

17  allegation carefully avoids pleading whether each specific request was *actually* exhausted (and, as

18  explained below, at least some were not).  The Court is not required to accept legal conclusions in

19  a complaint couched as factual allegations.  *Iqbal*, 556 U.S. at 678.  Indeed, Plaintiffs' legal claim

20  of "constructive" exhaustion in lieu of actual exhaustion is an enormous red flag, because their

21  amended complaint does not plead facts consistent with a constructive exhaustion claim.  Under

22  FOIA's constructive-exhaustion provision and pertinent Ninth Circuit precedent, requestors are

23  deemed to have constructively exhausted their remedies (1) when an agency misses a statutory

24  deadline with no response or (2) the requestor files suit before a late response.   5 U.S.C.

§ 552(a)(6)(C)(i); *see Hajro v. USCIS*, 811 F.3d 1086, 1092 (9th Cir. 2016); *Aguirre*, 11 F.4th at 725 (initial tardiness of agency response in a FOIA request did not absolve the requestor of his obligation to exhaust his claim by seeking administrative appeal).  But Plaintiffs' amended complaint indicates that they received responses to their FOIA requests and does not plead any facts indicating they sought administrative appeal of those responses.  Dkt. 34. ¶ 117-18.  Nor do they provide the specific timing of the responses such that the Court can determine whether their claim of "constructive" exhaustion is accurate.  *Id.*  And even if Plaintiffs could legally be deemed to have constructively exhausted their administrative remedies with respect to any of their FOIA requests, they do not plead that *all* of their requests meet such a requirement.  *Id.*  Thus, their threadbare assertions regarding the exhaustion requirement are insufficient to state a viable claim.  *See Windom v. Drug Enforcement Agency*, 2020 WL 3791643 (N.D. Cal. July 7, 2020) ("Under the pleading standard of *Iqbal* and *Twombly*, [] '[t]hreadbare recitals of a cause of action's elements, supported by mere conclusory statements, do not suffice.'  *Iqbal*, 556 U.S. at 678.  Windom has not included factual allegations addressing [. . .] what steps [he] took to exhaust his administrative remedies.").  By amalgamating all of their FOIA requests into one opaque picture, and failing to specify that the required exhaustion element to a FOIA claim occurred in each individual request, Plaintiffs have failed to provide sufficient allegations that they properly exhausted their FOIA claims.

At a minimum, Plaintiffs' claim stemming from James's FOIA request to USCIS should be dismissed for failure to exhaust administrative remedies because Plaintiff received a final response from USCIS but did not file an administrative appeal.  Ex. 5 Decl. ¶ 8.  Plaintiffs needed to file an administrative appeal to provide USCIS the opportunity to consider the issue they now raise in court.  *See* 6 C.F.R. § 5.8(e) ("Appeal necessary before seeking court review"); *In re Steele*, 799 F.2d 461, 466 (9th Cir. 1986) (the "exhaustion doctrine" requires requestors to "comply fully

1    with agency procedures.").  As the Supreme Court has explained, "[e]very premature filing of an

2    action under the [statute] imposes some burden on the judicial system," thus "[t]he interest in

3    orderly administration of this body of litigation is best served by adherence to [the statute's]

4    straightforward statutory command."  *McNeil v. United States*, 508 U.S. 106, 112 (1993).

5    Accordingly, Plaintiffs' claim against USCIS should be dismissed for failure to exhaust.

6                                    **<u>CONCLUSION</u>**

7         For the foregoing reasons, the Court should dismiss Plaintiff's Complaint with prejudice

8    pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

9         DATED this 19 day of September, 2025.

10                                   Respectfully submitted,

11                                   YAAKOV M. ROTH
                                     Acting Assistant Attorney General
12                                   Civil Division

13                                   ERNESTO MOLINA
                                     Deputy Director
14                                   Office of Immigration Litigation

15                                   ROBERTA ROBERTS
                                     Trial Attorney
16
                                     *s/Jonathan Robbins*
17                                   JONATHAN ROBBINS, VA Bar # 73366
                                     Assistant Director
18                                   U.S. Department of Justice
                                     Civil Division
19                                   Office of Immigration Litigation
                                     P.O. Box 878, Ben Franklin Station
20                                   Washington, D.C. 20044
                                     Phone: 202-305-8275
21                                   Email: Jonathan.A.Robbins@usdoj.gov

22                                   *Attorneys for Defendants*

23                                   I certify that this memorandum contains 8,356
                                     words, in compliance with the Local Civil Rules.
24

1

## **CERTIFICATE OF SERVICE**

2        I hereby certify that I am an employee in the Office of Immigration Litigation, Civil

3   Division, U.S. Department of Justice, and of such age and discretion as to be competent to serve

4   papers.

5        I further certify that on today's date, I electronically filed the foregoing with the Clerk of

6   the Court using the CM/ECF system, which will send notice of such filing to the Defendants, who

7   are CM/ECF participants.

8

        DATED this 19th day of September, 2025.

9
                                        *s/Jonathan Robbins*
10                                      JONATHAN ROBBINS,
                                        Assistant Director
11                                      U.S. Department of Justice
                                        Civil Division
12                                      Office of Immigration Litigation
                                        P.O. Box 878, Ben Franklin Station
13                                      Washington, D.C. 20044
                                        Phone: 202-305-8275
14                                      Email: Jonathan.A.Robbins@usdoj.gov

15

16

17

18

19

20

21

22

23

24

DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT
[Case No. 2:24-cv-00181-KKE] - 27