UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| ETEROS TECHNOLOGIES USA, INC., et al.,<br>Plaintiff(s),<br>v.<br>UNITED STATES OF AMERICA, et al.,<br>Defendant(s). | CASE NO. C25-181-KKE<br><br>ORDER ON MOTION TO DISMISS |

This case presents a conflict between the Government's treatment of foreign merchandise entering the United States pursuant to its customs laws and its treatment of foreign nationals, who wish to enter the United States in connection with their work for an American company. Plaintiffs Eteros Technologies USA, Inc. ("Eteros") and its employees Aaron McKellar, Amanda James, and Ryan Bjergso—all Canadian citizens—sued the Department of Homeland Security ("DHS"), Customs and Border Protection ("CBP"), and United States Citizenship and Immigration Services ("USCIS"), over a host of actions affecting each employee's ability to enter the United States. Dkt. No. 34 at 2. In essence, Plaintiffs assert that Defendants violated various statutory and constitutional requirements by turning Eteros's employees away at the border, denying them immigration benefits, and "adopt[ing] a contradictory and punitive 'dual policy'" that permits Eteros to import cannabis processing equipment while barring its employees from entry because of their work in the cannabis industry. *Id.* ¶ 1. Plaintiffs claim that Defendants' actions violated

the Administrative Procedure Act ("APA"), a statute governing CBP procedures, and the Due Process Clause of the Fifth Amendment. *Id.* Plaintiffs also challenge Defendants' alleged failure to produce related records under the Freedom of Information Act ("FOIA"). *Id.* ¶ 2. Because Plaintiffs either fail to state a claim, or have failed to exhaust their administrative remedies, the Court will grant Defendants' motion to dismiss.

## I. BACKGROUND

Eteros is a Washington corporation that specializes in manufacturing and distributing agricultural machinery, including "cannabis-related equipment." Dkt. No. 34 ¶ 3. In 2021, CBP excluded Eteros's machinery at a port of entry in Blaine, Washington, deeming it to be "drug paraphernalia" under the Controlled Substances Act ("CSA"). *Eteros Techs. USA, Inc. v. United States*, 592 F. Supp. 3d 1313, 1317–18 (Ct. Int'l Trade 2022) ("*Eteros I*"). Eteros then successfully challenged the exclusion of its machinery at the U.S. Court of International Trade ("CIT"). *Id.* at 1319, 1332. The CIT determined that Eteros's equipment was exempt from federal import prohibitions under a CSA exemption, 21 U.S.C. § 863(f)(1), reasoning that Washington state's legalization of marijuana authorized the import. *Id.* at 1322–32. As detailed below, the bulk of Eteros's claims in this suit contend that *Eteros I* mandates CBP to admit Eteros executives under federal immigration law.

Plaintiff Aaron McKellar is a Canadian citizen and the CEO of Eteros. Dkt. No. 34 ¶ 4. McKellar holds a nonimmigrant visa for executives of multinational companies—called an L-1A visa—which he has used to oversee Eteros's operations in the United States. *Id.* Upon attempting to cross the border on October 4, 2024 (for personal reasons unrelated to work), CBP found McKellar inadmissible. Dkt. No. 34 ¶ 24. At that time, CBP officers detained him at the port of entry in Blaine, Washington, and allegedly interrogated him about his work for Eteros "and the *Eteros I* litigation." *Id.* Having concluded that McKellar was "knowingly and intentionally

contributing to the proliferation of the marijuana industry in the United States," the CBP officers issued McKellar an expedited removal order ("ERO"), citing 8 U.S.C. § 1182(a)(2)(C), which relates to drug traffickers. *Id.* ¶¶ 26–27.

McKellar sought reconsideration of the ERO, which was denied. *Id.* ¶¶ 28–29. However, in a letter dated April 18, 2025, CBP changed course and vacated the ERO. Dkt. No. 19-1. McKellar then sought to gain entry to the United States again, this time via a flight from Canada to Las Vegas, Nevada. Dkt. No. 34 ¶ 32. But CBP officers sent him to secondary inspection upon arrival and, again, found McKellar inadmissible under 8 U.S.C. § 1182(a)(2)(C). *Id.* ¶¶ 32–33. McKellar was permitted to withdraw his application for admission and returned to Canada. *Id.* ¶ 33–34. Because he withdrew his application, "no new removal order was issued during this encounter." *Id.* ¶ 34. But according to the operative complaint, McKellar "remains barred from the United States as a result of" CBP's determination of inadmissibility. *Id.* ¶ 4.

Plaintiff Amanda James is a Canadian citizen and the Director of Strategy and Business Development with Eteros Canada and Eteros USA. *Id.* ¶ 39. For approximately three years prior to June 2024, James worked in the United States under an L-1A visa. *Id.* ¶ 40. She was also enrolled in the NEXUS trusted traveler program. *Id.* On June 11, 2024—two days after her visa expired—James sought entry to the United States through the port of entry in Blaine, Washington, and, at the same time, petitioned to renew her visa. *Id.* ¶ 5. CBP refused James admission and "in connection with that refusal," forwarded her petition materials to USCIS with a recommendation to deny. *Id.* CBP also revoked her NEXUS privileges. *Id.* As with McKellar, James withdrew her request for admission. *Id.* ¶ 50. In February 2025, USCIS approved her new L-1A visa but, a month later, pivoted and issued a Notice of Intent to Revoke the visa. *Id.* ¶ 5; *see also* Dkt. No. 40-1 at 24–29.

Plaintiff Ryan Bjergso is a Canadian citizen and senior executive of Eteros USA who regularly travels to Eteros's facilities in the United States. Bjergso also held a valid L-1A visa which, like McKellar and James, he has relied on to oversee Eteros's operations in the United States. Dkt. No. 34 ¶ 6. His visa expired on April 26, 2026. *Id.* Bjergso previously applied, and was conditionally approved, for NEXUS trusted traveler privileges; but CBP ultimately denied his application. *Id.* Plaintiffs allege the denial was "solely due to Defendants' policy of treating individuals affiliated with Eteros USA as presumed drug traffickers." *Id.* Unlike McKellar and James, Bjergso does not allege any past border encounters but claims a prospective "fear[] that if he attempts to enter the United States, he will be subjected to the same treatment as McKellar and James[.]" *Id.*

Plaintiffs bring six causes of action, asserting claims under the APA, a customs statute, the Freedom of Information Act ("FOIA"), and the Fifth Amendment. They challenge the revocation or denial of their NEXUS privileges; the purportedly "dual treatment" of Eteros's cannabis-related activities; the enactment of an allegedly "new" cannabis policy without notice-and-comment rulemaking; USCIS's alleged delay in adjudicating James's visa petition; and CBP's and USCIS's purported failure to adequately respond to a FOIA request by James and McKellar. Dkt. No. 34 at 26–38. Plaintiffs seek both declaratory and injunctive relief and request an order vacating the applicable agency actions and compelling adjudication of James's visa petition. *Id.* ¶¶ 1–2.

Previously, the Court granted in part and denied in part a motion to dismiss Plaintiffs' original complaint. *See* Dkt. No. 30. Plaintiffs then filed their First Amended Complaint ("FAC") (Dkt. No. 34) and Defendants again moved to dismiss. Having considered the parties' briefing and oral argument, the Court will grant the motion to dismiss for the reasons below. Dkt. Nos. 40, 47, 51, 54.

//

## II. LEGAL STANDARDS

Defendants move to dismiss the FAC under both Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6). Dkt. No. 40 at 26. Rule 12(b)(1) governs Defendants' standing challenge to Count IV. *See Al-Gharawy v. U.S. Dep't of Homeland Sec'y*, 617 F. Supp. 3d 1, 7 (D.D.C. 2022) ("Because 'defect[s] of standing' constitute 'defect[s] in subject matter jurisdiction,' … a challenge to standing is properly raised on a motion to dismiss under Federal Rule of Civil Procedure Rule 12(b)(1).") (alterations in original) (quoting *Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987)). Rule 12(b)(6) governs the motion as to the remaining Counts, as well as Defendants' argument, in the alternative, that Count IV fails to state a claim.[1]

### A. Rule 12(b)(1) Standard

Under Rule 12(b)(1), a complaint must be dismissed if its allegations "are insufficient on their face to invoke federal jurisdiction." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). A defendant may challenge the plaintiff's jurisdictional allegations in two ways. *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014). "A 'facial' attack accepts the truth of the plaintiff's allegations but asserts that they are insufficient on their face to invoke federal jurisdiction." *Id.* A facial attack is resolved like a "motion to dismiss under Rule 12(b)(6): Accepting the plaintiff's allegations as true and drawing all reasonable inferences in the plaintiff's favor, the court determines whether the allegations are sufficient as a legal matter to invoke the court's jurisdiction." *Id.* A "factual" attack contests the truth of the plaintiff's factual allegations,

[1] Defendants challenge several of Plaintiffs' claims for failure to exhaust administrative remedies—an issue that "may be resolved in a Rule 12(b)(1) motion, as a jurisdictional issue, or in a Rule 12(b)(6) motion for failure to state a claim." *Fernandez v. Donovan*, 760 F. Supp. 2d 31, 34 (D.D.C. 2011). As one court within this Circuit has observed, "[t]here is authority to support the [] position that Rule 12(b)(6) is the proper procedural means by which to make an exhaustion argument," as well as "to support the position that a failure to exhaust implicates subject matter jurisdiction and therefore should be raised through a Rule 12(b)(1) motion." *J.W. v. Soc. Sec'y Admin.*, 24-CV-05686-EMC, 2025 WL 405704, at *2 (N.D. Cal. Feb. 5, 2025) (collecting cases). Though "courts have struggled with this distinction," "[u]ltimately, whether [Defendants'] motion is resolved under 12(b)(1) or 12(b)(6) does not affect the outcome," as both types of "motions are reviewed using similar standards." *Fernandez*, 760 F. Supp. 2d at 35, 35 n.1.

typically by introducing evidence outside the pleadings, as Defendants have done here. *Id.* In evaluating a factual attack, courts may look to evidence beyond the complaint without converting the motion into a motion for summary judgment. *Safe Air for Everyone*, 373 F.3d at 1039. The plaintiff bears the burden of establishing the court's jurisdiction. *Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1122 (9th Cir. 2010).

**B. Rule 12(b)(6) Standard**

In evaluating a motion to dismiss under Rule 12(b)(6), a court examines the complaint to determine whether, assuming the facts alleged are true, the plaintiff has stated "a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Dismissal may be based on either the lack of a cognizable legal theory or the absence of sufficient facts alleging such theory. *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 965 (9th Cir. 2018) (citing *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001)). In analyzing the sufficiency of the allegations, the Court must "draw all reasonable inferences in favor of the plaintiff." *In re Tracht Gut, LLC*, 836 F.3d 1146, 1150 (9th Cir. 2016).

**III. ANALYSIS**

**A. The Court Will Consider Defendants' Exhibits.**

First, the Court must consider whether, in resolving Defendants' motion to dismiss, it may consider certain exhibits attached to the motion. "Generally, district courts may not consider material outside the pleadings when assessing the sufficiency of a complaint[.]" *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018). Federal Rule of Evidence 201, however, creates an exception that permits courts to take judicial notice of adjudicative facts "not subject to reasonable dispute." *Id.* at 999 (quoting Fed. R. Evid. 201(b)). A fact is "not subject to reasonable dispute" if it "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2).

Defendants attach the following exhibits to their motion: (1) a statement by CBP on Canada's legalization of marijuana and border crossings; (2) the NEXUS revocation or denial letters to McKellar, James, and Bjergso; (3) the Notice of Intent to Revoke James's L1-A visa; (4) a declaration by Jarrod Panter, USCIS's chief FOIA officer; (5) a letter confirming the receipt of James's FOIA requests; and (6) a letter responding to James's FOIA request. Dkt. No. 40-1. Plaintiffs do not object to the Court's consideration of Defendants' exhibits or dispute their accuracy. Accordingly, the Court finds the accuracy of the exhibits beyond reasonable dispute and will take judicial notice of them. *See Avilez v. Garland*, 69 F.4th 525, 527 n.3 (9th Cir. 2023) (finding judicial notice of immigration case materials proper, as courts "have discretion to take judicial notice of documents 'not subject to reasonable dispute'" (quoting Fed. R. Evid. 201(b)).

**B. *Eteros I* Does Not Bar Defendants' Motion to Dismiss.**

At the outset, Plaintiffs assert that the CIT's holding in *Eteros I* bars Defendants' motion to dismiss under the doctrines of claim and issue preclusion. Dkt. No. 47 at 10–19. The Court disagrees for the reasons below.

1. <u>Claim preclusion does not apply.</u>

Plaintiffs argue that "[t]he CIT's judgment [in *Eteros I*] necessarily decided the core issue presented in this case: whether Eteros can lawfully import, possess, and distribute cannabis equipment in the U.S. without such conduct being 'contrary to federal law,' … when state law authorizes the possession, manufacture, or distribution of such merchandise sufficient to trigger 21 U.S.C. § 863(f)(1)." Dkt. No. 47 at 12. Accordingly, they assert that Defendants may not raise arguments that they failed to raise in *Eteros I*. *Id.*

Claim preclusion—also known as "res judicata"—"applies when there is: (1) identity or privity between the parties; (2) a final judgment on the merits; and (3) identity of claims." *Yagman v. Garcetti*, 673 F. App'x 633, 634 (9th Cir. 2017) (citing *Stewart v. U.S. Bancorp*, 297 F.3d 953,

956 (9th Cir. 2002)). Claim preclusion prevents a party from taking a "second bite at the apple" by raising arguments it could have raised in an earlier litigation. *Id.* In determining whether there is "identity of claims," courts in the Ninth Circuit consider four factors: (1) "whether rights or interests established in the prior judgment would be destroyed or impaired by prosecution of the second action"; (2) "whether substantially the same evidence is presented in the two actions"; (3) "whether the two suits involve infringement of the same right"; and (4) "whether the two suits arise out of the same transactional nucleus of facts." *Id.* (quoting *Turtle Island Restoration Network v. U.S. Dep't of State*, 673 F.3d 914, 917–18 (9th Cir. 2012)).

Plaintiffs cannot show the requisite "identity of claims" between *Eteros I* and this case. In *Eteros I* the CIT cabined its holding to interpreting the Tariff Act and never considered whether the CSA affects immigration-related privileges under the INA or participation in the NEXUS program. *See* 592 F. Supp. 3d at 1322–32. Rather, *Eteros I* held only that an exemption under the CSA, 8 U.S.C. § 863(f)(1), applied to the importation of Eteros's cannabis-related *merchandise* (thus requiring CBP to release the merchandise) because Washington state law "authorized" such merchandise. *Id.* The decision did not involve admissibility determinations, visa petitions, or NEXUS privileges—the subjects of this suit—at all.

Indeed, the CIT could *not* have ruled on the arguments raised here. Like all federal courts, the CIT is a court of limited jurisdiction "conferred solely by statute[.]" *Wirtgen Am., Inc. v. United States*, 447 F. Supp. 3d 1359, 1367 (Ct. Int'l Trade 2020). Under 28 U.S.C. § 1581(a), the CIT has "exclusive jurisdiction of any civil action commenced to contest the denial of a protest, in whole or in part, under section 515 of the Tariff Act of 1930." Before Eteros filed this action, it filed a separate case before the CIT, requesting much of the same relief it seeks here. *Eteros Techs. USA, Inc. v. United States*, 794 F. Supp. 3d 1394 (Ct. Int'l Trade 2025) ("*Eteros II*"). The CIT dismissed that case, explaining that it lacked jurisdiction over Eteros's allegations because they

"pertain[ed] to CBP's actions with respect to the entry of Eteros's executives into the United States" and—"[w]rongful or not"—CBP's actions did "not pertain to 'the denial of a protest' as to 'the exclusion of merchandise from entry.'" *Id.* at 1400. Accordingly, the CIT lacked jurisdiction to consider the claims brought in this lawsuit.

Because the CIT could not have considered the claims in this case, res judicata does not defeat Defendant's motion to dismiss.

2. Issue preclusion does not apply.

Plaintiffs next assert, without citing relevant authority, that issue preclusion (also known as "collateral estoppel") bars Defendants' motion. Dkt. No. 47 at 17. Collateral estoppel "applies only where it is established that (1) the issue necessarily decided at the previous proceeding is identical to the one which is sought to be relitigated; (2) the first proceeding ended with a final judgment on the merits; and (3) the party against whom collateral estoppel is asserted was a party or in privity with a party at the first proceeding." *Hydranautics v. FilmTec Corp.*, 204 F.3d 880, 885 (9th Cir. 2000) (citation modified). Plaintiffs again argue that *Eteros I* determined that their "conduct" was lawful under the CSA, and that Defendants' motion to dismiss amounts to a "collateral[] attack" on that judgment. *Id.* at 18. In Plaintiffs' view, Defendants' motion "attempt[s] to relitigate the legality of Plaintiffs' conduct under federal law." *Id.* at 17.

The Court disagrees. Plaintiffs' construction of *Eteros I* is, again, overly broad. As explained above, the CIT reached only whether Eteros's merchandise could be lawfully imported into Washington state under the Tariff Act and the CSA. It never addressed whether the individual Plaintiffs' work in the cannabis industry could affect their admissibility into the United States or their ability to obtain NEXUS privileges or visas. Indeed, the CIT found these issues to be outside its jurisdiction. *Eteros II*, 794 F. Supp. 3d at 1399–1401. Because *Eteros I* did not decide—or,

indeed, even consider—the issues raised in Defendants' motion to dismiss, issue preclusion does not apply.

In sum, neither claim nor issue preclusion bars consideration of Defendants' motion.

**C. Plaintiffs Failed to Exhaust Administrative Remedies Before Suing Over Their NEXUS Privileges.**

Defendants move to dismiss the NEXUS claim because Plaintiffs did not exhaust their administrative remedies before filing suit. Dkt. No. 40 at 4–7. The NEXUS Trusted Traveler program "allows pre-screened, low-risk travelers from Canada to be processed at the border more quickly." *Gill v. Mayorkas*, C20-939 MJP, 2021 WL 3367246, at *1 (W.D. Wash. Aug. 3, 2021). According to the FAC, CBP revoked McKellar's and James's NEXUS privileges and denied Bjergso's NEXUS application. Dkt. No. 34 ¶¶ 27, 47, 62. Echoing their claim and issue preclusion arguments, Plaintiffs allege that the revocations (and the denial) were "predicated solely on activities previously adjudicated to be lawful" in *Eteros I*. *Id.* ¶ 72. And they allege that they "were given no notice, no individualized explanation, and no opportunity to contest these adverse actions." *Id.* ¶ 73. Doing so, they claim, was arbitrary and capricious and "exceeded [CBP's] authority" in violation of Sections 706(2)(A) and (C) of the APA. *Id.* ¶¶ 69–74. Plaintiffs accordingly ask the Court to vacate CBP's actions.

CBP has promulgated regulations establishing procedures for any individual "whose application is denied or who is removed from the program" to seek redress. *See* 8 C.F.R. § 235.12(j)–(k). Those regulations provide:

> If an applicant is denied participation … CBP will notify the applicant of the denial, and the reasons for the denial. CBP will also provide instructions regarding how to proceed if the applicant wishes to seek additional information as to the reason for the denial. … An individual whose application is denied or who is removed from the program has two possible methods of redress. … The applicant/participant may choose to initiate the redress process through DHS Traveler Redress Program (DHS

> TRIP) [or] … by submitting a reconsideration request to the CBP Trusted Traveler Ombudsman through the online TTP System or other CBP-approved process.

*Id.* Plaintiffs do not allege that they exercised either redress option. In Defendants' view, the Court therefore "lacks a complete administrative record that would be helpful in adjudicating the merits of" Plaintiffs' NEXUS claim. Dkt. No. 40 at 4–7. Defendants also dispute the accuracy of Plaintiffs' allegation that they received no notice, individualized explanation, or opportunity to contest CBP's decisions. *Id.* at 4–7.

CBP issued letters to McKellar, James, and Bjergso, notifying each Plaintiff of the revocation or denial of their NEXUS membership and providing instructions for submitting "Reconsideration Requests" to the ombudsman and a general reason for the revocation. Dkt. No. 40-1 at 3–10.[2] Plaintiffs do not allege that either James or Bjergso submitted reconsideration requests. And while the FAC references a "reconsideration request" submitted by McKellar, Plaintiffs' opposition clarifies that this refers to his now-vacated expedited removal order—not the NEXUS cancellation. *See* Dkt. No. 47 at 21. Plaintiffs do not directly address the exhaustion argument in their opposition.[3]

"Under the doctrine of exhaustion of administrative remedies, a party may not seek judicial review of an adverse administrative decision until the party first pursues all possible relief within the agency." *Young v. Reno*, 114 F.3d 879, 881 (9th Cir. 1997). "[P]roper exhaustion of administrative remedies … means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits)." *Woodford v. Ngo*, 548 U.S. 81, 90 (2006) (emphasis in original) (quoting *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002)). "As

---

[2] As discussed above, the Court takes judicial notice of these documents. *Supra* at Part III.A.

[3] Instead, Plaintiffs argue only that"[t]his Court has already rejected" Defendants' jurisdictional argument. Dkt. No. 47 at 20 (citing Dkt. No. 30 at 10). But this is not the case. In its prior order, the Court rejected Defendants' claim that 8 U.S.C. § 1252(a)(2)(B) divested it of jurisdiction over Plaintiffs' challenge to their NEXUS revocations. Dkt. No. 30 at 10. The Court did not consider the exhaustion argument Defendants now raise.

a general rule[,] courts should not topple over administrative decisions unless the administrative body not only has erred, but has erred against objection made at the time appropriate under its practice." *Id.* (citation modified). Exhaustion "protect[s] administrative authority" and "promot[es] judicial efficiency" by allowing the agency to correct its own mistakes "before it is haled into federal court," preventing piecemeal appeals, and—"where a controversy survives administrative review"—developing a useful record for review. *McCarthy v. Madigan*, 503 U.S. 140, 145 (1992). It additionally "discourages disregard of the agency's procedures." *Woodford*, 548 U.S. at 89 (citation modified).

Where Congress has not required exhaustion, courts may impose such requirement as an act of "sound judicial discretion." *McCarthy*, 503 U.S. at 144. To determine whether exhaustion is required, courts must "balance the interest of the individual in retaining prompt access to a federal judicial forum against countervailing institutional interests favoring exhaustion." *Id.* at 146. There are "at least three broad sets of circumstances in which the interests of the individual weigh heavily against requiring administrative exhaustion:" (1) "where a party could 'suffer irreparable harm if unable to secure immediate judicial consideration'"; (2) "where the administrative agency is not empowered 'to grant effective relief'"; and (3) "'where the administrative body is shown to be biased or has otherwise predetermined the issue before it.'" *United States v. Connell*, 613 F. Supp. 3d 1227, 1233 (N.D. Cal. 2020) (quoting *McCarthy*, 503 U.S. at 146–148). By contrast, requiring exhaustion is favored where the agency proceedings allow the agency to apply its "special expertise" and when bypassing the administrative process could weaken an agency's effectiveness by encouraging disregard of its procedures. *McCarthy*, 503 U.S. at 145. And "[e]xhaustion concerns apply with particular force when the action under review involves exercise of the agency's discretionary power." *Id.* (citing *McKart v. United States*, 395 U.S. 185, 194 (1969)).

These factors counsel against considering Plaintiffs' unexhausted NEXUS claims. Plaintiffs face inconvenience—not irreparable harm;[4] the agency has power to grant effective relief; and CBP's regulations suggest that NEXUS decisions involve the exercise of CBP's discretionary power. *See* 8 C.F.R. § 235.12(j)(2) (providing list of reasons CBP may cite "at its sole discretion" in revoking program participation); *see also McCarthy*, 503 U.S. at 145. Though Plaintiffs challenge "CBP's opaque decision-making" (Dkt. No. 47 at 21), CBP's letters provided a reason (albeit vague) for each NEXUS decision as well as multiple avenues through which Plaintiffs could receive additional information or request reconsideration. *See* Dkt. No. 40-1 at 4. And because Plaintiffs do not allege that they have sought redress through the above procedures, the Court lacks a complete administrative record that could aid it in adjudicating the merits of their APA claim. *See McCarthy*, 503 U.S. at 146 (noting that exhaustion of remedies promotes development of "a useful record for subsequent judicial consideration").

With these considerations in mind, the Court, in its discretion, will dismiss Count I for failure to exhaust. *Compare Shearson v. Holder*, 865 F. Supp. 2d 850, 863 (N.D. Ohio Sep. 9, 2011) ("allowing Plaintiff to sidestep DHS TRIP would significantly undermine the program itself and Congress' intent in creating the program") *with El Ali v. Barr*, 473 F. Supp. 3d 479, 506 (D. Md. 2020) (not requiring exhaustion of administrative remedies where 39 plaintiffs "pleaded robustly" that administrative review procedure "historically offered little redress with no prospects of improvement"). Dismissal will be without prejudice.

---

[4] While an individual may be deemed ineligible for trusted traveler status "if CBP, at its sole discretion, determines that the individual" is inadmissible, trusted traveler status does not guarantee a finding of admissibility or any right of entry into the United States. 8 C.F.R. § 235.12(b)(2)(v).

**D. Plaintiffs' "Dual Policy" APA Claim is Dismissed for Failure to State a Claim.**

Under the APA, a reviewing court may vacate an agency decision that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law[.]" 5 U.S.C. § 706(A). Plaintiffs allege that Defendants "have adopted a contradictory practice" or "dual policy" in "permitting the entry of Eteros USA's products while simultaneously branding its executives as inadmissible narcotics traffickers under INA § 212(a)(2)(C) solely for managing those same lawful operations." Dkt. No. 34 ¶ 82. Such a "dual policy," Plaintiffs argue, is arbitrary, capricious, and contrary to law. *Id.* ¶ 84. Defendants counter that CBP's admissibility determinations do not reflect arbitrary agency action, but rather the reality that CBP makes such determinations pursuant to a different statutory scheme (the INA) than that which applied to the importation of goods in *Eteros I* (the CSA and the Tariff Act). Dkt. No. 40 at 7–12. The Court agrees with Defendants.

Plaintiffs' claims in this suit rest on CBP's determination that the individual Plaintiffs are inadmissible under the INA, 8 U.S.C. § 1182(a)(2)(C)(i). The statute provides:

> Any [noncitizen] who the consular officer … knows or has reason to believe … is or has been an illicit trafficker in any controlled substance or in any listed chemical (as defined in section 802 of title 21), or is or has been a knowing aider, abettor, assister, conspirator, or colluder with others in the illicit trafficking … is inadmissible.

In turn, 21 U.S.C. § 802 defines "controlled substance" as a "drug or other substance, or immediate precursor, included in schedule I, II, III, IV, or V of part B of this subchapter," and "marihuana" (i.e., marijuana or cannabis) is included in schedule I.[5] 21 U.S.C. §§ 802(6), 812.

---

[5] Medical marijuana and FDA-approved marijuana products have recently been reclassified as Schedule III drugs, and the Department of Justice and Drug Enforcement Administration have announced an "expedited" administrative process "to consider the broader rescheduling of marijuana from Schedule I to Schedule III." Press Release, Office of Public Affairs, U.S. Department of Justice, *Justice Department Places FDA-Approved Marijuana Products and Products Containing Marijuana Subject to a Qualifying State-issued License in Schedule III, Strengthening Medical Research While Maintaining Strict Federal Controls* (Apr. 23, 2026), https://www.justice.gov/opa/pr/justice-department-places-fda-approved-marijuana-products-and-products-containing-marijuana. Such reclassification, however, does not bear on the outcome, as a Schedule III drug is a "controlled substance" under 21 U.S.C. § 802(6).

Defendants contest that there is any conflict between their policies on importing cannabis-related merchandise and admitting individuals involved with the cannabis industry. Dkt. No. 51 at 8–9. As to merchandise, Defendants contend that they are merely following the law, as interpreted by the CIT, that provides a narrow exception to the CSA allowing importation of some drug paraphernalia into Washington state. Regarding individuals, Defendants maintain they are bound by the INA, which has long forbidden admission of noncitizens involved in the cannabis industry. To that end, CBP points to a 2018 agency statement issued in response to Canada's legalization of marijuana, clarifying its position on U.S. border crossings made by Canadian citizens. *See* Dkt. No. 40-2 at 21. That statement provides:

> U.S. Customs and Border Protection enforces the laws of the United States and U.S. laws will not change following Canada's legalization of marijuana. Requirements for international travelers wishing to enter the United States are governed by and conducted in accordance with U.S. Federal Law, which supersedes state laws. Although medical and recreational marijuana may be legal in some U.S. States and Canada, the sale, possession, production, and distribution of marijuana or the facilitation of the aforementioned remain illegal under U.S. Federal Law. Consequently, crossing the border or arriving at a U.S. port of entry in violation of this law may result in denied admission … A Canadian citizen working in or facilitating the proliferation of the legal marijuana industry in Canada, coming to the U.S. for reasons unrelated to the marijuana industry will generally be admissible to the U.S. [H]owever, if a traveler is found to be coming to the U.S. for reason[s] related to the marijuana industry, they may be deemed inadmissible.

Dkt. No. 40-1 at 21–23. Accordingly, since at least 2018, CBP has conveyed that it may declare inadmissible Canadian travelers who appear at the U.S. border for reasons related to work in the marijuana industry.

Plaintiffs cite no authority suggesting that the APA requires CBP to treat the admissibility of individuals under the INA consistently with the importation of merchandise under the Tariff Act or the CSA. Indeed, as Defendants point out, the "CIT decision recognize[d] the limited nature of the [CSA] exemption—i.e., that it is limited to the authorization [of marijuana] provided by Washington State." Dkt. No. 40 at 10. In particular, "Washington State can only 'authorize'

persons to partake in the enumerated activities of the [CSA] exemption within the confines of its own borders; if the drug paraphernalia leaves Washington, the 'authoriz[ation]' inquiry begins anew in the context of the new state." *Eteros I*, 592 F. Supp. 3d at 1331 n.27. In contrast, in making admissibility determinations, CBP officers consider whether a noncitizen may enter the United States as a whole. *See* 8 U.S.C. § 1182(a) (setting forth categories of noncitizens who are "ineligible to be admitted *to the United States*" (emphasis added)).

At bottom, Count II fails because Plaintiffs' legal theory is premised on an overly broad interpretation of *Eteros I*. Plaintiffs repeatedly suggest that the CIT sanctioned their business-related "conduct" as lawful when in fact the CIT considered only whether, under the Tariff Act of 1930, merchandise that processes cannabis can be imported in states where marijuana is legal. The CIT did not consider whether or how the CSA interacts with admissibility generally or the INA, 8 U.S.C. § 1182(a)(2)(C), in particular.

Accordingly, Plaintiffs fail to state a claim for relief on their "dual policy" theory, and the Court will dismiss Count II.

**E. Defendants Were Not Required to Engage in Notice-and-Comment Rulemaking.**

Plaintiffs argue that Defendants violated Section 553 of the APA and 19 U.S.C. § 1625(c) by failing to engage in notice-and-comment rulemaking "before implementing a new policy that treats cannabis-related equipment as *per se* unlawful." Dkt. No. 34 ¶¶ 91–92. In support of this claim, Plaintiffs point to a CBP prospective ruling letter ("HQ H327540"), which Plaintiffs argue "explicitly cites the *Eteros* [*I*] and *Keirton* decisions, upholding the legality of importing cannabis-related equipment pursuant to 21 U.S.C. § 863(f)(1)." *Id.* ¶¶ 88–89. Plaintiffs claim that by finding Eteros's "business activities" to be lawful, while still considering Eteros's executives to engage in narcotics trafficking, "Defendants effectively reversed CBP rulings on the subject, including HQ H327540[.]" *Id.* ¶ 89. In Plaintiffs' view, before (purportedly) deviating from the

HQ H327540 ruling, Defendants had to engage in notice-and-comment rulemaking. The Court, however, agrees with Defendants that Plaintiffs have not identified any "rule which finds people *per se* inadmissible" or any new policy that requires such procedures. Dkt. No 40 at 15–16.

The APA mandates procedures for federal agencies engaged in "rulemaking," which it defines as the process of "formulating, amending, or repealing a rule[.]" 5 U.S.C. § 551(5); *see also id.* § 553. The APA defines "rule" to include "statement[s] of general or particular applicability and future effect" that are designed to "implement, interpret, or prescribe law or policy[.]" *Id.* § 551(4). Agencies must follow notice-and-comment rulemaking procedures "when substantive rules are promulgated, modified, or revoked." *Am. Tort Reform Ass'n v. Occupational Safety & Health Admin.*, 738 F.3d 387, 396 (D.C. Cir. 2013) (emphasis omitted). Rules issued through notice-and-comment rulemaking "are often referred to as 'legislative rules' because they have the 'force and effect of law.'" *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015) (quoting *Chrysler Corp. v. Brown*, 441 U.S. 281, 302–03 (1979)).

Not all rules, however, are required to go through the notice-and-comment process. *Id.* The requirement, for instance, "does not apply" to "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice." 5 U.S.C. § 553(b)(A). Although the APA does not define "interpretative rule" (i.e., "interpretive rule"), the Supreme Court has explained that "the critical feature of interpretive rules is that they are 'issued by an agency to advise the public of the agency's construction of the statutes and rules which it administers.'" *Perez*, 575 U.S. at 97 (quoting *Shalala v. Guernsey Mem. Hosp.*, 514 U.S. 87, 99 (1995)). In the immigration context, "[c]ourts require agencies to engage in notice and comment rulemaking when implementing policy changes with substantive consequences for refugees and other immigrants." *Doe v. Trump*, 288 F. Supp. 3d 1045, 1073 (W.D. Wash. 2017).

Plaintiffs identify no substantive rule or policy that CBP issued or revised as to trigger rulemaking requirements. In arguing that Defendants "effectively reversed CBP rulings" permitting the import of their equipment, Plaintiffs rely primarily on HQ H327540 and its citation to the CIT's decision in *Eteros I*. For the reasons discussed, *Eteros I* is inapposite, as it answers only the specific question of whether cannabis-related equipment may be imported under trade law. CBP's enforcement of immigration laws does not amount to a modification or revocation of its prior rulings on the importation of goods under a separate statute. The Court finds nothing in the CBP ruling or *Eteros I* that can be read as exempting individuals who work in the cannabis industry from federal immigration laws. *See Bimini Superfast Operations LLC v. Winkowski*, 994 F. Supp. 2d 106, 122 (D.D.C. 2014) (finding CBP rulings interpreting trade laws that govern cruises could not be read as exempting the foreign individuals manning those cruises from federal immigration laws, thus declining to find any "significant revision" to CBP interpretation requiring notice-and-comment procedures). Because Plaintiffs identify no prior CBP ruling stating that noncitizens who work in the cannabis industry in the United States are not inadmissible under Section 212(a)(2)(C) of the INA, they fail to allege a "change in policy" requiring notice-and-comment rulemaking.[6]

Plaintiffs' claim that 19 U.S.C. § 1625 required such rulemaking likewise fails. Under 19 U.S.C. § 1625, CBP must publish notice and invite public comment on any "proposed interpretive ruling or decision which would … modify … or revoke a prior interpretive ruling or decision." 19 U.S.C. § 1625(c)(1). But, again, Plaintiffs identify no new interpretive ruling that modifies or revokes any prior CBP decision. The Court finds instructive the relief sought by Plaintiffs as to

[6] Plaintiffs also argue that the FAC sufficiently alleges a "hidden" and "new policy of general applicability" deeming individuals who work in the cannabis industry to be inadmissible. Dkt. No. 47 at 27. But the 2018 CBP statement establishes that, for at least eight years, CBP's position has been that noncitizens who work in the cannabis industry and travel to the United States for work may be inadmissible. *See* Dkt. No. 40-1 at 27.

Count III: that "the Court should declare that the judgment in *Eteros I* remains binding on the parties, and that Defendants cannot disregard that judgment or HQ H327540's interpretation absent proper rulemaking." Dkt. No. 34 at 40–41. Plaintiffs do not allege that CBP has declined to permit the import of Eteros's equipment in violation of either *Eteros I* or HQ H327540. Instead, they take issue only with the adjudications CBP officers have made "at the border on a case-by-case basis." Dkt. No. 51 at 15. But Plaintiffs cite no authority suggesting that either the APA or 19 U.S.C. § 1625 required notice-and-comment procedures for admissibility or adverse NEXUS determinations.

Because Plaintiffs fail to identify any new policy or rule that would trigger notice-and-comment requirements, the Court will dismiss Count III of Plaintiffs' FAC.

**F. Plaintiffs Fail to Allege That USCIS Withheld or Delayed a Nondiscretionary Duty.**

The APA imposes a general, nondiscretionary duty on administrative agencies to pass upon matters presented to them within a reasonable time and authorizes a "reviewing court [to] compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). "[A] claim under § 706(1) can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) (emphasis in original). Eteros and James allege that USCIS has unlawfully withheld or unreasonably delayed agency action by failing to issue a final decision on James's L-1A visa petition. Dkt. No. 34 ¶¶ 94–102. Because Plaintiffs have failed to identify a mandatory duty, the Court will grant Defendants' motion to dismiss this claim.

"To achieve temporary, nonimmigrant status, an employment-based applicant may apply for an L-1A visa." *Decor Team LLC v. McAleenan*, 520 F. Supp. 3d 1212, 1215 (D. Ariz. 2021). L-1A visas are available to noncitizens "who within the preceding three years ha[ve] been employed abroad for one continuous year by a qualifying organization" and who will be employed

by that employer in the United States "in a capacity that is managerial, executive, or involves specialized knowledge." 8 C.F.R. § 214.2(l)(1). L-1A visas may be extended in two-year increments, not to exceed a total visa period of seven years. *Id.* § 214.2(l)(15)(ii). If USCIS determines, among other things, that a visa holder is no longer eligible or that approval of the petition "involved gross error," USCIS "shall send to the petitioner a notice of intent to revoke the petition[.]" *Id.* § 214.2(l)(9)(iii)(A). A finally revoked petition may be appealed. *Id.* § 214.2(l)(10).

On October 25, 2024, Eteros filed a visa petition on James's behalf, which USCIS approved on February 11, 2025. Dkt. No. 34 ¶ 53. On March 28, 2025, USCIS issued James a Notice of Intent to Revoke ("NOIR") her approved L-1A visa petition because its prior "approval had been granted in error." *Id.* ¶ 55. According to James and Eteros, however, USCIS never "finalize[d] the revocation process by issuing a final decision either by revoking James's petition or reaffirming its approval." *Id.* ¶¶ 96–97. Thus, "James remains in limbo pending USCIS's final resolution of the matter." *Id.* ¶ 57.

USCIS argues that under the applicable regulations, it is not "required" to take further action following its issuance of a NOIR, and that Plaintiff's claim is premature because her petition remains approved. Dkt. No. 40 at 19–21, Dkt. No. 51 at 13–14. Thus, according to USCIS, James lacks standing because she has not yet suffered any injury. *Id.* Without citing authority, Eteros and James suggest that USCIS "needs to either reaffirm the approval or formally revoke" James's petition. Dkt. No. 47 at 30. *See* Dkt. No. 34 ¶¶ 94–102; Dkt. No. 47 at 27–31. But the regulations do not require USCIS to "finalize" the revocation process by formally issuing a decision. Instead, they state:

> The notice of intent to revoke shall contain a detailed statement of the grounds for the revocation and the time period allowed for the petitioner's rebuttal. The petitioner may submit evidence in rebuttal within 30 days of the date of the

> notice. The Director shall consider all relevant evidence presented in deciding whether to revoke the petition.

8 C.F.R. § 214.2(l)(9)(iii)(B). The NOIR contains the required detailed statement of the grounds for revocation and notifies James of her right to "submit additional information, evidence or arguments to support" her petition. Dkt. No. 40-1 at 24–29.[7] Because the regulations do not require USCIS to issue an additional written decision on revocation after it sends a NOIR to a visa holder, Plaintiffs cannot allege that CBP has failed to undertake a mandatory duty. Plaintiffs in fact concede that "Congress has set no specific statutory deadline for resolving an L-1A NOIR[.]" Dkt. No. 47 at 28. Accordingly, the Court will dismiss Count IV.[8]

**G. Eteros Fails to State a Procedural Due Process Claim.**

In Count V of the FAC, Eteros alleges that Defendants' actions violated the company's Fifth Amendment procedural due process rights. Dkt. No. 34 ¶¶ 103–113. To state a procedural due process claim, a plaintiff must allege: (1) a liberty or property interest protected by the Due Process Clause; and (2) inadequate procedures to protect said interest from erroneous deprivation. *Nozzi v. Hous. Auth. Of City of Los Angeles*, 806 F.3d 1178, 1191–93 (9th Cir. 2015). Eteros contends that it "has cognizable liberty and property interests," including "its right to engage in lawful business activities, to hire and rely on the continued employment of its chosen executives (including those admitted to the United States under valid visas), and to maintain its good name and reputation," as well as "benefits conferred by the government" such as "valid visas, trusted traveler program memberships, and other licenses or permissions[.]" Dkt. No. 34 ¶ 105. Eteros

---

[7] As explained above, the Court takes judicial notice of the NOIR. *Supra* at Part III.A.

[8] In support of Count IV, Eteros and James also assert that USCIS lost "on the very same issue in *Treez, Inc. v. United States Dep't of Homeland Sec.*, No. 22-cv-07027-RS, 2024 WL 4982723 (N.D. Cal. Dec. 3, 2024)[.]" Dkt. No. 34 ¶ 99. *Treez* involved the denial of an H1-B petition and did not consider whether USCIS had a nondiscretionary duty to take additional action after sending a NOIR. *See Treez*, 2024 WL 4982723, at *3–4. Accordingly, *Treez* does not aid James in the current procedural posture of this case.

argues deprivations of these interests cannot occur without due process and underscores that "[c]orporations are persons under the Fifth Amendment." *Id.*; Dkt. No. 47 at 35 n.11. Defendants counter that Eteros has no liberty interest in having its executives admitted to the United States. Dkt. No. 40 at 21 (collecting cases). Defendants also point out that noncitizens seeking admission to the United States, such as McKellar, James, and Bjergso, have "no constitutional rights regarding [their] application[s], for the power to admit or exclude [noncitizens] is a sovereign prerogative." *Id.* (quoting *Landon v. Plasencia*, 459 U.S. 21, 32 (1982)).

The Court agrees with Defendants. First, Eteros fails to grapple with caselaw explaining that a corporation "has no constitutionally protected 'property interest'" in having a noncitizen "admitted into the United States for business purposes." *Spencer Enters., Inc. v. United States*, 229 F. Supp. 2d 1025, 1043 (E.D. Cal. 2001), *aff'd,* 345 F.3d 683 (9th Cir. 2003); *see also Khachatryan v. Blinken*, 4 F.4th 841, 855 (9th Cir. 2021) (holding plaintiff did not have a protected liberty interest in having his father come to the United States where he could "not point to any statute or other source of nonconstitutional law" to support such a liberty interest); *Blacher v. Ridge*, 436 F. Supp. 2d 602, 606 (S.D.N.Y. 2006) (holding company had "no constitutionally protected interest in [a noncitizen's] immigration status") (first citing *Kleindienst v. Mandel*, 408 U.S. 753, 762 (1972) and then citing *Azizi v. Thornburgh*, 908 F.2d 1130, 1134 (2d Cir. 1990)). While a visa program may provide "an opportunity for eligible [noncitizens] to enter the United States," it does not necessarily "create rights in United States' businesses to require admission of non-qualifying [noncitizens]." *Spencer Enters.*, 229 F. Supp. 2d at 1043; *see also Dep't of State v. Muñoz*, 602 U.S. 899, 912 (2024) ("From the beginning, the admission of noncitizens into the country was characterized as of favor and *not of right*." (emphasis in original) (citation modified)). Nor does Eteros address settled law "recogniz[ing] the power to expel or exclude [noncitizens] as a fundamental sovereign attribute exercised by the Government's political departments largely

immune from judicial control." *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (quoting *Shaughnessy v. Mezei*, 345 U.S. 206, 210 (1953)).

Eteros's opposition is notably devoid of any cases that consider procedural due process rights for corporations or individual applicants for admission in the immigration context. Indeed, Eteros cites only *Landon v. Plasencia* to support the proposition that "even [noncitizens] have procedural due process rights in exclusion hearings." Dkt. No. 47 at 34. *Landon* is inapposite. That case considered the scope of the procedural due process rights of legal permanent residents, which Plaintiffs are not. 459 U.S. at 32 ("[A] continuously present resident [noncitizen] is entitled to a fair hearing when threatened with deportation[.]"). Moreover, and unhelpfully to Plaintiffs, *Landon* reaffirms that permanent residents have a different constitutional status than noncitizens seeking admission. *Id.* ("once [a noncitizen] gains admission to our country and begins to develop the ties that go with permanent residence his constitutional status changes accordingly."); *see also Leng May Ma v. Barber*, 357 U.S. 185, 187 (1958) ("[O]ur immigration laws have long made a distinction between" noncitizens "who have come to our shores seeking admission, … and those who are within the United States after an entry[.]"). Though Plaintiffs had obtained visas, they do not dispute that at all relevant times they have been seeking admission.[9] Eteros's arguments ignore this distinction.[10]

---

[9] Holding a visa does not make one admissible, or grant a right of entry to the United States. 8 U.S.C. § 1201(h) ("Nothing in this chapter shall be construed to entitle any [noncitizen], to whom a visa or other documentation has been issued, to be admitted … if, upon arrival at a port of entry in the United States, he is found to be inadmissible under this chapter, or any other provision of law."); *see, e.g.*, *Rohani v. Rubio*, 2:24-CV-00389-LK, 2025 WL 1503950, at *10 (W.D. Wash. May 27, 2025) (explaining that Canadian visa applicants "do not have a right of entry into the United States, they can be found inadmissible, and the Court cannot order [the Government] to admit them into the United States").

[10] Although Eteros insists its "continued enjoyment" of its employees' benefits such as NEXUS trusted traveler status and L-1A work visas is a property interest, it nonetheless admits, as it must, that those authorizations are subject to the "individuals [meeting] the requirements" of each program. Dkt. No. 47 at 34. As discussed, admissibility is a threshold requirement for NEXUS trusted traveler status and an L-1A work visa.

To the extent Plaintiffs allege due process violations for reputational harm suffered based on the "stigma-plus" doctrine, those claims also fail. Dkt. No. 34 ¶ 105; Dkt. No. 47 at 31–33. To assert a stigma-plus due process claim, a plaintiff must "show the public disclosure of a stigmatizing statement by the government, the accuracy of which is contested, plus the denial of 'some more tangible interest[] such as employment,' or the alteration of a right or status recognized by state law." *Ulrich v. City & Cnty. of San Francisco*, 308 F.3d 968, 982 (9th Cir. 2002) (quoting *Paul v. Davis*, 424 U.S. 693, 701 (1976)). "Where these elements exist, the plaintiff is 'entitled to notice and a hearing to clear his name.'" *Id.* (quoting *Bollow v. Fed. Rsrv. Bank*, 650 F.2d 1093, 1100 (9th Cir. 1981)). "[A] cognizable constitutional wrong must be joined with the defamation claim in order to state a stigma-plus claim." *Miller v. Calif.*, 355 F.3d 1172, 1178 (9th Cir. 2004). Accordingly, a stigma-plus plaintiff must "show loss of a recognizable property or liberty interest in conjunction with injury to their reputation." *Id.* at 1179.

Plaintiffs not only fail to show the requisite loss of property or liberty interests, they do not allege any *public* disclosure of a stigmatizing statement made by the government. *See Wenger v. Monroe*, 282 F.3d 1068, 1074 n.5 (9th Cir. 2002) (intra-governmental disclosure is insufficient to make stigma-plus claim because it is not a "public disclosure"); *Bollow*, 650 F.2d at 1101 ("Unpublicized accusations do not infringe constitutional liberty interests" under stigma-plus test "because, by definition, they cannot harm good name, reputation, honor, or integrity." (citation modified)). "[P]ublic disclosure is a *necessary* element of a stigma-plus claim that must be alleged at the pleadings stage." *Ochoa v. City of Los Angeles*, 2:20-CV-06963-AB-AGR, 2025 WL 3248088, at *8 (C.D. Cal. Aug. 11, 2025) (emphasis in original) (citing *Chaudhry v. Aragon*, 68 F.4th 1161, 1171 (9th Cir. 2023)). Plaintiffs' failure to allege a public disclosure is fatal to any stigma-plus due process claims.

Finally, Eteros's due process claim is undermined by the fact that its employees have been afforded some process. For example, James alleges she invoked the review process following receipt of her NOIR and submitted materials to USCIS for consideration. Dkt. No. 34 at 20–21. McKellar likewise alleges he petitioned for reconsideration of his ERO, which was denied initially, and then ultimately granted. *Id.* at 11–13. Other process remains available to Plaintiffs that they have so far refused to pursue: the individual Plaintiffs have to date failed to seek administrative relief regarding their NEXUS Trusted Traveler status and their FOIA requests. *See* Dkt. No. 40-1 at 4–10 (NEXUS letters providing opportunity to request reconsideration or additional information); *id.* at 37–39 (letter providing administrative appeal instructions regarding FOIA request). Eteros does not explain what additional process it is entitled to. Rather, the core of its claim simply challenges the merits of CBP's enforcement of the INA. *See Next Gen. Tech., Inc. v. Johnson*, 328 F. Supp. 3d 252, 271–72 (S.D.N.Y. 2017) (no due process violation where USCIS issued NOIR "in compliance with the applicable regulations[,]" "duly notified [employer] of its 30-day reply window to respond[,]" and included "a statement of the grounds for the intended revocation").

Because Eteros fails to sufficiently plead a liberty or property interest protected by the Due Process Clause, its procedural due process claim fails, and the Court will dismiss Count V of the FAC.

**H. James and McKellar Failed to Exhaust Administrative FOIA Remedies.**

Enacted to "ensure an informed citizenry," FOIA requires federal agencies to disclose information to the public upon request. *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978); 5 U.S.C. § 552(a)(3)(A). Upon receipt of a FOIA request, an agency has twenty working days to decide whether to comply and inform the requestor of its decision. 5 U.S.C. § 552(a)(6)(A)(i). If the requester is dissatisfied with the response, they may seek judicial review,

"but must first exhaust available administrative remedies, including an appeal within the agency." *Aguirre v. U.S. Nuclear Regul. Comm'n*, 11 F.4th 719, 725 (9th Cir. 2021) (citing 5 U.S.C. § 552(a)(6)(A)(i)–(ii), (C)(i)). "[C]ourts can waive the [exhaustion] requirement when … further administrative proceedings would prove futile." *Id.*

Plaintiffs McKellar and James allege that "[o]n multiple occasions," between July 2024 and February 2025, Plaintiffs McKellar and James submitted FOIA requests to Defendants CBP and USCIS seeking records concerning: (1) their border encounters with CBP on June 11, 2024, October 4, 2024, and April 29, 2025; (2) the expedited removal order issued to McKellar; (3) the 5-year ban imposed on McKellar; (4) the inadmissibility determinations issued against McKellar; (5) the referral of James's L-1A visa petition to USCIS; (6) the revocation of James's and McKellar's NEXUS privileges; and (7) "related determinations." Dkt. No. 34 ¶ 116. Plaintiffs allege that Defendants "failed to timely and lawfully respond," and thus "improperly withheld agency records" within the meaning of 5 U.S.C. § 552(a)(4)(B). *Id.* ¶¶ 117–18.

Crucially, however, Plaintiffs do not allege that they properly exhausted their remedies by pursuing an administrative appeal, and instead argue the Court should waive the exhaustion requirement. *See* Dkt. No. 47 at 41–42. But Plaintiffs do not sufficiently allege facts showing that further administrative proceedings would be futile. To the contrary, the letters from USCIS responding to the FOIA request—which produce responsive pages and explain that the requester may file an administrative appeal—do not suggest futility. *See Aguirre*, 11 F.4th at 727 (affirming district court's rejection of futility argument where the agency "engaged with [plaintiff] throughout the process, provided him with an interim production … and eventually completed its response").

Accordingly, the Court will dismiss Count VI without prejudice.

**I. The Court Declines to Grant Leave to Amend.**

The Court declines to grant Plaintiffs leave to amend their dismissed claims. When assessing the propriety of leave to amend, courts consider five factors: bad faith, undue delay, prejudice to the opposing party, futility, and prior amendment. *United States v. Corinthian Colls.*, 655 F.3d 984, 995 (9th Cir. 2011) (citing *Johnson v. Buckley*, 356 F.3d 1067, 1077 (9th Cir.2004)). "In dismissing for failure to state a claim, a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Ebner v. Fresh, Inc.*, 838 F.3d 958, 963 (9th Cir. 2016) (quoting *Doe v. United States*, 58 F.3d 494, 497 (9th Cir. 1995)). Here, Plaintiffs have not sought leave to amend, and the parties' briefs do not address the issue. Additionally, Plaintiffs have already amended their pleading after the Court dismissed part of their original complaint. Dkt. Nos. 30, 34. And further amendment would be futile because Plaintiffs' claims are predicated upon an inherently flawed legal theory—namely, that *Eteros I* requires CBP to find individuals who work in the cannabis industry exempt from the INA. The Court cannot "conceive of facts that would render" their claims "viable." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 701 (9th Cir. 1988) (citation modified). Thus, the Court will not grant Plaintiffs leave to amend.

**IV. CONCLUSION**

For all these reasons, the Court will GRANT Defendants' motion to dismiss without prejudice and without leave to amend. Dkt. No. 40.

Dated this 30th day of July, 2026.

Kymberly K. Evanson
United States District Judge